18
WANGER JONES HELSLEY PC
Kurt F. Vote #160496
265 E. River Park Circle, Ste. 310
Fresno, CA 93720
Telephone:   (559) 233-4800
Email:         kvote@wjhattorneys.com

MacCONAGHY & BARNIER, PLC
John H. MacConaghy #83684
Jean Barnier #231683
645 First Street West, Ste. D
Sonoma, CA  95476
Telephone:   (707) 935-3205
Email:         macclaw@macbarlaw.com

Attorneys for Plaintiff Randy Sugarman, Liquidating Trustee

IN THE UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| In re<br><br>GREGORY JOHN TE VELDE,<br><br>Debtor. | CASE NO.  18-11651<br><br>Chapter 11 |
| RANDY SUGARMAN, LIQUIDATING TRUSTEE,<br><br>Plaintiff,<br><br>v.<br><br>IRZ CONSULTING, LLC, an Oregon limited liability company ; and LINDSAY CORPORATION, a Delaware corporation, doing business under the fictitious name of IRZ CONSTRUCTION DIVISION, LLC;<br><br>Defendant. | Adv. Proc. No.:  19-1033 |

**FIRST AMENDED COMPLAINT (1) OBJECTING TO CLAIM, (2) FOR DAMAGES FOR BREACH OF CONTRACT, (3) FOR DAMAGES FOR NEGLIGENCE, AND (4) FOR AVOIDANCE OF FRAUDULENT TRANSERS**

Plaintiff Randy Sugarman, Liquidating Trustee ("Plaintiff"), alleges against Defendant IRZ Consulting, LLC and Lindsay Corporation as follows:

## INTRODUCTION

1. This is an action objecting to a Proof of Claim filed by Defendant IRZ Consulting Services, LLC in the amount of $347,057.56 allegedly due and payable for the design and project management services provided by the Defendant in the development of a waste water treatment and disposal system for a 30,000 cow dairy. The system was improperly designed and constructed resulting in catastrophic environmental liabilities, lost operating revenues, and loss of land value to the estate in an amount currently unknown, but estimated to be in excess of $18,550,000. The Plaintiff seeks recovery of those damages from IRZ Consulting, LLC and its affiliate Lindsay Corporation, which did business as a fictitious, unlicensed entity named "IRZ Construction Division, LLC, an Oregon limited liability company", as a counterclaim for breach of contract and negligence. The Plaintiff further seeks avoidance of a partial waiver of damages provision contained in the relevant contracts, applicable to the negligence cause of action only, as a fraudulent transfer pursuant to 11 U.S.C. Section 544(b).

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157, 28 U.S.C. § 1331 and 1334, and 11 U.S.C. § 502 and 506.

3. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (H), and (O) and FRBP 3007(b) and 7001(a)(2). Plaintiff consents to the entry of a judgment in this matter by the Bankruptcy Court. Defendant IRZ Consulting, LLC has consented to entry of final judgment in this matter by the Bankruptcy Court by the filing of its Proof of Claim No. 19 in the Main Case, a correct copy of which is attached to this Complaint and labeled Exhibit 1.

4. This adversary proceeding relates to the Chapter 11 Case No. 18-11651, *In re Gregory John te Velde* (the "Main Case"), filed on April 26, 2018 which is currently pending before this Court.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

## PARTIES

FIRST AMENDED COMPLAINT OBJECTING TO CLAIM, ETC.
-2-

6. Plaintiff is the duly qualified and acting Liquidating Trustee of the estate of Gregory John te Velde ("Estate") pursuant to a confirmed Plan of Reorganization in the Main Case.

7. Defendant IRZ Consulting, LLC ("IRZ") is an Oregon limited liability company engaged in the business of the design, planning and construction of large scale dairies and agricultural waste water management and irrigation systems. Plaintiff is informed and believes and on that basis alleges that Defendant IRZ was at all relevant times a wholly owned subsidiary of Defendant Lindsay Corporation.

8. Defendant Lindsay Corporation is a Delaware corporation and is sued herein for the wrongful acts of its fictious, unlicensed subsidiary, "IRZ Construction Division, an Oregon limited liability company."

**GENERAL ALLEGATIONS**

**A. The Debtor's Development Plans for the Lost Valley Farm**

9. As of the year 2015, the Debtor Gregory te Velde was an experienced dairy operator, and part of a multi-generational family of dairymen who owned or controlled thousands of acres of land and a number of dairies across the Western United States. As of the year 2015, the Debtor owned and operated two large dairies in Tulare County, California and one large dairy near Boardman, Oregon, which was known as the Willow Creek Dairy.

10. Sometime on or about the year 2015, the Debtor became interested in acquiring the "Lost Valley Farm", a 7288 +/- acre parcel of land near Boardman Oregon.. The Debtor's Plan was to develop the Lost Valley Farm into another large dairy with the capacity to milk approximately 30,000 dairy cows, starting with his cows then located at Willow Creek Dairy.

11. Prior to the Debtor's acquisition of the Lost Valley Farm, it was owned and operated by an entity named Boardman Tree Farm, LLC and used for growing and harvesting cultivated poplar trees used in the manufacture of plywood and other building products. As of 2015, approximately one-half of the acreage of the Lost Valley Farm was still planted with these stands of commercial trees.

12. By the year 2015, the Debtor knew that in order to develop the Lost Valley Farm into a dairy, he was required to obtain a "Confined Animal Feeding Operation" permit ("CAFO") from the Oregon Department of Agriculture ("ODA") and other land use entitlements. The Debtor further learned that the Lost Valley Farm was in an environmentally sensitive area with elevated levels of nitrates in the groundwater, and that in order to obtain and maintain a CAFO he would be required to construct a sophisticated system to dispose of millions of gallons of liquid waste and tons of solid dairy waste, in an environmentally responsible manner. The Debtor concluded that he required professional assistance to determine the feasibility of constructing such a system, and design and project management of the system if determined to be feasible.

**B.    The 9/30/15 Work Order with Defendant Lindsay Corporation dba "IRZ Construction Division an Oregon limited liability company ('ICD')"**

13. On September 30, 2015, prior to his acquisition of the Lost Valley Farm, the Debtor and entered into a written "Work Order" for the Lost Valley Farm (referred to therein as "Willow Creek Dairy") with an alleged entity known as "IRZ Construction Division, an Oregon limited liability company (ICD)", a correct copy of which is attached to this Complaint and labeled Exhibit 1.

14. Plaintiff thereafter discovered that "IRZ Construction Division, LLC" (hereinafter referred to as "ICD") was a wholly fictitious entity as of September 30, 2015. ICD was not organized as a limited liability or other business entity in the State of Oregon or any other state and it was not duly licensed as a contractor by the State of Oregon, which was required to perform the services described in the "Work Order". ICD was simply a fictitious name under which Defendant Lindsay Corporation did business, as evidenced in party by ICD's invoices to the Debtor, a sample of which is attached to this Complaint and labeled Exhibit 2, identifying the billing entity as "ICD IRZ Construction Division by Lindsay".

15. Among other things, in the "Work Order" Defendant Lindsay agreed to provide the following services to the Debtor on a time and materials basis not to exceed $100,000:

- GPS generated site map with elevations
- Site plan with structure, corral, and waste handling locations

- Preliminary grading plan to be used for mass excavation calculations
- Preliminary infrastructure plan to include onsite drain lines, underground water lines and underground power lines
- Preliminary effluent water flow line plan to include lines from site drainage, structures, corrals, and effluent handling components to lagoon systems
- Preliminary lagoon design detailed enough to satisfy CAFO application requirements
- Preliminary cost estimates for project
- Estimated schedule to construct project

16. The Work Order included the implied covenant on the part of Defendant Lindsay to perform its services in a competent manner, consistent with the skill, diligence, and expertise of licensed contractors providing wastewater management and irrigation construction services in the Pacific Northwest.

17. The Work Order further included a provision purporting to limit Defendant Lindsay's damages for negligence (though not breach of contract), providing in 6 point type, "**Liabilities**. The client agrees to limit ICD's liability to the client and to all construction contractors and subcontractors on the project, due to ICD's or any employee of ICD's negligent acts, errors, or omissions, such that the total aggregate limit of ICD to all those names shall not exceed $50,000, or the amount of ICD's fees, whichever is less."

18. Following the execution of the Work Order, Defendant Lindsay provided certain services to the Debtor, including a preliminary plan for the development and construction of the wastewater management and irrigation aspects of the dairy the Debtor hoped to construct. Based on Defendant Lindsay's opinion and services, the Debtor concluded that he could likely obtain a CAFO and purchase and develop the Lost Valley Farm into a 30,000 cow dairy in an environmentally and economically sustainable manner.

19. In particular, Defendant Lindsay proposed a development and construction scheme whereby minimal dairy waste from a large dairy herd would be released directly on to the ground where it had the potential to leach to groundwater. Instead, the waste from the large

confined dairy stalls holding thousands of animals was to drain by a timed water pressure flushing system over impermeable surfaces and collect in catch basins. From there it was to be piped to a concrete-lined "sand lane" settling area and separated into liquid and solid components. The liquid components were to be pumped into two (2) massive settling basins, where they would further separate and settle and then the liquid would drain into six (6) massive lined lagoons. All of the solid materials generated by the process was to be turned into high grade commercial compost. The liquid components, once sufficiently diluted, were to be pumped out of the lagoons and "land applied" at regulated rates by huge irrigation pivots over the thousands of acres of land not used by the dairy and wastewater processing facilities. Both the processed liquid and solid wastes would act as fertilizer to grow feed for the dairy cattle and other commercial crops.

20.　　In summary, the point of the development and construction scheme was to make the anticipated dairy operation at the Lost Valley Farm a self-contained waste-recycling system, dispersing the huge amount of waste over such a large area that the nitrogen and other nutrients contained in the waste could be absorbed by the growing crops without polluting the groundwater.

21.　　Based on, and in reliance of the preliminary development and construction scheme devised by the Defendant Lindsay, the Debtor completed an application for an individual CAFO permit from the ODA and the Oregon Department of Environmental Quality (DEQ).

**C.　　The Debtor's Purchase and Leaseback of the Lost Valley Farm**

22.　　Further, also in reliance on the preliminary development and construction scheme devised by the Defendant Lindsay, on November 12, 2015, the Debtor purchased the Lost Valley Farm from Boardman Tree Farm, LLC for the sum of $65 Million, payable by a $10 Million down payment and a $55 Million purchase money note and deed of trust.

23.　　As part of this purchase transaction, the Debtor executed an "Agricultural Lease" for a portion of the land back to BTF. The provisions of the Agricultural Lease provided that BTF would have a diminishing leasehold on the subject property through 2026, commencing with an initial leasehold of 3566 acres for which it would pay $37.50 acre per month. As BTF harvested trees, it would release the harvested land back to the Debtor for a corresponding reduction of rent, diminishing to a few hundred acres in 2026. The Debtor agreed to this

arrangement to be able to offset the debt service due BTF under the purchase money note and deed of trust during the period of time he planned to bring the dairy operation to full capacity.

### D. The 11/17/15 Agreement with Defendant IRZ

24. On November 17, 2015, shortly after the Debtor closed the purchase on the Lost Valley Farm, the Debtor entered into a written contract with the Defendant IRZ entitled "Design, Engineer, and Project Management Services for Greg Tevelde Willow Creek Dairy Construction Project November 2015" ("the 11/17/15 Agreement") on an IRZ form providing that IRZ would perform 21 separate construction related tasks for the Willow Creek Dairy referred to as the "SCOPE OF WORK". A correct copy of the 11/17/15 Agreement is attached to this Complaint and labeled Exhibit 3.

25. The "SCOPE OF WORK" was part of the same work of improvement referenced in the Work Order and included the performance of the following services in a competent manner, consistent with the skill, diligence, and expertise of licensed contractors providing dairy wastewater management and irrigation construction services in the Pacific Northwest :

- Final site plan with structure, corral, and waste handling locations
- Final grading plan to be used for mass excavation calculations
- Final infrastructure plan to include onsite drain lines, underground water lines and underground power lines
- Final effluent water flow line plan to include lines from site drainage, structures, corrals, and effluent handling components to lagoon systems
- Final lagoon design sufficient to satisfy CAFO requirements
- All construction management and oversight of the Debtor's subcontractors and materialmen to ensure that the construction was undertaken in accordance with Defendant's plans and in a manner which would enable the Debtor to lawfully operate under his CAFO once the dairy was commissioned.

26. The 11/17/15 Agreement further included a provision purporting to limit Defendant IRZ's damages for negligence (though not breach of contract), providing in 6 point

FIRST AMENDED COMPLAINT OBJECTING TO CLAIM, ETC.

-7-

type at Section 6.01 A "**ICD Liability**. It is agreed by OWNER that ICD may be liable for damages directly caused by negligent acts, errors, or omissions made by ICD. Under no circumstances shall that amount exceed $500,000 or the amount of ICD's fees whichever is lower. Under no circumstances shall ICD be liable for negligent acts, errors, and omissions of OWNER or SUBCONTRACTORS".

27.　　The Debtor performed all conditions precedent and concurrent to the Estates' right to enforce the Work Order and the 11/17/15 Agreement against Defendants, except those conditions which were excused by the material breaches of Defendants described below.

28.　　As of the date of the Work Order, Defendants knew or should have known of the existence of the Agriculture Lease with BTF and the fact the BTF was still occupying approximately half of the Lost Valley Farm for its commercial tree farming operation. The vast stands of BTF's trees on the Lost Valley Farm, generally 50 feet tall, were and are readily and easily noticeable by an inspection of the site.

29.　　Also as of the date of the Work Order, Defendants knew or should have known of (a) the estimated daily volume of liquid and solid waste the Debtor's planned dairy herd was likely to produce, (b) the estimated acreage and number of irrigation pivots required to disperse the liquid waste in a lawful manner, (c) the fact that "land application" of the liquid waste required that the irrigation system be regularly flushed out with massive amounts of fresh water, (d) fresh water in these amounts was available to the Lost Valley Farm only for the period from April 1 through October 31 of each each year due to its limited irrigation rights with the Columbia Improvement District, and (e) during the period November 1 through March 31 of each year, all liquid waste would need to be stored in the settling lagoons in an environmentally responsible manner until fresh water was available to resume land application, at rates allowed by the CAFO permit and its accompanying Animal Waste Management Plan ("AWMP").

30.　　From and after the Work Order, the Defendants performed certain services for the Debtor and was paid approximately $850,000 by the Debtor for those services. Concurrently with the performance by Defendants for their services, and in reliance that those services would be performed in accordance with the Agreements, the Debtor incurred additional debts of not less

than $25 Million in completing the mega dairy encompassed by the Defendant' development and construction scheme which he used for various purposes, including funding the construction of dairy buildings and improvements on the site, funding the purchase and installation of the pivot irrigation system, assembling a dairy herd of approximately 12,000 animals, and funding the construction of the waste water system included within Defendants' services under the Agreements.

31.　Following the issuance of the Debtor's CAFO and other entitlements on March 31, 2017, the Debtor partially commissioned the dairy by mid- 2017 it was operating at 40% capacity.

### E. Defendants' Breach of Contract and the Estate's General Damages

32.　Sometime after 9/30/15 and 11/17/15, as applicable, Defendants breached their obligations under the Work Order and the 11/17/15 Agreement by failing to provide competent services to the Debtor consistent with the skill, diligence, and expertise of licensed contractors providing wastewater management and irrigation construction services in the Pacific Northwest, and by billing the Debtor for services incompetently performed. Specifically and without limitation, Defendants committed the following acts and omissions:

- Failed to prepare an adequate and competent preliminary and/or final site plan with structure, corral, and waste handling locations
- Failed to prepare an adequate and competent preliminary and/or final grading plan to be used for mass excavation calculations
- Failed to prepare an adequate and competent preliminary and/or final infrastructure plan to include adequate onsite drain lines, underground water lines and underground power lines
- Failed to prepare an adequate and competent preliminary and/or final effluent water flow line plan to include adequate lines for site drainage, structures, corrals, and effluent handling components to the lagoon systems

- Failed to prepare an adequate and competent preliminary and/or final lagoon design sufficient to satisfy the Debtor's obligations under his CAFO permit and other dairy entitlements
- Most egregiously, prepared a defective irrigation plan and failed to advise the Debtor that there were too many acres under lease to Boardman Tree Farm, LLC to enable the Debtor to install a sufficient number of irrigation pivots to properly dispose of the effluent from a 12,000 head dairy herd.
- Prepared a defective site plan which provided insufficient grade in the dairy stalls and an inadequate flushing system for the waste to flow into the catch basins
- Specified the use of porous decomposed granite for the bedding of the dairy stalls, which absorbed and became saturated with the waste, preventing the waste from flowing by gravity into the catch basins
- Specified underground piping of insufficient diameter and flow, so that the underground waste pipes consistently clogged and backed up
- Specified inadequate impermeable surface areas throughout the system, particularly at the sand lane, so that waste regularly came in contact with unprotected soil
- Specified overflow pipes and drains at improper heights so that effluent improperly spilled out of the lagoons and the sand lane areas.
- Failed to adequately perform its construction management and oversight of the Debtor's subcontractors and materialmen to ensure that the construction was undertaken in accordance with Defendant's plans, to the extent those plans were not defective, and in a manner which would enable the Debtor to lawfully operate under his CAFO once the dairy was commissioned.

33. Due to the development process of the Lost Valley Farm, these breaches of contract could not have been discovered through the exercise of reasonable diligence prior to April 27, 2016.

34. The contract price for these defective and incompetent services was the approximate sum of $1,243,476.80, of which approximately $850,000 has been paid.

35. As a direct and proximate result of the Defendant IRZ's breach of contract, as alleged above, the Estate has been generally damaged in the amount of $850,000, representing the amount paid by the Debtor to Defendants for their worthless services.

### F. The Estate's Consequential Damages

36. The Plaintiff Trustee is informed and believes and on that basis alleges that had the Defendants complied with their contractual obligations to the Debtor and the Estate to properly perform the services described in the Work Order and 11/17/15 Agreement, the current value of the Lost Valley Farm would be not less than $85 Million.

37. At all relevant times, Defendants were aware of the enforcement sanctions of the ODA's CAFO program and the Debtor's obligations under the CAFO, as evidenced by the fact that the Work Order expressly refers to Defendant IRZ providing services related to the CAFO program.

38. Shortly after substantial dairy operations commenced at the Lost Valley Farm, the waste water management system failed in multiple respects. Large amounts of liquid and solid dairy waste backed up, overflowed, and were released onto bare soil. As required by his CAFO, the Debtor self-reported most of these incidents, resulting in extremely aggressive enforcement action taken by the ODA against the Debtor, including fines in the approximate amount of $187,000, the largest ever issued in the CAFO program.

39. More importantly, the net result of Defendants' multiple breaches of contact is that, over time, millions and millions of gallons of dairy waste backed up in the lagoons, since more waste was being created on a daily basis than could be "land applied", given the inadequate number of irrigation pivots specified by Defendants.

40. Due to the fact that this imbalance of waste production over lawful waste treatment and removal, if left unchecked, would result in an overflow of thousands of gallons of liquid waste and manure out of the lagoons and onto unprotected areas, the ODA filed administrative and

FIRST AMENDED COMPLAINT OBJECTING
TO CLAIM, ETC.

-11-

judicial proceedings against the Debtor and the Estate to revoke the CAFO permit and compel a decommissioning of the dairy.

41. The regulatory enforcement actions by the ODA and the resulting revocation of the CAFO permit, both the direct, foreseeable, and proximate cause of the breach of contract by Defendants as alleged above, substantially impaired the value of the Lost Valley Farm by requiring the Plaintiff Trustee to shut down all revenue producing dairy operations, liquidate the dairy herd at depressed auction prices, perform extensive remediation of the backed up dairy waste and sell the Lost Valley Farm at a significant loss. . The ODA's regulatory actions against the Debtor and the Estate culminated in an Order and Mutual Agreement between the Plaintiff and the ODA, a correct copy of which is attached to this Complaint and labeled Exhibit 4.

42. Thus, as a direct, foreseeable, and proximate cause of the Defendants' breach of contract, the Estate has suffered consequential damages in an amount not less $18,987,000 consisting of the following: (1) direct remediation costs of the excess effluent on the Lost Valley Farm in the approximate amount of $3,500,000, (2) loss of profits from dairy revenues in the approximate amount of $3,000,000, (3) professional fees to counsel and environmental consultants in responding to the ODA's enforcement actions in the approximate amount of $300,000, (4) fines assessed by the ODA in the approximate amount of $187,000, and (5) loss of value to the Lost Valley Farm land in the approximate amount of $12,000,000.

### FIRST CLAIM FOR RELIEF
(Objection to Proof of Claim - 11 U.S.C § 502(b))
(Against Defendant IRZ Only)

43. Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 42, inclusive.

44. On June 4, 2018, the Defendant IRZ filed its Proof of Claim No. 19 in the Main Case herein the amount of $347,057.56 for breach of contract and quantum meruit. A correct copy of that Proof of Claim is attached to this Complaint and labeled Exhibit 1.

45. Pursuant to the provisions of Section 502(b)(1) this Proof of Claim is entirely unenforceable against the Debtor, and the property of the Debtor due to the fact that it was the Defendant IRZ and its parent Defendant Lindsay who breached the Work Order and the 11/17/15 Agreement, as alleged in detail above, and commenced the services in question without a valid Oregon Contractor's license, and no further sums are due the Defendant from the Estate.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## SECOND CLAIM FOR RELIEF
(Counterclaim for Breach of Contract – FRBP 7001, 7013, and 3007)
(Against All Defendants)

46. Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 45, inclusive.

47. At the times and in the manner alleged above, Defendants breached their obligations under the Work Order and the 11/17/18 Agreement to the Debtor and the Estate.

48. The Debtor performed all conditions precedent and concurrent to the Estates' right to enforce the Work Order and the 11/17/15 Agreement against Defendants, except those conditions which were excused by the material breaches of Defendants described above.

49. As a direct and proximate result of the Defendants' breach of contract, as alleged above, the Estate has been generally damaged in the amount of $850,000, representing the amount paid by the Debtor to Defendants for their worthless services.

50. Further, as a direct, foreseeable, and proximate cause of the Defendants' breach of contract, the Estate has suffered consequential damages in an amount not less $18,987,000 consisting of the following: (1) direct remediation costs of the excess effluent on the Lost Valley Farm in the approximate amount of $3,500,000, (2) loss of profits from dairy revenues in the approximate amount of $3,000,000, (3) professional fees to counsel and environmental consultants in responding to the ODA's enforcement actions in the approximate amount of

$300,000, (4) fines assessed by the ODA in the approximate amount of $187,000, and (5) loss of value to the Lost Valley Farm land in the approximate amount of $12,000,000.

WHEREFORE, Plaintiff prays for judgment as described below.

### THIRD CLAIM FOR RELIEF
(Counterclaim for Negligence – FRBP 7001, 7013, and 3007)
(Against All Defendants)

51. Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 50, inclusive.

52. At all relevant times, the Defendants held themselves out to members of the general public to be an experienced licensed contractor with special expertise in the areas of large scale agricultural irrigation and waste water design, and large scale dairies.

53. As such Defendants owed a duty to the Debtor to perform such services on the Debtor's behalf in a competent manner, and to exercise the diligence, care, and skill in the performance of such services, consistent with the skill, diligence, and expertise of other licensed contractors providing wastewater management and irrigation and large dairy construction services in the Pacific Northwest.

54. Sometime after 9/30/15, Defendants breached their duty of care to the Debtor by failing to provide competent services to the Debtor, consistent with the skill, diligence, and expertise of licensed contractors providing wastewater management and irrigation construction services in the Pacific Northwest, and by billing the Debtor for services incompetently performed. Specifically and without limitation, Defendants committed negligently committed the following acts and omissions:

- Failed to prepare an adequate and competent preliminary and/or final site plan with structure, corral, and waste handling locations
- Failed to prepare an adequate and competent preliminary and/or final grading plan to be used for mass excavation calculations

- Failed to prepare an adequate and competent preliminary and/or final infrastructure plan to include adequate onsite drain lines, underground water lines and underground power lines
- Failed to prepare an adequate and competent preliminary and/or final effluent water flow line plan to include adequate lines for site drainage, structures, corrals, and effluent handling components to the lagoon systems
- Failed to prepare an adequate and competent preliminary and/or final lagoon design sufficient to satisfy the Debtor's obligations under his CAFO permit
- Most egregiously, prepared a defective irrigation plan and failed to advise the Debtor that there were too many acres under lease to Boardman Tree Farm, LLC to enable the Debtor to install a sufficient number of irrigation pivots to properly dispose of the effluent from a 12,000 head dairy herd.
- Prepared a defective site plan which provided insufficient grade in the dairy stalls and an inadequate flushing system for the waste to into the catch basins
- Specified the use of porous decomposed granite for the bedding of the dairy stalls, which absorbed and became saturated with the waste, preventing the waste from flowing into the catch basins
- Specified underground piping of insufficient diameter and flow, so that the underground waste pipes consistently clogged and backed up
- Specified inadequate impermeable surface areas throughout the system, particularly at the sand lane, so that waste regularly came in contact with unprotected soil
- Specified overflow pipes and drains at improper heights so that effluent improperly spilled out of the lagoons and the sand lane areas.
- Failed to adequately perform its construction management and oversight of the Debtor's subcontractors and materialmen to ensure that the construction was undertaken in accordance with Defendant's plans, to the extent those plans

FIRST AMENDED COMPLAINT OBJECTING
TO CLAIM, ETC.

-15-

were not defective, and in a manner which would enable the Debtor to lawfully operate under his CAFO once the dairy was commissioned.

55. Due to the development process of the Debtor, this negligence could not have been discovered through the exercise of reasonable diligence prior to April 27, 2016.

56. As a direct and proximate result of the Defendants' negligence, as alleged above, the Estate has been generally damaged in the amount of $850,000, representing the amount paid by the Debtor to Defendants for their worthless services.

57. Further, as a direct, foreseeable, and proximate cause of the Defendants' negligence, the Estate has suffered consequential damages in an amount not less $18,987,000 consisting of the following: (1) direct remediation costs of the excess effluent on the Lost Valley Farm in the approximate amount of $3,500,000, (2) loss of profits from dairy revenues in the approximate amount of $3,000,000, (3) professional fees to counsel and environmental consultants in responding to the ODA's enforcement actions in the approximate amount of $300,000, (4) fines assessed by the ODA in the approximate amount of $187,000, and (5) loss of value to the Lost Valley Farm land in the approximate amount of $12,000,000.

58. The two contracts executed by the Debtor in favor Defendants contain provisions for a partial waiver of damages which purport to limit the recoverable damages the Trustee may recover against Defendant IRZ for its negligence to the sum of $550,000.00. Plaintiff is informed and believes and on that basis alleges that these partial waiver of damages provisions are void under the Oregon state law doctrine of procedural unconscionability due, among other things, to their small type face and the fact that at the time the work was commenced, ICD was not a licensed contractor in the State of Oregon.

WHEREFORE, Plaintiff prays for judgment as described below.

**FOURTH CLAIM FOR RELIEF**
(Avoidance of Fraudulent Transfer or Obligation – 11 U.S.C. Section 544(b))
(Against All Defendants)

59. Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 58, inclusive.

60. Among the rights and powers of Plaintiff as the duly appointed Chapter 11 Trustee in Bankruptcy of the Estate of the Debtor are all of the rights and powers of actual unsecured creditors of the Debtor as of the Petition Date, including without limitation the right to avoid certain transfers or obligations by the Debtor pursuant to the Uniform Avoidable Transaction Act, fka the Uniform Fraudulent Transfer Act.

61. On September 30, 2015 and again on November 17, 2015, the Debtor made two transfers of his intangible rights and/or incurred two obligations in favor the Defendants, specifically the partial waiver of his potential damages claims for negligence set forth in the "Limitation of Damages" provisions in the Work Order and the 11/17/15 Agreement.

62. Given the massive liabilities incurred by the Debtor through the negligence of the Defendants, these transfers or obligations, if enforced, rendered the Debtor in insolvent.

63. Given the massive liabilities incurred by the Debtor through the negligence of Defendant IRZ, these transfers or obligations, if enforced, left the Debtor with an unreasonably small capital for his business.

64. The Debtor failed to receive reasonably equivalent value in exchange for these transfers. Plaintiff is informed and believes, and on that basis alleges that the fees charged by the Defendants to the Debtor were no different than fees charged by professionals who do not seek to limit their liability for their negligence in advance. Further, Plaintiff is informed and believe that Defendants could have, or did, maintain liability insurance with coverage limits far in excess of its purported limited liability.

65. There are actual creditors of the Debtor existing as of the Petition Date which had the right to avoid the transfers or obligations encompassed in the "Limitation of Liability" waivers by the Debtor pursuant to the Uniform Avoidable Transaction Act, fka the Uniform Fraudulent Transfer Act. These creditors include without limitation Rabobank, N.A., and the members of the Official Committee of Unsecured Creditors herein.

66. Plaintiff is therefore entitled to avoid the transfers or obligations encompassed in the partial waiver of damages provisions as fraudulent transfers and preserve these transfers for the benefit of the Estate.

## PRAYER

WHEREFORE, the Plaintiff prays for judgment as follows:

1. For an Order Sustaining the Plaintiff's Objection to Defendant IRZ's Proof of Claim No. 19, and disallowing the claim in full;

2. For a judgment of general and consequential damages of not less than $19,837,000, according to proof;

3. For a judgment avoiding the transfers or obligations encompassed in the partial waiver of damages provisions in the two agreements between the Debtor and Defendants as fraudulent transfers and preserving these transfers for the benefit of the Estate;

4. For attorney's fees and the costs of suit incurred in this adversary proceeding; and

5. For such other and further relief as is just.

Dated:  October 30, 2022            WANGER JONES HELSLEY PC

and

MacCONAGHY & BARNIER, PLC

By: ___/s/ John H. MacConaghy___
    John H. MacConaghy
    Attorneys for Randy Sugarman,
    Liquidating Trustee