58
MacCONAGHY & BARNIER, PLC
John H. MacConaghy #83684
Jean Barnier #231683
645 First Street West, Ste. D
Sonoma, CA  95476
Telephone:  (707) 935-3205
Email:         macclaw@macbarlaw.com


WANGER JONES HELSLEY PC
Kurt F. Vote #160496
265 E. River Park Circle, Ste. 310
Fresno, CA 93720
Telephone:  (559) 233-4800
Email:         kvote@wjhattorneys.com

Attorneys for Plaintiff Randy Sugarman, Liquidating Trustee

IN THE UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| In re | CASE NO.  18-11651-B |
| GREGORY JOHN TE VELDE, | Chapter 11 |
| Debtor. | |
| RANDY SUGARMAN, LIQUIDATING TRUSTEE, | Adv. Proc. No.:  19-1033 |
| Plaintiff, | Date:     N/A<br>Time:     N/A<br>Place:     2500 Tulare Street |
| v. | Fresno, CA 93721<br>5th Floor, Courtroom 13 |
| IRZ CONSULTING, LLC, aka IRZ CONSTRUCTION DIVISION, LLC; LINDSAY CORPORATION ; | Judge:    Honorable Rene Lastreto II |
| Defendant. | |
| AND RELATED THIRD PARTY COMPLAINT | |

**EXHIBITS TO FIRST AMENDED COMPLAINT (1) OBJECTING TO CLAIM, (2) FOR DAMAGES FOR BREACH OF CONTRACT, (3) FOR DAMAGES FOR NEGLIGENCE, AND (4) FOR AVOIDANCE OF FRAUDULENT TRANSERS**

EXHIBITS TO FIRST AMENDED COMPLAINT
OBJECTING TO CLAIM, ETC.

| Exhibit | Description | Pages |
|---------|-------------|-------|
| 1 | IRZ Consulting Services Proof of Claim No. 19 | 32 |
| 2 | Oregon Department of Agriculture "Order and Mutual Agreement | 23 |

Dated:  October 30, 2022                    WANGER JONES HELSLEY PC


                                            and

                                            MacCONAGHY & BARNIER, PLC


                                                   /s/ John H. MacConaghy
                                            By:  _____
                                                 John H. MacConaghy
                                                 Attorneys for Randy Sugarman,
                                                 Liquidating Trustee

# EXHIBIT 1

**Fill in this information to identify the case:**

Debtor 1    GREGORY JOHN TE VELDE

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   Eastern District of California

Case number   18-11651

## Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Name of the current creditor (the person or entity to be paid for this claim)
**IRZ Consulting, LLC, an Oregon limited liability company**

Other names the creditor used with the debtor    N/A

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Wayne Downey
Name

300 E. Mallard Drive, Suite 350
Number        Street

Boise                    ID        83709
City              State          ZIP Code

Contact phone   (208) 383-4140

Contact email   wayned@irz.com

Where should payments to the creditor be sent? (if different)

Name

Number        Street

City              State          ZIP Code

Contact phone

Contact email

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_____

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.   Claim number on court claims registry (if known) _____

Filed on _____
             MM  / DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

Official Form 410                        Proof of Claim                           page 1

**Part 2:**   **Give Information About the Claim as of the Date the Case Was Filed**

6. **Do you have any number you use to identify the debtor?**
☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

7. **How much is the claim?**   $_____347,057.56_. Does this amount include interest or other charges?
☐ No
☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**
Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Services performed.

9. **Is all or part of the claim secured?**
☐ No
☑ Yes.   The claim is secured by a lien on property.

**Nature of property:**
☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe:   See attached Complaint.

**Basis for perfection:**   See attached Complaint.
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:   $_____90,000,000.00_ (per schedules)
Amount of the claim that is secured:   $_____347,057.56_ (plus further accruing interest, costs, and attorney fees)
Amount of the claim that is unsecured:   $_____0.00_ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:   $_____347,057.56_
(plus accrued costs and attorney fees)

Annual Interest Rate (when case was filed)_9.00_%
☑ Fixed
☐ Variable

10. **Is this claim based on a lease?**
☑ No
☐ Yes. Amount necessary to cure any default as of the date of the petition.   $_____

11. **Is this claim subject to a right of setoff?**
☑ No
☐ Yes. Identify the property: _____

12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

**Amount entitled to priority**

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

$_____

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

$_____

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

$_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

$_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

$_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.

$_____

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:    Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    06/01/2018
                   MM / DD / YYYY

Signature    *Wayne Downey*

Print the name of the person who is completing and signing this claim:

Name    Wayne                          Downey
        First name        Middle name        Last name

Title    Director of Construction

Company    ICD, IRZ Construction Division
           Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    300 E. Mallard Drive, Suite 350
           Number        Street

           Boise                    ID    83709
           City                     State    ZIP Code

Contact phone    (208) 383-4140          Email    wayned@irz.com

   

Official Form 410                    Proof of Claim                    page 3

**ATTACHMENT A**

Claimant attaches this statement pursuant to Bankruptcy Rule 3001(c)(2)(A).  All amounts are as of the petition date of April 26, 2018.

Principal:      $329,661.50
Interest:       $ 17,396.06 (calculated at 9% per annum from September 25, 2017
                                through April 26, 2018)

Interest continues to accrue on the principal balance of $329,661.50 at the rate of $81.29 per day from April 27, 2018 until paid.

Claimant is also entitled to accrued and accruing costs, disbursements, and attorney fees in an amount not yet determined.

546843-0001/4836-1160-7399.1

**ATTACHMENT A**
**Page 1 of 1**

11/2/2017 12:15 PM
17CV47954

1

2

3

4      IN THE CIRCUIT COURT OF THE STATE OF OREGON

5          FOR THE COUNTY OF MORROW

| | |
|---|---|
| 6   IRZ CONSULTING, LLC, an Oregon limited liability company, | Case No.   17CV47954 |
| 7 | |
|          Plaintiff, | |
| 8 | |
|     v. | |
| 9 | |
| GREG TEVELDE, an individual, fdba | **COMPLAINT** |
| 10   Willow Creek Dairy; BOARDMAN TREE FARM, LLC, a Delaware limited liability | **(Construction Lien Foreclosure; Breach of Contract; Quantum Meruit)** |
| 11   company; J.D. HEISKELL HOLDINGS, LLC, an Oregon limited liability company, | **NOT SUBJECT TO MANDATORY ARBITRATION** |
| 12          Defendants, | |
| 13 | **Amount in Controversy: $394,425.81 Fee Authority: ORS 21.160(1)(c)** |
| HATFIELD MANUFACTURING, INC., | |
| 14   an Idaho corporation; LASER LAND LEVELING, INC., an Idaho corporation; | |
| 15   CONCRETE SPECIAL TIES, INC., an Oregon corporation; RE INVESTMENT | |
| 16   CO. LLC, dba PRO-RENTALS & SALES, a Montana limited liability company; and | |
| 17   KONCRETE INDUSTRIES INC., a Washington corporation, | |
| 18 | |
|          Nominal Defendants. | |
| 19 | |

20

21     Plaintiff IRZ Consulting, LLC ("IRZ") alleges as follows:

22          **COMMON ALLEGATIONS**

23              1.

24     At all times material herein, IRZ was an Oregon domestic limited liability

25   company with its primary place of business in Umatilla County, Oregon, and was duly licensed

26   with the Construction Contractors Board of the State of Oregon that, among other things,

Page 1 -    COMPLAINT

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 503.224.5858 | F: 503.224.0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204
      546843-0001/4822-2605-2690.1

1   provides labor, equipment, material, services, supervision, plans, drawings, and surveys used in

2   the construction of improvements on, landscaping, and preparation of real property.

3                                          2.

4               At all times material herein, defendant Greg teVelde ("teVelde"), formerly doing

5   business as Willow Creek Dairy, was an individual and the record owner or reputed owner of

6   certain real property and improvements located in Morrow County, Oregon, commonly known

7   as 73950 and 73956 Homestead Lane and 73920 Pole Line Road, Boardman, more particularly

8   described in Exhibit 1 to this complaint (the "Property"). The whole of the Property is necessary

9   for the convenient use and occupancy of the improvement.

10                                         3.

11              From September 30, 2015 through August 3, 2017 IRZ, at the request of teVelde,

12  provided and furnished all labor, equipment, material, services, supervision, plans, drawings, and

13  surveys required by the contract between IRZ and teVelde and used for the benefit of the

14  Property. The contract price agreed to, including all accepted change orders, and after deduction

15  of all just credits and offsets, is the sum of $393,476.81.

16                                         4.

17              IRZ, at the request of teVelde, supplied labor, equipment, material, services,

18  supervision, plans, drawings, and surveys to teVelde pursuant to an agreement (the

19  "Agreement"), a true copy of which is attached as Exhibit 2 to this complaint and incorporated

20  herein by this reference. Pursuant to the Agreement, teVelde agreed to pay interest in the

21  amount of 18 percent per annum on invoices that are past due.

22                                         5.

23              From time to time, IRZ invoiced teVelde and demanded payment for supplying

24  labor, equipment, material, services, supervision, plans, drawings, and surveys pursuant to the

25  Agreement, but teVelde has failed and refused to pay the balance owed.

26

Page 2 -    COMPLAINT

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 503.224.5858 | F: 503.224.0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204          546843-0001/4822-2605-2690.1

1        6.

2    IRZ has fully performed all of the terms and conditions of the Agreement.  All

3 conditions necessary for payment to IRZ have been satisfied.

4        7.

5    There is now due and owing to IRZ under the terms of the Agreement the

6 principal sum of $393,476.81, together with interest thereon at the rate of 18 percent per annum

7 from September 25, 2017 until paid.

8        8.

9    Defendants teVelde, Boardman Tree Farm, LLC ("BTF"), and Heiskell Holdings,

10 LLC ("HH") may claim some right, title, or interest in the Property, but any such interests are

11 junior and subordinate to IRZ's construction lien.

12        9.

13    Nominal defendants Hatfield Manufacturing, Inc., Laser Land Leveling, Inc.,

14 Concrete Special Ties, Inc., RE Investment Co. LLC, and Koncrete Industries Inc. (collectively,

15 the "Other Construction Lien Holders") may claim some right, title, or interest in the Property.

16 The claims of the Other Construction Lien Holders, if determined to be valid by this court, have

17 no more than equal priority with IRZ's construction lien.

18        **FIRST CLAIM FOR RELIEF**
19        **(Construction Lien Foreclosure—All Defendants)**

20        10.

21    IRZ realleges paragraphs 1 through 9 as if fully stated herein.

22        11.

23    On or about September 25, 2017, within 75 days after IRZ ceased providing labor

24 and materials pursuant to the Agreement, IRZ filed in the County Records of Morrow County,

25 Oregon, a claim of lien substantially in the form required by ORS 87.035 containing a true

26 statement of its demand, after deducting all just offsets and credits; the name of the owner or

Page 3 -    COMPLAINT

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 503.224.5858 | F: 503.224.0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

546843-0001/4822-2605-2690.1

**ATTACHMENT B**
**Page 3 of 29**

1    reputed owner of the lot and improvement; and the name of the person to whom the materials

2    were furnished, together with the description of the property to be charged with the lien,

3    sufficient for identification. The lien was duly verified and recorded on September 25, 2017 as

4    Document Number 2017-41009 in the Records of Morrow County, Oregon. A true copy of the

5    lien is attached as Exhibit 1 to this complaint and incorporated herein by this reference.

6                                        12.

7           On September 28, 2017, within 20 days after the date of recording of the lien, IRZ

8    caused to be delivered to the defendants identified on the notice a notice in writing (a) stating

9    that the lien had been filed, (b) enclosing a true copy of the lien, and (c) stating its intent to

10   commence suit to foreclose its lien unless the lien was paid within 10 days of the notice. A true

11   copy of the notice is attached as Exhibit 3 and incorporated herein by this reference. Those

12   defendants received the notice more than 10 days prior to the commencement of this action, and

13   IRZ has complied with all applicable subsections of ORS 87.039 and 87.057.

14                                       13.

15          IRZ is entitled to $86.00 for payment to the County Clerk of Morrow County,

16   Oregon, for the filing and recording of its claim of lien. IRZ is also entitled to $863.00 for the

17   foreclosure guaranty necessary for the preparation of and foreclosure of the lien.

18                                       14.

19          Pursuant to ORS 87.060, IRZ is entitled to recover its reasonable attorney fees for

20   the preparation of and foreclosure of its lien.

21                                       15.

22          Plaintiff has no plain, adequate, or speedy remedy at law. It will be necessary to

23   sell all of the Property to satisfy IRZ's claim of lien.

24

25

26

Page 4 -    COMPLAINT

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 503.224.5858 | F: 503.224.0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204          546843-0001/4822-2605-2690.1

**ATTACHMENT B**
**Page 4 of 29**

**SECOND CLAIM FOR RELIEF**
**(Breach of Contract—Defendant Greg teVelde)**

16.

IRZ realleges paragraphs 1 through 7 and 13 as if fully stated herein.

17.

TeVelde has breached the Agreement.

18.

As a result of teVelde's breach of the Agreement, IRZ has been damaged in the amount of $394,425.81.

19.

The Agreement provides, in part, that "[i]f any legal action is filed to enforce a party's rights under this contract, or to interpret this contract, the prevailing party shall be entitled to his reasonable attorney's fees, costs and expenses from the other at trial, in arbitration, and on appeal."

20.

IRZ has incurred and will continue to incur reasonable attorney's fees, costs, and expenses herein, in an amount to be established at or after trial.

**THIRD CLAIM FOR RELIEF**
**(Quantum Meruit—Defendant Greg teVelde)**

21.

IRZ realleges paragraph 16 as if fully stated herein.

22.

IRZ supplied labor and materials at the request of teVelde that were used and incorporated in the improvement for the benefit of the Property. TeVelde owns the Property and received a benefit from the labor and materials supplied by IRZ. The reasonable value of the labor and materials furnished by IRZ for which it has not been paid is $393,476.81.

Page 5 -    COMPLAINT

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 503.224.5858 | F: 503.224.0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204

546843-0001/4822-2605-2690.1

23.

IRZ has been damaged in an amount equal to $393,476.81, plus interest at the statutory rate from September 27, 2017, until paid.

WHEREFORE, IRZ requests the following relief:

1.    On its First Claim for Relief:

(a)    For a money judgment against defendant teVelde in the principal amount of $393,476.81, plus $86.00 for lien recording fees, $863.00 for the foreclosure guaranty necessary for foreclosure of the lien, interest on a total of $394,425.81 at the contract rate of 18 percent per annum from September 25, 2017 until entry of judgment herein, IRZ's reasonable costs, disbursements, and attorney fees incurred herein, and post-judgment interest on the total amount of the judgment at the contract rate of 18 percent per annum from entry of the judgment until paid.

(b)    For a judgment:

(1)    Declaring that IRZ's construction lien is a valid and subsisting lien upon the Property superior to any rights, titles, liens, estates, or interests of defendants teVelde, BTF, and HH and, if their liens are determined to be valid by this court, at least equal in priority to the liens of the Other Construction Lien Holders, and that the Property be sold at foreclosure sale in the manner provided by law and the proceeds thereof applied to the amount of the judgment in favor of IRZ herein, together with all accrued interest, fees, and other charges.

(2)    If any deficiency remains after the application of the proceeds of any foreclosure sale of the Property, declaring that execution may issue against defendant teVelde for any such deficiency and against any of his property not exempt from execution.

(3)    Against teVelde, BTF, HH and the Other Construction Lien Holders declaring that, by such foreclosure and sale, the rights of teVelde, BTF, HH and the Other Construction Lien Holders, and all persons claiming by, through or under them in the Property, are forever foreclosed.

Page 6 -    COMPLAINT

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 503.224.5858 | F: 503.224.0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204

546843-0001/4822-2605-2690.1

1     (4) Declaring that any party to this action may become the purchaser

2 at the sale of the Property, and that the purchaser shall be entitled to exclusive possession of the

3 Property from the date of sale and entitled to such remedies as are available to secure possession,

4 including a writ of assistance.

5     (5) At IRZ's election, appointing a receiver pursuant to applicable law

6 to take possession and control of the Property, either before or after the entry of judgment, for

7 the purpose of preserving and protecting the Property and, if appropriate, for the purpose of

8 liquidating the Property and using the proceeds thereof to pay the obligations of teVelde to IRZ

9 or any other appropriate party either during the pendency of this action or post-judgment.

10   2. On its Second Claim for Relief, for a money judgment against defendant

11 teVelde in the amount set forth in paragraph 1(a) above.

12   3. On its Third Claim for Relief, for a money judgment against defendant

13 teVelde in the amount of 393,476.81, together with interest at the statutory rate of 9 percent per

14 annum from September 25, 2017 until paid.

15   4. Such other and further relief as the court deems just and proper.

16 DATED this 2nd day of November, 2017.

17     MILLER NASH GRAHAM & DUNN LLP

18

19     *s/ Sanford R. Landress*
      Trial Attorney: Sanford R. Landress

20      OSB No. 814382
      sanford.landress@millernash.com

21      Phone: 503.224.5858 | Fax: 503.224.0155

22      Attorneys for Plaintiff IRZ Consulting, LLC

23

24

25

26

Page 7 - COMPLAINT

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 503.224.5858 | F: 503.224.0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204

546843-0001/4822-2605-2690.1



MORROW COUNTY, OREGON          **2017-41009**
L-CONST
Cnt=1 Stn=23 TC              09/25/2017 09:39:00 AM
$50.00 $11.00 $20.00                        $81.00

I, Bobbi Childers, County Clerk for Morrow
County, Oregon, certify that the instrument
identified herein was recorded in the Clerk
records.

Bobbi Childers - County Clerk

<u>After recording return to:</u>

Fred A. Ziari
IRZ Consulting, LLC
500 N. 1st Street
Hermiston, Oregon 97838

**CONSTRUCTION CLAIM OF LIEN**

     The undersigned, IRZ Consulting, LLC ("Claimant"), claims a lien created under
ORS 87.010 on the real property and improvements described in this document and further
claims perfection of the lien under ORS 87.035 by filing this Claim of Lien.

Lien Creditor:      IRZ CONSULTING, LLC

Lien Debtor:       GREG TE VELDE

Lien Amount:      The principal amount of $393,476.81, plus interest at the rate of
                18 percent per annum until paid, the recording fee for this lien, and
                attorney fees.

A.     The real property that is subject to this Claim of Lien is located at the street address of
        73950 and 73956 Homestead Lane and 73920 Pole Line Road, Boardman, Morrow
        County, Oregon, which is the real property described in <u>Exhibit A</u> attached to this Claim
        of Lien and incorporated by this reference.

B.     The name of the owner or reputed owner of the real property is GREG TE VELDE.

C.     Claimant provided and furnished labor, equipment, material, services, supervision, and
        plans, drawings, and surveys required and actually used in the construction of
        improvements on and landscaping, and preparation of the real property commencing on
        or about September 30, 2015.  Claimant's last day of performance was on or about
        July 12, 2017.

D.     The name of the person by whom Claimant was employed and to whom Claimant
        furnished the labor, equipment, material, services, supervision, and plans, drawings, and
        surveys is GREG TE VELDE.

4847-4907-7583.1
**EXHIBIT 1**
**Page 1 of 10**

**ATTACHMENT B**
**Page 8 of 29**

E.   The true statement of Claimant's demand, after deducting all just credits and offsets, is as follows:

|  |  |
|---|---|
| Labor (supervision, surveys, preparation of plans, and travel): | $392,151.25 |
| Equipment: | $1050.00 |
| Materials: | $163.06 |
| Services: | $112.50 |
| Total Principal Amount: | $393,476.81 |

plus the recording fees for this lien, interest at the rate of 18 percent per annum on the principal amount, until paid, and attorney fees. Claimant's demand is more particularly described on Exhibit B attached to this Claim of Lien and incorporated by this reference.

F.   Claimant claims a perfected lien for the principal amount of $393,476.81, plus interest, recording fees, and its attorney fees, on the real property described above, extending to the improvement at its site, and together with the land that may be required for the convenient use and occupation of the improvement, to be determined by the court at the time of foreclosure of this lien.

DATED this 21st day of September, 2017.

IRZ Consulting, LLC

By: _Fred Ziari_____
Fred A. Ziari, President and CEO

STATE OF OREGON        )
                       )  ss
COUNTY OF MULTNOMAH     )

I, Fred A. Ziari, being first duly sworn and being subject to the penalties for false swearing under ORS 162.075, depose and say: I am the President and CEO of IRZ Consulting, LLC, named in the foregoing instrument; I have knowledge of the facts set forth therein; and all statements made in the foregoing instrument are true and correct as I verily believe.

_Fred Ziari_____
Fred A. Ziari

SIGNED AND SWORN to before me on September 21, 2017, by Fred A. Ziari.

_Lisa Conrad_____
Notary Public for Oregon
My commission expires: 8-14-2020

OFFICIAL STAMP
LISA MARIE CONRAD
NOTARY PUBLIC-OREGON
COMMISSION NO. 953542A
MY COMMISSION EXPIRES AUGUST 14, 2020

**EXHIBIT 1**
4847-4907-7503.1
**Page 2 of 10**


**ATTACHMENT B**
**Page 9 of 29**

Filed 03/08/19       Case 19-01033       Claim Doc 5

<u>EXHIBIT A</u>

TRACT ONE:

All of Section 15, Township 3 North, Range 26 East of the Willamette Meridian, in the County of Morrow and State of Oregon.

ALSO all of Section 16, Township 3 North, Range 26 East of the Willamette Meridian, in the County of Morrow and State of Oregon.

ALSO all of Section 17, Township 3 North, Range 26 East of the Willamette Meridian, in the County of Morrow and State of Oregon.

EXCEPTING THEREFROM all that portion of Section 17, Township 3 North, Range 26 East of the Willamette Meridian, in the County of Morrow and State of Oregon, lying Westerly of the following described line:

COMMENCING at the Northwest corner of Section 29, said township and range; thence South 01°30'21" East 1759.00 feet along the West line of said Section 29 to the TRUE POINT OF BEGINNING of said line; thence South 89°55'40" East 2928.43 feet; thence South 59°52'37" East 378.03 feet; thence North 30°06'34" East 2112.15 feet; thence North 29°29'36" West 1521.36 feet; thence North 30°07'54" East 1521.36 feet; thence North 29°29'42" West 1538.94 feet; thence North 29°34'17" East 1476.46 feet; thence North 29°31'32" West 1573.16 feet; thence North 29°35'01" East 1457.59 feet; thence North 29°10'25" West 1550.63 feet; thence North 30°14'40" East 1625.98 feet to a point on the North line of Section 17, said township and range, being the POINT OF TERMINATION of said line, said point being North 89°16'33" West 857.68 feet from the Northeast corner of said Section 17.

ALSO all of Section 20, Township 3 North, Range 26 East of the Willamette Meridian, in the County of Morrow and State of Oregon.

EXCEPTING THEREFROM all that portion of Section 20, Township 3 North, Range 26 East of the Willamette Meridian, in the County of Morrow and State of Oregon, lying Westerly of the following described line:

COMMENCING at the Northwest corner of Section 29, said township and range; thence South 01°30'21" East 1759.00 feet along the West line of said Section 29 to the TRUE POINT OF BEGINNING of said line; thence South 89°55'40" East 2928.43 feet; thence South 59°52'37" East 378.03 feet; thence North 30°06'34" East 2112.15 feet; thence North 29°29'36" West 1521.36 feet; thence North 30°07'54" East 1521.36 feet; thence North 29°29'42" West 1538.94 feet; thence North 29°34'17" East 1476.46 feet; thence North 29°31'32" West 1573.16 feet; thence North 29°35'01" East 1457.59 feet; thence North 29°10'25" West 1550.63 feet; thence North 30°14'40" East 1625.98 feet to a point on the North line of Section 17, said township and range, being the POINT OF

4847-4907-7583.1
**EXHIBIT 1**
**Page 3 of 10**

**ATTACHMENT B**
**Page 10 of 29**

TERMINATION of said line, said point being North 89°16'33" West 857.68 feet from the Northeast corner of said Section 17.

ALSO all of Section 21, Township 3 North, Range 26 East of the Willamette Meridian, in the County of Morrow and State of Oregon.

ALSO all of Section 22, Township 3 North, Range 26 East of the Willamette Meridian, in the County of Morrow and State of Oregon.

ALSO a portion of the West half of Section 28, Township 3 North, Range 26 East of the Willamette Meridian, in the County of Morrow and State of Oregon, more particularly described as follows:

BEGINNING at the Northwest corner of Section 28, said township and range; thence North 89°28'04" East 1150.29 feet along the North line of said Section 28; thence South 00°31'56" East 1442.20 feet to a point of curve; thence Westerly 1920.36 feet along a curve to the right having a radius of 1350.00 feet to a point on the West line of said Section 28; thence North 00°31'40" West 2777.38 feet along the West line of said Section 28 to the POINT OF BEGINNING.

ALSO a portion of the North half of Section 29, Township 3 North, Range 26 East of the Willamette Meridian, in the County of Morrow and State of Oregon, more particularly described as follows:

BEGINNING at the Northwest corner of Section 29, said township and range; thence South 89°55'40" East 5314.21 feet along the North line of said Section 29 to the Northeast corner of said Section 29; thence South 00°31'40" East 2777.38 feet along the East line of said Section 29 to a point of curve; thence Westerly 922.51 feet along a curve to the right having a radius of 1350.00 feet; thence North 59°52'37" West 1706.19 feet; thence North 89°55'40" West 2928.43 feet along a line which is parallel with the North line of said Section 29 to a point on the West line of said Section 29; thence North 01°30'21" West 1759.00 feet along the West line of said Section 29 to the POINT OF BEGINNING.

EXCEPTING THEREFROM all that portion of Section 29, Township 3 North, Range 26 East of the Willamette Meridian, in the County of Morrow and State of Oregon, lying Northerly and Westerly of the following described line:

COMMENCING at the Northwest corner of Section 29, said township and range; thence South 01°30'21" East 1759.00 feet along the West line of said Section 29 to the TRUE POINT OF BEGINNING of said line; thence South 89°55'40" East 2928.43 feet; thence South 59°52'37" East 378.03 feet; thence North 30°06'34" East 2112.15 feet; thence North 29°29'36" West 1521.36 feet; thence North 30°07'54" East 1521.36 feet; thence North 29°29'42" West 1538.94 feet; thence North 29°34'17" East 1476.46 feet; thence North 29°31'32" West 1573.16 feet; thence North 29°35'01" East 1457.59 feet; thence North 29°10'25" West 1550.63 feet; thence North 30°14'40" East 1625.98 feet to a point

4847-4907-7583.1

**EXHIBIT 1**
**Page 4 of 10**

**ATTACHMENT B**
**Page 11 of 29**

Filed 03/08/19          Case 19-01033          ClaimDoc 5

on the North line of Section 17, said township and range, being the POINT OF TERMINATION of said line, said point being North 89°16'33" West 857.68 feet from the Northeast corner of said Section 17.

TRACT TWO:

All that portion of Sections 2, 3, 10 and 11, Township 2 North, Range 26 East of the Willamette Meridian, in the County of Morrow and State of Oregon, more particularly described as follows:

BEGINNING at the Northwest corner of Section 2, said township and range; thence North 89°39'06" East 2205.64 feet along the Northerly line of said Section 2; thence South 21°46'36" East 3006.50 feet; thence South 06°25'54" East 681.77 feet; thence South 19°49'25" West 2971.56 feet; thence South 49°28'13" West 738.67 feet; thence South 68°56'55" West 381.07 feet; thence North 84°35'36" West 673.57 feet; thence North 64°22'22" West 498.86 feet; thence North 30°57'52" West 610.67 feet; thence South 83°51'38" West 179.95 feet; thence South 35°46'58" West 645.54 feet; thence South 57°29'32" West 414.96 feet; thence South 76°21'15" West 411.79 feet; thence North 84°40'00" West 574.35 feet; thence North 61°30'19" West 298.77 feet; thence North 44°43'36" West 482.75 feet; thence North 29°36'05" West 289.52 feet; thence North 21°02'27" West 297.13 feet; thence North 02°54'58" West 474.28 feet; thence North 11°46'03" East 454.46 feet; thence North 62°17'52" West 1234.57 feet; thence North 52°00'57" West 266.20 feet; thence North 19°45'29" West 556.46 feet; thence North 05°52'18" West 210.58 feet; thence North 00°00'26" West 242.39 feet; thence North 02°57'32" East 205.68 feet; thence North 14°13'57" East 194.34 feet; thence North 29°38'55" East 411.54 feet; thence North 25°38'35" East 2277.72 feet; thence North 38°03'36" East 503.16 feet to a point on the Northerly line of Section 3, said township and range, said point being North 89°23'00" East 60.58 feet from the North quarter corner of said Section 3; thence North 89°23'00" East 2578.64 feet along the Northerly line of said Section 3 to the Northwest corner of said Section 2 and the POINT OF BEGINNING.

TRACT THREE:

The West half of Section 14, Township 3 North, Range 26 East of the Willamette Meridian, in the County of Morrow and State of Oregon.

ALSO all of Section 23, Township 3 North, Range 26 East of the Willamette Meridian, in the County of Morrow and State of Oregon.

ALSO all that portion of Sections 27 and 34, Township 3 North, Range 26 East of the Willamette Meridian, in the County of Morrow and State of Oregon, lying Easterly of the following described line:

COMMENCING at the South quarter corner of Section 34, said township and range; thence North 89°23'00" East 60.58 feet along the Southerly line of said Section 34 to the

4847-4907-7583.1

**EXHIBIT 1**
**Page 5 of 10**

**ATTACHMENT B**
**Page 12 of 29**

TRUE POINT OF BEGINNING of said line; thence North 38°03'36" East 10.24 feet; thence North 52°25'12" East 333.45 feet; thence North 70°24'04" East 464.38 feet; thence North 53°54'08" West 421.01 feet; thence North 42°42'52" West 523.40 feet; thence North 19°27'27" West 325.52 feet; thence North 00°29'16" West 2664.23 feet; thence South 80°08'12" West 580.46 feet; thence North 73°56'03" West 956.50 feet; thence North 22°36'58" West 1352.27 feet; thence North 35°35'17" East 1488.75 feet; thence North 64°01'20" East 562.04 feet; thence South 67°42'30" East 1406.33 feet; thence North 22°17'30" East 1393.16 feet; thence North 67°42'30" West 1697.41 feet; thence North 04°14'58" East 1171.44 feet; thence North 12°00'12" East 1157.95 feet to the North quarter corner of Section 27, said township and range, being the POINT OF TERMINATION of said line.

ALSO all that portion of Sections 26 and 35, Township 3 North, Range 26 East of the Willamette Meridian, in the County of Morrow and State of Oregon, lying Northerly and Westerly of the following described line:

BEGINNING at the Northeast corner of Section 26, said township and range; thence South 00°31'56" East 3559.99 feet along the East line of said Section 26; thence South 89°28'05" West 805.28 feet; thence South 00°32'22" East 1651.97 feet; thence South 89°27'28" West 3372.06 feet; thence South 15°38'27" West 2280.70 feet; thence South 35°50'54" East 1920.69 feet; thence South 21°46'36" East 1704.41 feet to a point on the Southerly line of Section 35, said township and range; thence South 89°39'06" West 2205.64 feet along the Southerly line of said Section 35 to the Southwest corner of said Section 35, being the POINT OF TERMINATION of said line.

TRACT FOUR:

A parcel of land in Sections 27, 28, 33 and 34, Township 3 North, Range 26 East of the Willamette Meridian, in the County of Morrow and State of Oregon, more particularly described as follows:

COMMENCING at the Northwest corner of Section 28, said township and range; thence North 89°28'04" East 1150.29 feet along the North line of said Section 28; thence South 00°31'56" East 1442.20 feet to a point of curve; thence Southwesterly 278.05 feet along the arc of a curve having a central angle of 11°48'03" and a radius of 1350.00 feet to the TRUE POINT OF BEGINNING; thence South 70°26'25" East 4306.92 feet; thence South 13°06'01" East 4312.46 feet; thence South 49°02'47" West 1626.40 feet; thence North 68°48'59" West 4283.16 feet; thence North 12°00'00" West 4192.31 feet to a point on a curve; thence Northeasterly 1587.21 feet along the arc of a curve having a central angle of 67°21'48" and a radius of 1350.00 feet to the TRUE POINT OF BEGINNING.

ALSO a parcel of land in Sections 28, 29, 32 and 33, Township 3 North, Range 26 East of the Willamette Meridian, in the County of Morrow and State of Oregon, more particularly described as follows:

Filed 03/08/19    Case 19-01033    Claim Doc 5

COMMENCING at the Northwest corner of Section 28, said township and range; thence North 89°28'04" East 1150.29 feet along the North line of said Section 28; thence South 00°31'56" East 1442.20 feet to a point of curve; thence Southwesterly along a curve to the right having a radius of 1350.00 feet, a central angle of 120°39'19", an arc distance of 1865.26 feet to a point on curve and the TRUE POINT OF BEGINNING; thence continuing along said curve an arc distance of 977.61 feet; thence North 59°52'37" West 258.83 feet; thence South 00°37'43" East 2645.05 feet along a line which is parallel with the East line of Section 29, said township and range, to a point of curve, said curve having a radius of 1600.00 feet, a central angle of 229°11'20", and a bearing of South 05°45'39" East to the radius point; thence a chord distance of 100.14 feet along said curve on a chord bearing of South 82°26'45" West; thence continuing along said curve on chords corresponding to 300.00 feet of arc lengths, an arc distance of 6300.00 feet to a point of tangency, said point lying South 54°56'59" East of said radius point, and said chords being the true boundary line; thence North 35°03'01" East 939.67 feet; thence North 12°00'00" West 4192.31 feet to the TRUE POINT OF BEGINNING.

EXHIBIT B
IRZ CONSULTING, LLC: Willow Creek Dairy Project

| | | | | | | | CATEGORIES [1] Labor, (2) Equipment, (3) Materials, (4) Services, (5) Surveying, (6) Preparing Plans, Drawings, and Specifications, and (7) Supervising Construction Work | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Invoice Number | Date Work Performed | Laborer | Category | Location | Labor Hours | Labor Rate | Labor Costs (hours * rate) | Travel Expenses | Equipment Rental Costs | Material Costs | Services Costs |
| 7687 | 7:10,11,12,8:14 | Rowell, Josh | 1, 5 | Site | 14.25 | $125 | $1,781.25 | | | | |
| 7577 | | Evans, Gibb | 1, 4 | Office | 4 | $150 | $600.00 | | | | |
| 7581 | 6:6,15,22 | Downey, Wayne | 1, 7 | Site | 5 | $125 | $625.00 | | | | |
| 7581 | 6:5,6,9,12,19,22,28,30 | Obendorf, Josh | 1, 7 | Site | 65.75 | $125 | $8,218.75 | | | | |
| 7581 | 6:12 | Rowell, Josh | 1, 5 | Site | 17 | $125 | $1,500.00 | | | | |
| 7468 | 5:9-31,15-17,19 | Downey, Wayne | 1, 7 | Site | 19 | $125 | $2,375.00 | | | | |
| 7468 | 5:1-5,8-9,12,16-19,22,23,30 | Obendorf, Josh | 1, 7 | Site | 185.25 | $125 | $23,156.25 | | | | |
| 7468 | | Misc Materials | | | | | | | | $42.64 | |
| 7370 | 4:3,4,12,17 | Downey, Wayne | 1, 7 | Site | 32 | $160 | $5,120.00 | | | | |
| 7370 | 4:3-6,11,12,14,17,20,24-28 | Obendorf, Josh | 1, 7 | Site | 153 | $135 | $20,655.00 | | | | |
| 7370 | 4:6 | McMillan, Robert | 1, 5 | Site | 4.25 | $105 | $446.25 | | | | |
| 7370 | | Travel Expenses | | | | | | $790.90 | | | |
| 7256 | 3:3,13,14,16,17,21,2 3:25,30 | Downey, Wayne | 1, 7 | Site | 42 | $160 | $6,720.00 | | | | |
| 7256 | 3:10,17,20,21,23,28,30,31 | Obendorf, Josh | 1, 7 | Site | 108.25 | $135 | $14,613.75 | | | | |
| 7256 | 3:16 | Brown, Ian | 3, 6 | Office | 1 | $135 | $135.00 | | | | |
| 7256 | 3:15,16 | Rowell, Josh | 1, 5 | Site | 3 | $130 | $390.00 | | | | |
| 7256 | | Travel Expenses | | | | | | $1,229.77 | | | |
| 7155 | 2:01 | Downey, Wayne | 1, 7 | Site | 9 | $160 | $1,440.00 | | | | |
| 7155 | 2:6,13,20,23,24,27 | Obendorf, Josh | 1, 7 | Site | 41 | $135 | $5,535.00 | | | | |
| 7155 | 2:23 | Brown, Ian | 3, 6 | Office | 4.5 | $135 | $607.50 | | | | |
| 7155 | | Travel Expenses | | | | | | $224.08 | | | |

Page 1 of 3

EXHIBIT 1
Page 8 of 10

ATTACHMENT B
Page 15 of 29

**EXHIBIT B**

**IRZ CONSULTING, LLC: Willow Creek Dairy Project**

CATEGORIES (1) Labor, (2) Equipment, (3) Materials, (4) Services, (5) Surveying, (6) Preparing Plans, Drawings, and Specifications, and (7) Supervising Construction Work

| Invoice Number | Date Work Performed | Laborer | Category | Location | Labor Hours | Labor Rate | Labor Costs (hours * rate) | Travel Expenses | Equipment Rental Costs | Material Costs | Services Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7097 | 1:31 | Downey, Wayne | 3, 7 | Site | 2 | $160 | $320.00 | | | | |
| 7097 | 1:10,24,25,31 | Obendorf, Josh | 1, 7 | Site | 32 | $135 | $4,320.00 | | | | |
| 7097 | Travel Expenses | | | Site | | | | $173.18 | | | |
| 7041 | 12:1,7,19,26-28 | Downey, Wayne | 1, 7 | Site | 43 | $160 | $6,880.00 | | | | |
| 7041 | 12:3,7,5-9,12-14,19-21,28 | Obendorf, Josh | 1, 7 | Site | 118.5 | $135 | $15,997.50 | | | | |
| 7041 | 12:7,9,13-16 | Brown, Ian | 1, 6 | Office | 47.75 | $135 | $5,771.25 | | | | |
| 7041 | 12:02 | Rowell, Josh | 1, 5 | Site | 5 | $130 | $650.00 | | | | |
| 7041 | Travel Expenses | | | Site | | | | $1,517.60 | | | |
| 6849 | 11:2,8,9,22,23,28,29 | Downey, Wayne | 1, 7 | Site | 60 | $160 | $9,600.00 | | | | |
| 6849 | 11:7,8,14-18,21,30 | Obendorf, Josh | 1, 7 | Site | 97 | $135 | $13,095.00 | | | | |
| 6849 | 11:2,3,15 | McMillan, Robert | 1, 5 | Site | 19 | $105 | $1,995.00 | | | $150.00 | |
| 6849 | 11:7,11, | Brown, Ian | 1, 6 | Office | 7 | $135 | $945.00 | | | | |
| 6849 | 11:01 | Rowell, Josh | 1, 5 | Site | 3 | $130 | $390.00 | | | | |
| 6849 | Travel Expenses | | | Site | | | | $1,429.67 | | | |
| 6849 | Misc Materials | | | Site | | | | | | $100.75 | |
| 6786 | 10:4,6,7,13-15,18,21,24-26 | Downey, Wayne | 1, 7 | Site | 74 | $160 | $11,840.00 | | | | |
| 6786 | 13,17,18,20,24-26,31 | Obendorf, Josh | 1, 7 | Site | 113 | $135 | $15,255.00 | | | | |
| 6786 | 10:5,7,10-13,26,27 | Brown, Ian | 1, 6 | Office | 64.75 | $135 | $8,741.25 | | | | |
| 6786 | 10:4,7,11,14,15,17,18,20,26-28 | Rowell, Josh | 1, 5 | Site | 36.5 | $130 | $4,745.00 | | | | |
| 6786 | 10:26,27 | McMillan, Robert | 3, 5 | Site | 20.5 | $105 | $2,152.50 | | | $150.00 | |
| 6786 | Travel Expenses | | | Site | | | | $2,758.01 | | | |
| 6704 | 9:1,2,6-9,12-15,19,20,23,27 | Downey, Wayne | 1, 7 | Site | 78 | $160 | $12,480.00 | | | | |

Page 2 of 3

**EXHIBIT 1**
**Page 9 of 10**

**ATTACHMENT B**
**Page 16 of 29**

**EXHIBIT B**
**IRZ CONSULTING, LLC: Willow Creek Dairy Project**

CATEGORIES (1) Labor, (2) Equipment, (3) Materials, (4) Services, (5) Surveying, (6) Preparing Plans, Drawings, and Specifications, and (7) Supervising Construction Work

| Invoice Number | Date Work Performed | Laborer | Category | Location | Labor Hours | Labor Rate | Labor Costs (hours × rate) | Travel Expenses | Equipment Rental Costs | Material Costs | Services Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6704 | 9,6,7,12,13,19,20,27 | Obendorf, Josh | 1,7 | Site | 65.5 | $135 | $8,842.50 | | | | |
| 6704 | 9;1,6,8,13,16,26,27 | Rowell, Josh | 1,5 | Site | 28 | $130 | $3,640.00 | | | | |
| 6704 | 9,8,23,26,27 | McMillan, Robert | 1,5 | Site | 16.5 | $105 | $1,732.50 | | | $200.00 | |
| 6704 | | Travel Expenses | | Site | | | | $2,871.72 | | | |
| 6596 | 8;1-5,8-12,16-19,22-26,29-31 | Downey, Wayne | 1,7 | Site | 124 | $160 | $19,840.00 | | | | |
| 6596 | 8;1-5,8-11,15-19,22-26,29-31 | Obendorf, Josh | 1,7 | Site | 209.5 | $135 | $28,282.50 | | | | |
| 6596 | 10,15,19,22-26,29-31 | Rowell, Josh | 1,5 | Site | 57.5 | $130 | $7,475.00 | | | | |
| 6596 | 8;1-4,5,9-11,15-18,22,23,25,26,29,30 | Brown, Ian | 1,6 | Office | 58 | $135 | $7,830.00 | | | | |
| 6596 | 8;2,5,8,17,22,24,25,26,31 | McMillan, Robert | 1,5 | Site | 43.75 | $105 | $4,593.75 | | | $350.00 | |
| 6596 | | Misc Materials | | Site | | | | | | $19.67 | |
| 6596 | | Travel Expenses | | Site | | | | $3,668.75 | | | |
| 6550 | 6;27-30,7;1,5-8,13-15,18-23,25-29 | Downey, Wayne | 1,7 | Site | 132 | $160 | $21,120.00 | | | | |
| 6550 | 6;27-30,7;5-9,11-15,18-22,25-28 | Obendorf, Josh | 1,7 | Site | 197.5 | $135 | $25,987.50 | | | | |
| 6550 | 6;27-30,7;6-8,11-14,18-22,25-28 | Brown, Ian | 1,6 | Office | 99 | $135 | $13,365.00 | | | | |
| 6550 | 6;27,29,30,7;5-7,8,11-15,18-22,25-29 | Rowell, Josh | 1,5 | Site | 139 | $130 | $18,070.00 | | | | |
| 6550 | 6;28,29,30,7;12,24,27,28 | McMillan, Robert | 1,5 | Site | 25.5 | $105 | $2,677.50 | | | $200.00 | |
| 6550 | | Travel Expenses | | Site | | | | $5,935.07 | | | |
| 6550 | | Outside Services | 1,4 | | | | | | | | $112.50 |
| TOTAL | | | | | | | $372,552.50 | $19,598.75 | $1,050.00 | $163.06 | $112.50 |

Page 3 of 3

CATEGORIES (1) Labor, (2) Equipment, (3) Materials, (4 ...

| Invoice Number | Date Work Performed | Laborer | Category | Locat |
|---|---|---|---|---|
| 6704 | 9,6,7,12,13,19,20,27 | Obendorf, Josh | 1,7 | Site |
| 6704 | 9;1,6,8,13,16,26,27 | Rowell, Josh | 1,5 | Site |
| 6704 | 9,8,23,26,27 | McMillan, Robert | 1,5 | Site |
| 6704 | | Travel Expenses | | Site |
| 6596 | 8;1-5,8-12,16-19,22-26,29-31 | Downey, Wayne | 1,7 | Site |
| 6596 | 8;1-5,8-11,15-19,22-26,29-31 | Obendorf, Josh | 1,7 | Site |
| 6596 | 10,15,19,22-26,29-31 | Rowell, Josh | 1,5 | Site |
| 6596 | 8;1-4,5,9-11,15-18,22,23,25,26,29,30 | Brown, Ian | 1,6 | Offi |
| 6596 | 8;2,5,8,17,22,24,25,26,31 | McMillan, Robert | 1,5 | Site |
| 6596 | | Misc Materials | | Site |
| 6596 | | Travel Expenses | | Site |
| 6550 | 6;27-30,7;1,5-8,13-15,18-23,25-29 | Downey, Wayne | 1,7 | Site |
| 6550 | 6;27-30,7;5-9,11-15,18-22,25-28 | Obendorf, Josh | 1,7 | Site |
| 6550 | 6;27-30,7;6-8,11-14,18-22,25-28 | Brown, Ian | 1,6 | Offi |
| 6550 | 6;27,29,30,7;5-7,8,11-15,18-22,25-29 | Rowell, Josh | 1,5 | Site |
| 6550 | 6;28,29,30,7;12,24,27,28 | McMillan, Robert | 1,5 | Site |
| 6550 | | Travel Expenses | | |
| 6550 | | Outside Services | 1,4 | |
| TOTAL | | | | |

**EXHIBIT 1**
**Page 10 of 10**

**ATTACHMENT B**
**Page 17 of 29**



## Work Order

Client: *Greg Tevelde*                    Date: *9/30/15*
Phone: *559-799-9111*          Fax: *559-752-4033*
Address: *6850 Ave. 160  Tipton Ca. 93272*
Project Name: *Willow Creek Dairy*      Project #: *___*
Project Leader: *Wayne Downey*          Fee Quoted: *NTE $100,000.00*

Select one: ___ Fixed Fee (lump sum)  ___ Time & Material  _X_ Time & Material (NTE without permission)

IRZ Construction Division, an Oregon limited liability company (ICD) and CLIENT agree as follows:

CLIENT hires ICD to perform the following services and work:

IRZ Construction Division located at 500 N. 1st street, Hermiston Oregon 97838 will be retained by *Greg Tevelde* (OWNER). ICD will provide the following tasks:

- GPS generated site map with elevations
- Site plan with structure, corral, and waste handling component locations
- Preliminary grading plan to be used for mass excavation calculations
- Preliminary infrastructure plan to include on site drain lines, underground water lines and underground power lines
- Preliminary effluent water flow line plan to include lines from site drainage, structures, corrals, and effluent handling components to lagoon system
- Preliminary lagoon design detailed enough to satisfy CAFO application requirements
- Preliminary cost estimates for project (already provided)
- Estimated schedule to construct project (already provided)
- All information provided by OWNER and others are assumed to be accurate.

Project Start Date: *9/30/15*            Estimated Finish: *12/30/15*
Additional terms:  *This contract can be expanded and modified only by a written permission from Owner*

**Payment.** Unless other payments terms are specified herein, CLIENT shall pay invoice within 30 days. CLIENT shall incur a late fee of 1.5% per month on any unpaid balance.

**Termination of Services.** ICD may unilaterally terminate this contract and not conclude the services and work upon the following circumstances; CLIENT fails to make payment when due; or CLIENT refuses to cooperate with ICD's services and work or provide information or access to data, equipment, or land as requested and as determined

500 North 1st st.    Hermiston, Oregon 97838    541-567-0252    www.ir..om                    Page | 1

## Providing all your Design and Construction needs

**EXHIBIT 2**
**Page 1 of 10**

**ATTACHMENT B**
**Page 18 of 29**

Filed 03/04/19          Case 19-01033              Claim Doc 5



by ICD in its sole opinion and discretion. **Upon termination of services, CLIENT shall be responsible for paying contract in full within 30 days of billing.**

**Equipment and Data.** The parties agree that the equipment and data prepared for the services and work are instruments of and the property of ICD.

**Litigation Testimony.** With these services and work, ICD provides no rights for litigation testimony and if litigation testimony is needed, prior arrangements must be made with ICD.

**Full Agreement; Modification; Time of the Essence; Venue.** This writing is the full and complete agreement between the parties concerning ICD'S services to CLIENT for the above services and work. This agreement may not be modified except by an agreement signed by ICD and CLIENT. Time is of the essence of this agreement. Venue for any litigation to enforce this agreement or arising out of this agreement shall lie in the State of Oregon in Umatilla County, or in the Oregon county in which the land is located.

**Liabilities:** The client agrees to limit ICD's liability to the client and to all construction contractors and sub-contractors on the project, due to ICD's or any employee of ICD's negligent acts, errors, or omissions, such that the total aggregate limit of ICD to all those names shall not exceed $50,000, or the amount of ICD's fees, whichever is less.

**Attorney's Fees.** If any legal action is filed to enforce a party's rights under this contract, or to interpret this contract, the prevailing party shall be entitled to his reasonable attorney's fees, costs and expenses from the other at trial, in arbitration, and on appeal

**Contract Via Fax.** The parties may enter into this contract by exchanging faxed copies of this contract with the signature of both parties.

**Severability.** If any term, provision, covenant, or condition in this agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the rest of the agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

**Assignment.** ICD may assign this Agreement without the consent of the Client.

Providing all your Design and Construction needs

**EXHIBIT 2**
**Page 2 of 10**

**ATTACHMENT B**
**Page 19 of 29**

**IRZ**
**Construction Division**

AGREED:

IRZ CONSTRUCTION DIVISION , an Oregon limited liability company

By: _Fred Ziari_ _____     Printed Name: _Fred Ziari_ _____ as
Agent for IRZ CONSTRUCTION DIVISION     Date: _9/30/15_ _____
Director of Construction Wayne Downey

Name of CLIENT: _Greg Tevelde_ _____
Signature: _____     Title: _Owner_ _____
Date: _9/30/15_ _____     Purchase Number _____
Contact Person & Phone:
_Greg Tevelde_ _____
_559-799-9111_ _____

Providing all your Design and Construction needs

**EXHIBIT 2**
**Page 3 of 10**

**ATTACHMENT B**
**Page 20 of 29**



## Service Fee Schedule 2015

### Design, Engineer and Project Management Services

Service charges for this project will be based on Time and Materials. The hourly charges are listed below. ICD will use based on their judgment one or many qualified persons to conduct these tasks. Invoice will be provided that shows the total hours and date spent for each individual. More detailed breakdown of billing information can be provided based on requests by the client.

| | |
|---|---|
| Principal [1] | $165 per hour |
| Director [1] | $160 per hour |
| Senior Engineer (PE) [1] | $160 per hour |
| Senior Hydrologist [1] | $150 per hour |
| Project Manager [1] | $150 per hour |
| Superintendent [2] | $135 per hour |
| Environmental Specialist [2] | $135 per hour |
| Project Engineer [2] | $135 per hour |
| Foreman [2] | $130 per hour |
| Estimator [2] | $130 per hour |
| Tradesman [2] | $120 per hour |
| Technical Staff [2] | $105 per hour |
| Technician | $ 80 per hour |
| Field Labor | $ 60 per hour |
| Clerical | $ 60 per hour |
| Outside Consultant / Services | Cost plus 20% |
| **Daily Rates** | |
| [1] Per Day (>4 hours portal to portal) | $1500 per day |
| [2] Per Day (>4 hours portal to portal) | $1250 per day |
| | |
| Mileage Charge | at GSA Rates |
| Meal & Lodging | cost plus 20% |

Providing all your Design and Construction needs

**EXHIBIT 2**
**Page 4 of 10**

**ATTACHMENT B**
**Page 21 of 29**



# AGREEMENT BETWEEN OWNER AND ICD FOR SERVICES

This is an Agreement effective as of date of signing by OWNER ("Effective Date") between **Greg Tevelde** ("OWNER") and **IRZ Consulting, LLC** (d/b/a IRZ Construction Division) (together IRZ Consulting, LLC and IRZ Construction Division shall be referred to as "ICD"). OWNER retains ICD to perform design, engineering, and project management services, in connection with the design, engineering, and construction of The Willow Creek Dairy Construction Project as described in the enclosed Scope of Work ("Assignment")

OWNER and ICD, in consideration of their mutual covenants as set forth herein, agree as follows:

## ARTICLE 1-- SERVICES

### 1.01 Scope

A   ICD shall provide the services set forth in SCOPE OF WORK.

B.  Upon this Agreement becoming effective, ICD is authorized to begin service as set forth in the SCOPE OF WORK

C.  If authorized in writing by OWNER, and agreed to by ICD, services beyond the SCOPE OF WORK will be performed by ICD for additional compensation either by amending this contract or a new contract  All such contracts will be completed through a "CHANGE ORDER" document.

## ARTICLE 2--OWNER'S RESPONSIBILITIES

### 2.01 General

OWNER is responsible for and shall do the following in a timely manner so as not to delay the services of the ICD:

A.  OWNER will act as a General Contractor for this project and will be responsible for all duties, responsibilities, and liabilities generally known to be General Contractor responsibilities, or found to be General Contractor responsibilities, under Oregon law.

B.  As a General Contractor, the Owner is responsible for all safety and regulatory safety requirements on this project.

C.  OWNER will have all necessary equipment and trained operators for performing General Contractor duties.

D.  Provide all criteria and full information as to OWNER'S requirements for the Assignment

E.  Furnish to ICD all existing studies, reports and other available data pertinent to the Assignment, obtain or authorize ICD to obtain or provide additional reports and data as required, and furnish to ICD services of others as required for the performance of ICD'S services.

**EXHIBIT 2**
**Page 5 of 10**

**ATTACHMENT B**
**Page 22 of 29**





F. ICD shall be entitled to use and rely upon all such information and services provided by OWNER or others in performing ICD'S services under this Agreement. Provide all relevant data and information to ICD in a timely manner.

G. To the extent possible there shall be regular meetings between OWNER, ICD and SUB-CONTRACTORS. ICD and OWNER shall work in good faith to develop a conflict resolution protocol to facilitate smooth construction and start-up of the project.

H. OWNER agrees that it shall not disclose the results of any services performed or any work product generated under this Agreement or any Scope of Work attached hereto without ICD's prior written consent, which will not be unreasonably withheld. As a condition to granting its consent, ICD may require OWNER to add disclaimers in order to disclaim ICD's liability to third parties in connection with such disclosure.

I. All financial issues.

J. All land ownership, easement for pipe crossing, all government surveying, etc.

K. All safety meetings and safety compliance requirements and any other contact with or requirements from OSHA.

L. All warranties and repairs of workmanship, construction, construction materials, equipment and any other warranties or repairs that may arise under the Scope of Work for this project.

## ARTICLE 3 – CONTRACTORS AND MATERIAL SUPPLIERS RESPONSIBILITIES

3.01 ICD will assist OWNER in developing relevant contracting documents that define the SUB-CONTRACTORS roles and responsibilities, time for completion of all construction activities, protocol for communications and construction methodologies, penalties for non-compliance, etc. For the sake of clarity, ICD shall not be liable for the negligence, errors and omissions of SUB-CONTRACTORS and OWNER shall sign off on all contract terms between OWNER and SUB-CONTRACTORS.

A. Prior to tendering the prospective SUB-CONTRACTOR will be responsible for visiting the site with an OWNER or ICD representative, so that the SUB-CONTRACTOR has a complete visual perspective of the work being required.

B. The prospective tendering SUB-CONTRACTOR will be expected to submit a tender quotation covering the tasks as they are specified, according to the relevant contract and according to the drawings and specifications provided to them.

C. The SUB-CONTRACTOR's tender will include all equipment, materials and labor costs required to complete the work as specified by ICD, with the required materials and within the Time Schedule determined

D. The SUB-CONTRACTOR will provide all the required construction survey staking to complete the works of the contract. OWNER/ICD will provide GPS control and elevations and location for the sites finish grade and for the placement of the concrete and facilities

E. The SUB-CONTRACTOR will be responsible for maintaining the construction and/or material quality as specified by ICD and as defined in the OWNERS tendering documents. The SUB-CONTRACTOR will be responsible for correcting any quality

**EXHIBIT 2**
**Page 6 of 10**

**ATTACHMENT B**
**Page 23 of 29**



deficiencies according to the specification and as determined by ICD during routine inspections during construction. Any cost or time delays as a result of these corrections will be the sole responsibility of the SUB-CONTRACTOR.

F   During construction the SUB-CONTRACTOR will participate in project management meetings with the OWNERS and ICD representatives to discuss construction progress, logistics, quality, and timeline. These meeting will occur at least once weekly at a mutually agreed location and regularly scheduled time.

## ARTICLE 4 -- TIMES FOR RENDERING SERVICES

4.01   ICD shall use its commercially reasonable efforts to perform its services upon the estimated timelines. Notwithstanding the foregoing, OWNER acknowledges that the timeline is largely outside ICD's control and ICD shall not be liable for delays in the estimated timeline. If ICD services are substantially delayed or suspended in whole or in part by OWNER, Government actions, natural disasters, floods and weather, erroneous data provided by OWNER and/or Contractors, financial issues. ICD shall be entitled to equitable adjustment of the time for performance and rates and amounts of compensation provided for elsewhere in this Agreement to reflect reasonable costs incurred by ICD in connection with, among other things, such delay or suspension and reactivation and the fact that the time for performance under this Agreement has been revised.

4.02   ICD's design services will be in effect for six months after project completion and/or project startup to deal with minor changes and adjustments, and providing of final documentation and As-Built drawings. Any work beyond this period will be billed based on ICD's standard Time and Material rates. A schedule of such is attached herein

## ARTICLE 5--PAYMENTS TO ICD

5.01

A.   DESIGN, ENGINEERING AND PROJECT MANAGEMENT SERVICES. For the service provided by ICD under the Scope of Work, OWNER shall compensate ICD in accordance with ICD's standard hourly rate schedule attached herein, plus expenses. These charges will be calculated on a monthly basis and be submitted for payment in the regular monthly progress payment. Payment shall be due within 30 days of the respective monthly invoice.

B.   CHANGE ORDER: OWNER and ICD shall negotiate in good faith fees based on substantial change in scope of work and/or duration of the project. All Change Orders shall be in writing.

C.   OTHER SERVICES NOT SPECIFIED IN THE SCOPE OF WORK: Upon written approval from the OWNER, any other tasks requested by the OWNER that are not included under this agreement, OWNER shall pay ICD for Services as follows:

1   A Per Hour amount based on ICD's standard hourly rate schedule attached herein, plus expenses. This amount represents an hourly fee for any time that the OWNER requests ICD to provide services outside this agreement and the accompanying SCOPE OF WORK.

**EXHIBIT 2**
**Page 7 of 10**

**ATTACHMENT B**
**Page 24 of 29**

Filed 03/08/19                    Case 19-01033                            Claim Doc 5

**IRZ**
**Construction Division**

### ARTICLE 6—MISCELLANEOUS

6.01

A. **ICD LIABILITY:** It is agreed by OWNER and ICD that ICD may be liable for damages directly caused by negligent acts, errors, and omissions made by ICD. Under no circumstances shall that amount exceed $500,000 or the amount of ICD's fees, whichever is lower. Under no circumstances shall ICD be liable for negligent acts, errors and omissions of OWNER or SUB-CONTRACTORS

B. **Equipment and Data.** The parties agree that the equipment and data prepared for the services and work are instruments of and the property of ICD.

C. **Litigation Testimony.** With these services and work, ICD provides no rights for litigation testimony and if litigation testimony is needed, prior arrangements must be made with ICD.

D. **Full Agreement; Modification; Venue.** This writing is the full and complete agreement between the parties concerning ICD's services to OWNER for the above services and work. This agreement may not be modified except by an agreement signed by ICD and OWNER. Venue for any litigation to enforce this agreement or arising out of this agreement shall lie in the State of Oregon in Umatilla County, or in the Oregon county in which the land is located.

E. **Attorney's Fees.** If any legal action is filed to enforce a party's rights under the contract, or to interpret this contract, the prevailing party shall be entitled to his reasonable attorney's fees, costs and expenses from the other at trial, in arbitration, and on appeal.

### ARTICLE 7—Deliverable

7.01    The following items shall be provided by ICD:

A    Printable, electronic copies of all new design documents and drawings created during this Agreement period, and all other related and relevant data, for this project in PDF format.

B.    Printable, electronic copies of all completed construction As-Built drawings, and relevant data for this project in PDF format

C.    Printable, electronic copies of all completed reports, studies, cost estimates and any other documents requested by the OWNER, during this Agreement period for this project.

**EXHIBIT 2**
**Page 8 of 10**

**ATTACHMENT B**
**Page 25 of 29**

Filed 03/08/19　　　　　　　Case 19-01033　　　　　　　Claim Doc 5



## Service Fee Schedule 2015

## Design, Engineer and Project Management Services

Service charges for this project will be based on Agreed Lump Sum or Time and Materials and Expenses as listed below. ICD will use based on their judgment qualified persons to conduct these tasks.

Principal [1] ................................................................... $165 per hour
Director [1] .................................................................... $160 per hour
Senior Engineer (PE) [1] ................................................ $160 per hour
Senior Hydrologist [1] .................................................... $150 per hour
Project Manager [1] ........................................................ $150 per hour
Superintendent [2] .......................................................... $135 per hour
Environmental Specialist [2] ............................................ $135 per hour
Project Engineer [2] ........................................................ $135 per hour
Foreman [2] .................................................................... $130 per hour
Estimator [2] .................................................................. $130 per hour
Tradesman [2] ................................................................ $120 per hour
Technical Staff [2] .......................................................... $105 per hour
Technician ...................................................................... $ 80 per hour
Field Labor .................................................................... $ 60 per hour
Clerical .......................................................................... $ 60 per hour
Outside Consultant / Services ........................................ Cost plus 20%
Daily Rates
[1] Per Day (>4 hours portal to portal) ............................ $1500 per day
[2] Per Day (>4 hours portal to portal) ............................ $1250 per day

Mileage Charge ............................................................. at GSA Rates
Meal & Lodging ............................................................. cost plus 20%

**EXHIBIT 2**
**Page 9 of 10**

**ATTACHMENT B**
**Page 26 of 29**

Filed 09/09/19　　　　　　Case 19-01033　　　　　　Claim Doc 5



AGREED:

IRZ Consulting, LLC (d/b/a IRZ Construction Division through Wayne Downey as Director of Construction)

By: _____

Printed Name: Fred Ziari, President _____

Date: _____ 11/17/15 _____

Greg Tevelde  (OWNER)

Signature: _____    Title: _____ Owner _____

Date: _____ 11/14/15 _____    Purchase Number _____

Contact Person & Phone:

Travis Love _____

509-201-0560 _____

**EXHIBIT 2**
**Page 10 of 10**

**ATTACHMENT B**
**Page 27 of 29**

Filed 03/08/19        Case 19-01033        Claim Doc 5



MILLER NASH | GRAHAM & DUNN LLP
ATTORNEYS AT LAW

U.S. Bancorp Tower
111 S.W. Fifth Avenue, Suite 3400
Portland, Oregon 97204

office 503.224.5858
fax 503.224.0155

**D. Gary Christensen, P.C.**
gary.christensen@millernash.com
503.205.2435 direct line

September 28, 2017

**CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Gregory J. Te Velde
5850 Avenue 160
Tipton, California 93272

Willow Creek Dairy
c/o its registered agent
Gregory J. Te Velde
5850 Avenue 160
Tipton, California 93272

Boardman Tree Farm, LLC
c/o GreenWood Resources, Inc.
1500 S.W. First Avenue, Suite 1150
Portland, Oregon 97201
Attn: President and CEO

Boardman Tree Farm, LLC
c/o its registered agent
Corporation Service Company
1127 Brodaway Street NE, Suite 310
Salem, Oregon 97301

J.D. Heiskell Holdings, LLC
c/o its registered agent
CT Corporation System
780 Commercial Street SE, Suite 100
Salem, Oregon 97301

J.D. Heiskell Holdings, LLC
c/o Chad M. Lew
McCormick Kabot Jenner & Lew
4010 S. Demaree Street
Visalila, California 93277

Subject:    Notice of Recording Construction Claim of Lien and Intent to Foreclose

Project:     73950 and 73956 Homestead Lane and 73920 Pole Line Road, Boardman, Oregon

To Whom It May Concern:

       We represent IRZ Consulting, LLC, in its effort to collect past due amounts owed by Greg Te Velde for labor performed and materials furnished to improve the real property located at 73950 and 73956 Homestead Lane and 73920 Pole Line Road, Boardman, Oregon (the "Property"). The real property is further described in Exhibit A attached to the enclosed construction claim of lien.

Portland, OR
Seattle, WA
Vancouver, WA
Long Beach, CA
MILLERNASH.COM

546843-0001/4840-2012-3726.1

**EXHIBIT 3**
**Page 1 of 2**

**ATTACHMENT B**
**Page 28 of 29**

Filed 06/03/19          Case 19-01033                       Claim Doc 5



Gregory J. Te Velde, et al.
September 28, 2017
Page 2

       In accordance with ORS 87.039, this letter serves as notice that on September 25, 2017, IRZ recorded a construction claim of lien against the Property in the principal amount of $393,476.81.  In accordance with the lien and ORS 87.060, IRZ is entitled to interest accruing on the principal amount of $393,476.81 at the rate of 18 percent per annum until paid, reasonable attorney fees, costs, and disbursements incurred in enforcing its rights.  The lien was recorded in the official real property records of Morrow County, Oregon, as document No. 2017-41009.

       In accordance with ORS 87.057, you are hereby notified that if full payment is not made within ten days from delivery of this notice, IRZ will file a lawsuit to foreclose the enclosed lien.

Very truly yours,

D. Gary Christensen, P.C.

Enclosure

cc:   Mr. Wayne Downey:  wayne.downey@irz.com

Portland, OR
Seattle, WA
Vancouver, WA
Long Beach, CA
MILLERNASH.COM

546843-0001/4840-2012-3728.1
**EXHIBIT 3**
**Page 2 of 2**

**ATTACHMENT B**
**Page 29 of 29**

# EXHIBIT 2

OREGON DEPARTMENT OF AGRICULTURE

| | |
|---|---|
| In the Matter of Greg teVelde ) | **ORDER** |
| dba Lost Valley Farm ) | **AND** |
| Oregon Confined Animal Feeding Operation ) | **MUTUAL AGREEMENT** |
| National Discharge Elimination System ) | |
| Individual Permit No.: OR995129 ) | OAH Case No. 2018-ABC-02014 |
| Master Address No.: 1000184 ) | |
| ) | |
| Randy Sugarman, Trustee. ) | |

### RECITALS

WHEREAS, Gregory John te Velde is an individual residing in the state of California. Mr. te Velde conducted business in Oregon under the assumed business name Lost Valley Farm (Oregon Secretary of State Registry Number 128131497). Lost Valley Farm is a large confined animal feeding operation (CAFO) located at 73956 Homestead Lane, Boardman, Oregon, in Morrow County (the "Facility") and permitted under Oregon CAFO NPDES Individual Permit No. OR995129 (the "CAFO Permit") issued by the Oregon Department of Agriculture (ODA) and the Oregon Department of Environmental Quality (DEQ);

WHEREAS, on April 26, 2018, Mr. te Velde filed for bankruptcy under 11 U.S.C. §§ 101 *et seq.* ("the Bankruptcy Case");

WHEREAS, on June 27, 2018, the ODA and DEQ proposed to revoke Oregon CAFO NPDES Individual Permit No. OR995129 and issued a NOTICE OF REVOCATION OF INDIVIDUAL PERMIT NO. OR995129 ("Notice"). The Notice includes a proposed order for a shutdown of the facility within 60 days of the order becoming final;

WHEREAS, on August 24, 2018, Mr. te Velde timely filed a REQUEST FOR HEARING, NOTICE OF REVOCATION OF PERMIT NO. OR995129 (the "Request for Hearing") to dispute the Notice;

WHEREAS, on September 9, 2018, the United States Bankruptcy Court, Eastern District of California (18-11651-A-11) ordered appointment of a trustee for the Chapter 11 Bankruptcy Estate of Gregory John te Velde;

WHEREAS, on September 14, 2018, the ODA referred the Request for Hearing to the Office of Administrative Hearings for a contested case proceeding (the "Contested Case");

WHEREAS, on September 19, 2018, Randy Sugarman was appointed as the trustee (the "Trustee") and has since assumed management all of the assets the Chapter 11 Bankruptcy Estate

of Gregory John te Velde, including Lost Valley Farm and the CAFO Permit (the "Estate").
The Trustee is authorized and appointed to perform any and all activities in relation to the Estate
including winding up Lost Valley Farm and its assets, and complying with the terms of the
Notice and this Order and Mutual Agreement (OMA), in a manner that is consistent with the
Trustee's obligations as a fiduciary of the Estate;

WHEREAS, the Trustee has declared to the U.S. Bankruptcy Court and Multnomah
County Circuit Court that it is in the best interest of the Estate to liquidate the herd existing on
the Facility and to sell Lost Valley Farm. The Trustee has also declared to the ODA that he does
not intend to continue operations of the dairy, intends to wind down the CAFO operations, and
intends to sell Lost Valley Farm to a new owner.

WHEREAS, the Trustee and the ODA have agreed to a STIPULATION TO SCOPE OF
HEARING narrowing the contested issues to those addressing shut-down of the Facility only and
have further agreed to reach resolution of the remaining issues through settlement;

NOW THEREFORE the ODA and the Trustee (together "the Parties") agree that this
OMA may be issued to operate in addition to the Individual Permit No. OR995120 and further
that this OMA resolves the Request for Hearing and the December 3, 2018 AMENDED
REQUEST FOR HEARING NOTICE OF REVOCATION OF INDIVIDUAL PERMIT NO.
OR995129 PURSUANT TO STIPULATION TO SCOPE OF HEARING (the "Amended
Request for Hearing").

## I. MUTUAL AGREEMENT

1.1.    **Authorization.** The Trustee covenants and agrees that, subject to court approval of this
OMA in the Bankruptcy Case, he is authorized and appointed to perform any and all activities
contained in this OMA.

    1.1.1.   The ODA and DEQ are authorized to enter into and to issue this OMA pursuant to
    ORS 183.417, ORS 468.050, ORS 468.065, ORS 468.100 and OAR 340-045-0062.

1.2.    **Withdrawal of hearing request.** The Trustee stipulates and agrees that the Request for
Hearing and the Amended Request for Hearing are withdrawn.

    1.2.1.   The ODA and DEQ stipulate and agree that this OMA is a settlement of disputed
    claims asserted in the Amended Request for Hearing and that the Trustee makes no
    admission of liability or agrees to any finding of fact, conclusion of law or order made or
    proposed in the Notice.

    1.2.2.   The Parties stipulate and agree that this OMA supersedes and replaces the Order
    set forth in the Notice only. Other provisions in the Notice, being the sections entitled
    "Authorities", "Findings of Fact", "Ultimate Findings of Fact", "Conclusions of Law"
    and "Discussion" remain in effect but only as consistent with the terms of this OMA.

1.3.    **Governing terms.** The Parties agree that the terms of the CAFO Permit, the applicable ODA-approved Animal Waste Management Plan ("AWMP"), and the OMA control the actions specified in this OMA, and further agree that the terms used in this OMA, unless specifically noted otherwise, are as defined in the CAFO Permit.

> 1.3.1.  The term "Facility" means Lost Valley Farm and includes the Production and Land Application Areas that are covered by the CAFO Permit and the ODA-approved AWMP. Attachment 1 depicts the Facility (page 1) and Production Area (page 2), which is the area depicted as the dairy on page 1. The Land Application Area is the area of the Facility other than the Production Area.

> 1.3.2.  The term the "CAFO Permit" refers to the Oregon CAFO NPDES Individual Permit No. OR995129.

> 1.3.3.  The term "clean-up permit" refers to the CAFO Permit and the amended ODA-approved AWMP as provided in Paragraph 3.5.

> 1.3.4.  The term "ODA-approved AWMP" refers to the ODA-approved AWMP as it is approved or as it is amended and approved as provided in Paragraphs 3.4 and 3.5.

> 1.3.5.  To the extent that the terms of the CAFO Permit, or the OMA conflict on terms governing clean-up or decommissioning of the Facility, the OMA shall control to the extent consistent with law.

1.4.    **Documents incorporated by reference.** The CAFO Permit and the ODA-approved AWMP are incorporated by reference herein.

1.5.    **Objectives of the OMA.** The Parties agree that the clean-up or decommissioning of the Facility must be accomplished in a manner that assures:

> 1.5.1.  Clean-up or decommissioning of the Facility consistent with the terms of the CAFO Permit, ODA-approved AWMP, and the OMA.

> 1.5.2.  Continuous accountability under the CAFO Permit, the ODA-approved AWMP and the OMA, regardless of whether the Facility is part of the Estate or is owned by persons who purchase the Facility.

> 1.5.3.  That the ODA will terminate coverage under the CAFO Permit only upon clean-up to the satisfaction of the ODA and subsequent issuance of coverage under a new CAFO permit to a new owner or operator of the Facility (the "New CAFO Permit") or subsequent to decommissioning of the Facility to the satisfaction of the ODA.

1.6.    **Implementation of objectives.** The Parties agree to the following to accomplish the objectives in Paragraph 1.5 above:

**Continuity**

1.6.1.  The Trustee agrees to perform the clean-up and/or decommissioning consistent with the terms of this OMA, the CAFO Permit, and the ODA-approved AWMP which remain a Covenant of the Trustee on behalf of the Estate that shall survive the closing of any transaction to sell or to otherwise dispose of the Facility and shall continue until the Trustee is released as provided in Paragraph 1.15.

1.6.2.  The Trustee agrees to secure all necessary agreements from any new owner and/or operator of the Facility to ensure that the Trustee is able to perform the obligations set forth in this OMA, and further agrees that any sale of the Facility sought by the Trustee shall be pursuant to an order that includes this term and the terms of the OMA. Such agreements shall be a condition of the closing of any transaction to sell or any other disposition of the Facility.

1.6.3.  To ensure the work under this OMA is complete and the interests of the State are protected, the ODA and DEQ reserve any and all of their rights to file an administrative priority claim in the bankruptcy proceedings to obtain payment for the costs to comply with the terms of this OMA should the Trustee or his assignee fail to complete the clean-up and decommissioning, if applicable. In addition, the Trustee shall include as a term of sale a liquidated damages clause payable by the new owner and/or operator of the Facility for the clean-up related costs the new owner and/or operator is obligated yet fails to perform under their agreement with the Trustee, which clause shall remain effective until the ODA issues the Notice of Satisfaction and terminate thereafter. Further, in the event of a default by the Trustee under this OMA prior to the issuance of the Notice of Satisfaction for the clean-up and upon written request of the ODA and/or DEQ, the Trustee will assign all rights available to the Trustee to enforce and obtain liquidated damages to the ODA and/or DEQ, which rights shall be exercisable only upon depletion of the segregated trust account funds (as described in the following sentence), and not prior. Until the Trustee is released as provided in Paragraph 1.15, the Trustee agrees to hold the sum of $500,000.00 in a segregated account to assure his performance under this OMA, which shall be paid to the ODA and/or DEQ upon the Trustee's material breach of his obligations under this OMA, provided that such breach is not substantially cured after thirty (30) days written notice of default.

1.6.4.  If the new owner or operator of the Facility does not elect to apply for a new CAFO Permit by October 31, 2019 as set forth in Section 1.10.1, the Trustee agrees to decommission the Facility as provided in this OMA. The Trustee may assign and the ODA may transfer the clean-up permit as provided in Section 1.6.10 and 1.15, but until such time as the transfer order is issued, the Trustee shall remain responsible for compliance with this OMA, the CAFO Permit and ODA-approved AWMP.

1.6.5.  This OMA, the CAFO Permit and the ODA-approved AWMP shall be binding on any subsequently appointed bankruptcy trustee in the Bankruptcy Case, the trustee appointed in the Bankruptcy Case under another chapter of the Bankruptcy Code, the debtor in possession if reinstated, and the debtor in the event the Bankruptcy Case is

dismissed. The Trustee further agrees not to propose any Plan of Reorganization or Liquidation inconsistent with the terms of this OMA and this OMA shall be incorporated into such Plan.

**Amended AWMP**

1.6.7. Not less than 60 days prior to removal of the last of the dairy cows and heifers from the Facility, or by another date set by ODA, the Trustee shall submit an amended AWMP to the ODA for review and approval. The amended AWMP must be consistent with Special Permit Condition S3.D.1(b) (non-substantial changes) and shall reflect that upon removal of all existing animals, no (zero) animals may be confined or fed at the Facility such that the terms of the AWMP govern clean-up activities only. The remaining terms of the AWMP may not be amended as would constitute a substantial change to the AWMP as provided in Special Permit Condition S3.D.1(a).

1.6.8. The ODA agrees to review the amended AWMP in a timely manner and to approve the AWMP as consistent with law and the terms of the CAFO Permit.

1.6.9. Upon approval of the amended AWMP, the CAFO Permit shall constitute a "clean-up permit" only and no (zero) animals may be fed or confined on the Facility under the ODA-approved AWMP or the CAFO Permit.

**Transfer of Clean-up Permit**

1.6.10. Subsequent to approval of the amended AWMP, and upon issuance of a Notice of Satisfaction for the clean-up of the Facility, the ODA may withdraw its Notice of Revocation against the CAFO Permit and may allow transfer of the CAFO Permit as provided in Special Condition S1.C., OAR 340-045-0045, and Paragraph 1.15, provided however, that a transfer order must reflect that the new owner or operator is bound to the terms of the OMA and provided the OMA is assigned to the new owner or operator.

1.6.10.1. Within 30-days of issuance of a Notice of Satisfaction for the clean-up of the Facility, the Trustee shall inquire whether the new owner or operator of the Facility will assume ownership of the clean-up permit via a transfer and assignment of the CAFO Permit as set forth in Paragraph 1.15. The Trustee agrees to notify the ODA of the new owner or operator's response within 15-days after the Trustee's inquiry.

1.6.10.2 If the new owner or operator will not request transfer of the clean-up permit or otherwise refuses to accept transfer and assignment of the clean-up permit as set forth in Paragraph 1.15, the Trustee will initiate decommissioning of the Facility within 30-days of providing the notification described in Paragraph 1.6.11 to the ODA.

1.7.    **Termination of the CAFO Permit.**  The Parties agree that termination of coverage under the CAFO Permit may occur only as follows:

>   1.7.1.  Upon clean-up of the Facility to the satisfaction of the ODA and then only upon issuance of the New CAFO Permit to the new owner or operator of the Facility; or

>   1.7.2.  Upon clean-up and decommissioning of the Facility to the satisfaction of the ODA if a new owner or operator of the Facility does not seek to operate a confined animal feeding operation as consistent with Paragraph 1.10.1, or if no new owner or operator of the Facility is found.

1.8.    **Good faith.**  The Parties agree to work cooperatively and in good faith to implement the terms of this OMA.  Good cause may be a basis for nonperformance according to agreed-upon timelines, but may not be a basis for nonperformance of any task.

>   1.8.1.  For the purposes of this OMA, "good cause" exists when an action, delay, or failure to act arises due to acts of God, riot, war, terrorism, bioterrorism, civil unrest, flood, earthquake, power outage or government fiat. "Good cause" may also exist when there are conditions, situations or circumstances that are outside the Parties' reasonable control.

>   1.8.2.  If good cause is asserted as a basis for nonperformance under this OMA the Parties shall meet and confer to determine whether this OMA should be amended to address the contingencies that resulted in an assertion of nonperformance for good cause.

1.9.    **Resolution of disputes.**  Where there is a dispute about implementation of the actions described in the OMA, ODA's decision shall control the outcome.

>   1.9.1   Notwithstanding, the Parties agree to meet and confer about disputes and to work in good faith and in a timely manner to resolve disputes.   The Parties may consider mediation to resolve disputes.  Any mediator is to be chosen by agreement of the Parties.

>   1.9.2.  If dispute resolution is unsuccessful, the Parties retain their rights and remedies.

1.10.   **Operation of Facility.**  At all times until a New CAFO Permit is issued or until the Facility is decommissioned, the Trustee or transferee/assignee (pursuant to Paragraph 1.15) shall operate the Facility in compliance with the CAFO Permit, the ODA-Approved AWMP, and this OMA.

>   1.10.1.  After clean-up to the satisfaction of the ODA, and if no application has been received by the ODA and DEQ by October 31, 2019, which application is for the resumption of a confined animal feeding operation on the Facility, decommissioning must be initiated within 90 days and as consistent with the terms of this OMA, the ODA-approved AWMP, and any relevant non-conflicting terms of the CAFO Permit.

1.11.    **Construction and Assurance of work quality**. The Trustee agrees to perform or cause to be performed all actions as specified in this OMA.

    1.11.1. The Trustee agrees that no construction activities subject to ODA approval prior to beginning construction may begin until after ODA has approved the construction activity.

    1.11.2. The Trustee covenants and assures that all work associated with clean-up or decommissioning shall be performed or overseen by qualified professionals.

        1.11.2.1. The Parties agree that if ODA objects to the quality of the work performed, the Trustee will timely address the ODA's concerns and will remedy the work that is objected to so that it meets the satisfaction of the ODA.

        1.11.2.2. The ODA agrees that it will exercise good faith in any objections to the quality of work and will facilitate necessary approvals in a timely manner.

1.12.    **Timely inspection**. Upon completion of clean-up or decommissioning tasks and the Trustee's request for inspection, the ODA agrees to timely (within 3-5 business days) inspect the Facility to determine whether the clean-up or decommissioning task has been implemented to its satisfaction. The Parties agree that under the terms of this OMA, clean-up and decommissioning may be completed in phases and over time and that ODA may therefore need to conduct more than one inspection of the Facility to confirm clean-up or decommissioning is complete to ODA's satisfaction. The ODA will utilize the Notice of Satisfaction Checklist included as Attachment 2 for purposes of inspection and sign-off on the clean-up tasks as they are completed to the ODA's satisfaction. If a task is not complete, the ODA will specify what is necessary to achieve clean-up as set forth in Paragraph 1.13.2.

1.13.    **Notice of Satisfaction**. Upon completion of clean-up or decommissioning, if applicable, consistent with the terms of the CAFO Permit, the ODA-approved AWMP and this OMA (Part III), the ODA agrees to issue a written Notice of Satisfaction for the clean-up within 90 days of completion of clean-up and, separately, a written Notice of Satisfaction for the decommissioning within 90 days of completion.

    1.13.1. The ODA agrees that a Notice of Satisfaction may not be unreasonably withheld or withheld without cause.

        1.13.1.1. "Unreasonably withheld" means that the ODA or DEQ adds or significantly amend tasks that are not described in the Order provisions of this OMA, or add terms or conditions that are not included in or are inconsistent with the terms of the CAFO Permit or ODA-approved AWMP.

        1.13.1.2. "Without cause" means that the ODA withholds a Notice of Satisfaction without legal basis or without substantial evidence to support its actions.

1.13.2. If the Facility is not cleaned up or decommissioned to the satisfaction of the ODA, the ODA agrees to explain in writing why clean-up is not to its satisfaction, and to specify the tasks that must be accomplished in order to achieve clean-up or decommissioning to its satisfaction.

1.13.3. The Parties agree to pursue dispute resolution as provided in Paragraph 1.9 if disputes arise under this Paragraph 1.13 and its subparts.

1.14.   **Enforcement of Order.**  The Parties agree that the ODA and/or DEQ or the Trustee may seek enforcement of the terms of this OMA in a court of competent jurisdiction and further agree that the ODA and/or DEQ or the Trustee may seek any lawful remedy to enforce the terms of the OMA or the terms of the CAFO Permit.  Notwithstanding the foregoing, the United States Bankruptcy Court for the Eastern District of California shall retain jurisdiction to interpret or otherwise enforce this OMA and any Order issued by the Bankruptcy Court relative to this OMA.

1.14.1. The ODA and DEQ agree to seek enforcement after pursuing dispute resolution as provided in Paragraph 1.9 above in its discretion and as consistent with its duties to protect the public health, welfare and safety.

1.15.   **Assignment, Transfer and Release.**  The Trustee shall assign this OMA to a new owner or operator of the Facility who has applied for and received ODA's approval for a transfer of the CAFO Permit pursuant to OAR 340-045-0045 and the terms of the CAFO Permit.  A condition of the assignment shall be that the new owner or operator is bound to the terms of this OMA.

1.15.1. If the OMA is assigned consistent with Paragraph 1.15, the ODA and DEQ shall, upon issuance of a transfer order consistent with Paragraph 1.6.7, fully release the Trustee from any further liabilities or obligations under the OMA, CAFO Permit and ODA-approved AWMP.

1.15.2. Upon issuance of a Notice of Satisfaction to the Trustee for the decommissioning of the Facility, the ODA and DEQ shall fully release the Trustee from any further liabilities or obligations under the OMA, CAFO Permit and ODA-approved AWMP.

1.16.   **Severability and Enforceability.**  The provisions of this OMA shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this OMA, or the application thereof to any Party or any circumstance, is determined by a court of law to be invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of the OMA and the application of such provision shall not be affected by such invalidity or unenforceability.

1.17.   **Court Approval of Compromise.** The Trustee agrees to seek approval of this Agreement under Federal Rule of Bankruptcy Procedure 9019 within ten (10) business days of its full execution and, pending such approval, agrees to not seek approval of an Order

authorizing the sale of the Facility under terms and conditions inconsistent with this OMA. To the extent the Trustee seeks approval of the sale of the Facility pending the approval of this OMA, the Trustee agrees that any such sale shall be pursuant to this OMA as approved.

IT IS SO AGREED.

_____          _____
RANDY SUGARMAN, Trustee                     DATE
On behalf of the Lost Valley Farm

_____          _____
ALEXIS TAYLOR, Director                      1/17/19
OREGON DEPARTMENT OF AGRICULTURE             DATE

_____          _____
RICHARD WHITMAN, Director                    1/17/19
Oregon Department of Environmental Quality   DATE

## II.    CONSENT

2.1.    I, the Trustee for the Lost Valley Farm acknowledge that I have the assistance of qualified legal counsel and that I have read and understand the terms of this OMA.

2.2.    I understand and agree that this OMA and all documents incorporated by reference sets for the entire agreement of the Parties.

2.3.    I understand and agree that this OMA resolves the contested case hearing regarding the Notice of Revocation. I understand my right to a contested case hearing and judicial review of a final order in contested case and freely and voluntarily waive the right to a contested case hearing, request for reconsideration, and right to judicial review. I also freely and voluntarily waive reconsideration and judicial review of this OMA.

Page 9 -- ORDER AND MUTUAL AGREEMENT (LOST VALLEY FARM)
JUSTICE#9396183-v1

authorizing the sale of the Facility under terms and conditions inconsistent with this OMA. To the extent the Trustee seeks approval of the sale of the Facility pending the approval of this OMA, the Trustee agrees that any such sale shall be pursuant to this OMA as approved.

IT IS SO AGREED.

_____          1/16/2019
RANDY SUGARMAN, Trustee                      _____
On behalf of the Lost Valley Farm                        DATE


_____          _____
ALEXIS TAYLOR, Director                                   DATE
OREGON DEPARTMENT OF AGRICULTURE


_____          _____
RICHARD WHITMAN, Director                                 DATE
Oregon Department of Environmental Quality


## II.     CONSENT

2.1.    I, the Trustee for the Lost Valley Farm acknowledge that I have the assistance of qualified legal counsel and that I have read and understand the terms of this OMA.

2.2.    I understand and agree that this OMA and all documents incorporated by reference sets for the entire agreement of the Parties.

2.3.    I understand and agree that this OMA resolves the contested case hearing regarding the Notice of Revocation. I understand my right to a contested case hearing and judicial review of a final order in contested case and freely and voluntarily waive the right to a contested case hearing, request for reconsideration, and right to judicial review. I also freely and voluntarily waive reconsideration and judicial review of this OMA.

Page 9 – ORDER AND MUTUAL AGREEMENT (LOST VALLEY FARM)
JUSTICE#9396183-v1

2.4.    I understand and agree that although I have withdrawn my right to a contested case hearing the Notice continues in effect only as consistent with the terms of this OMA, and further that the terms of this OMA, rather than the terms of the Notice, control the clean-up and, if applicable, the decommissioning activities for the Facility.

2.5.    I understand and agree that this OMA is not intended to limit in any way the ODA's right to proceed against the Estate in any forum for any future violations of the CAFO Permit or ODA-approved AWMP not expressly settled herein; provided however, that the ODA and DEQ acknowledge that the Estate will terminate on confirmation of a Plan of Reorganization or dismissal of the Bankruptcy Case. Provided, further, that I retain all rights and obligations to contest and dispute any action taken by ODA or DEQ regarding violations not expressly settled herein.

2.6.    In consideration of the conditions agreed to by ODA in Section I of this OMA, I, the Trustee, acting on behalf of the Estate, release and forever discharge the State of Oregon and all of its political subdivisions, agencies, department, administrators, officers, current and former employees, agents, attorneys, and insurers (collectively "Released Parties"), from any and all claims, demands, or causes of action, whether known or unknown, under any legal equitable, or other theory, relating existing as of the date of this OMA. The release, acquittal, and discharge of the described above ("Release") includes any claims against the Released Parties, including but not limited to any claim under federal or state law for damages, declaratory or equitable relief, under 42 USC § 1983 *et seq*, and for attorney fees or costs.

2.7.    I agree that subject to approval of the court in the Bankruptcy Case as provided herein, my signature binds the Estate, and that subsequent to sale of the Facility, I will continue to be bound by the terms of the OMA until released according to the terms of this OMA. I further agree that this OMA may be executed in one or more multiple counterparts, including facsimile, scanned and electronically transmitted or counterparts, each of which shall constitute an original and of which together shall constitute one and the same order.


_____            _1/16/2019_____
RANDY SUGARMAN,                              DATE
Trustee, Lost Valley Farms



### III.   ORDER

**Clean up of the Facility**

3.1.    Clean up of the Facility shall comprise three activities which may be performed separately or simultaneously but only as consistent with the terms of the CAFO Permit, the ODA-approved AWMP, and this OMA. Where there are conflicting provisions in the CAFO

Permit that directly govern clean-up or decommissioning, such as Special Permit Condition S1.E., the OMA will control. Notwithstanding, provisions of the CAFO Permit and the ODA-approved AWMP are crucial to lawful clean-up or decommissioning, and terms that do not conflict with the OMA must be complied with. Clean-up activities are in three parts as follows: 1) cessation of waste production; 2) clean-up of the Facility; and 3) operation of the Facility pending termination of the CAFO Permit as set forth in Paragraph 1.7. The Trustee must perform the following tasks according to the timelines and terms herein specified.

    3.1.1. **Removal of solid waste.** With regard to the clean-up of solid manure, removal of "all" solid manure or compost refers to the amount of stored solid manure that can be removed from compacted soil pens and approved solid manure/compost storage areas with normal operation of front-end loaders.

    3.1.2. **Removal of liquid waste.** With regard to the clean-up of liquid manure that is present in any vault (excluding lagoons and settling cells), underground transfer pipes, flush system components, and pumps associated with the waste system, removal of "all" liquid manure, refers to removal of liquid manure from generation areas through the waste system to the settling cells and lagoons, and subsequent flushing of systems with a legal water source; provided that, this provision does not require waste removal activities that would damage or require the deconstruction of any part of the waste system.

        3.1.2.1. Deconstruction means that any part of the infrastructure of the Facility is permanently taken apart such that it will no longer perform the function intended by its original construction.

    3.1.3 **Removal of liquid waste from biolynk tanks.** With regard to the clean-up of liquid manure from the biolynk tanks, removal of "all" liquid manure refers to removal of liquid manure by pumping the tanks as low as possible through the waste system to the settling cells and lagoons and, where access is available, removing the remaining waste to the maximum extent possible with hand shovels, and covering the tanks to prevent precipitation from entering the tanks; provided that, this provision does not require waste removal activities that would damage or require the deconstruction of any part of the waste system.

    3.1.4 **Removal of liquid waste from sand lanes and alleys.** With regard to the clean-up of liquid manure from the sand lanes and alleys, removal of "all" liquid manure refers to removal of liquid manure by scraping the surfaces of generation areas, removing the waste to approved storage areas and land applying it in accordance with the ODA-approved AWMP, then flushing the surfaces through the waste system to the settling cells and lagoons, and subsequent flushing of systems with a legal water source until visual free of turbidity as observed at the terminus of the sand lane; provided that, this provision does not require waste removal activities that would damage or require the deconstruction of any part of the waste system.

    3.1.5. **Maintenance and repair.** Maintenance and repair activities may be conducted only as needed to facilitate operation of the Facility while animals remain on the facility,

and after removal of the animals, will constitute only those activities necessary to facilitate clean-up or decommissioning of the Facility, to preserve or maintain infrastructure and fixtures within the Production Area, to maintain systems that pump storm water, or to conduct normal farming operations.

3.1.6. **Construction activities.** Other than construction activities required to satisfy the obligations under this OMA, no construction to enhance or expand the Production Area for purpose of operating a CAFO may occur without ODA's prior written consent, except as may be approved in association with a New CAFO Permit. No construction activities associated with the waste systems that are subject to ODA approval prior to commencement of activities may occur prior to any and all necessary ODA approvals, which shall not be unreasonably withheld, conditioned or delayed.

**Cessation of Waste Production**

3.2. For the purposes of this OMA, "by product feed" is any and all material transported to the Facility under contract with Luke Dynes or companies affiliated with Luke Dynes, or any other person who seeks to transport to the Facility and store on the Facility vegetable waste or other waste that is subsequently processed into usable or unusable material.

3.2.1. By January 31, 2019, all residual by product feed shall be moved from all solid waste and any other storage areas where such by product feed may be stored on the Facility and exported offsite or, by September 30, 2019, land applied in compliance with the CAFO Permit and the ODA-approved AWMP. This provision does not apply to by product feed moved onto the Facility after January 31, 2019. For the purposes of Paragraph 3.2 and its sub-parts "by product feed" is vegetable waste that is generated off site and not generated on the Facility.

3.2.2. Subsequent to removal of the material specified in paragraph 3.2., the Facility may not accept any further by product feed.

3.3. By April 15, 2019, all dairy cows whether milking or dry must be moved off of the Facility. An extension of this time period may be allowed by ODA only upon a showing of good cause.

**Amended AWMP, Withdrawal of Notice of Revocation, and Transfer**

3.4. Not less than 60 days prior to removal of the last of the dairy cows and heifers from the Facility or on another date set by ODA, the Trustee shall submit an amended AWMP to the ODA for review and approval; provided however, the AWMP may only be amended as follows:

3.4.1. To reflect that no (zero) dairy animals and heifers or any other animal is being confined, fed or otherwise held on the Facility;

3.4.2. To reflect that the waste systems will continue to function to collect runoff and ancillary waste generated by precipitation events and that waste will be generated as part

Page 12 – ORDER AND MUTUAL AGREEMENT (LOST VALLEY FARM)
JUSTICE#9396183-v1

of the clean-up and decommissioning activities, but that new no manure, process water or waste is expected to be generated by the Facility;

    3.4.3.  As consistent with the CAFO Permit Special Condition S3.D.1(b); and

    3.4.4  As otherwise required to be consistent with the terms and conditions of this OMA.

3.5.    An amended AWMP shall be reviewed and may be approved consistent with the terms of the CAFO Permit Special Condition S3.D.1(b) and applicable law. Upon approval of the amended AWMP, the CAFO Permit and the amended ODA-approved AWMP (the "clean-up permit") and this OMA shall govern operations of the Facility until, as applicable, a New CAFO Permit is issued or the Facility is decommissioned and the CAFO Permit is terminated.

### Transfer of the CAFO Permit

3.6.    Subsequent to approval of the amended AWMP and upon issuance of a Notice of Satisfaction for the clean-up of the Facility, the ODA may transfer the CAFO Permit as provided in Special Condition S1.C. and OAR 340-045-0045, and provided further, as follows:

    3.6.1.  Only the clean-up permit may be transferred.

    3.6.2.  A transfer order must include provisions binding the transferee to the terms of this OMA and provide that the terms of the CAFO Permit and the ODA-approved AWMP (the clean-up permit), and this OMA shall govern the Facility until, as applicable, a New CAFO Permit is issued or the Facility is decommissioned and the CAFO Permit is terminated.

    3.6.3.  As consistent with Paragraph 1.15, upon issuance of the transfer order, the Trustee shall be released from liability, duties and obligations under the CAFO Permit, the ODA-approved AWMP, and this OMA.

    3.6.4.  If the CAFO Permit (the clean-up permit) and this OMA are not transferred and assigned as provided in Paragraph 1.6.10 and its subparts and Paragraph 1.15, the Trustee shall be solely responsible for all liability and obligations under the CAFO Permit, the ODA-approved AMWP, and the OMA arising prior to and continuing through the date of the Notice of Satisfaction.

### Clean-up activities

#### Milking Parlor

3.7.    After the last milking and last milk pickup, all milking parlor systems shall be cleaned and emptied. All containers of teat dip, dairy pharmaceuticals, pipeline and milking system wash, disinfectant chemicals, milk silo wash, disinfectant chemicals, milk cooling chemicals (glycol) must be removed from the Facility or sealed with preservative solutions so that the chemicals may not enter into the liquid manure system on the Facility.

Page 13 – ORDER AND MUTUAL AGREEMENT (LOST VALLEY FARM)
JUSTICE#9396183-v1

### Holding Pens and Freestall Barns

3.8.    By September 30, 2019, all liquid and solid manure and sand bedding from the holding pens and freestall barns must be handled as follows:  solid manure and sand bedding shall be scraped, directly land applied to lands consistent with the CAFO Permit and the ODA-approved AWMP and all liquid manure shall be flushed and processed through the existing sand lane, biolynk, screen separators, settling cells and lagoons, and thereafter be applied to lands or exported consistent with the CAFO Permit and the  ODA-approved AWMP.

3.9.    The system components must be flushed with clean water derived from a lawful source until, subject to permitted storage capacity in the lagoons, the liquids flowing through the weir gate into the north sand lane pump vault are visually free of turbidity.

### North Sand Lane

3.10.   After the milk cows are removed, all accumulated manure solids, debris and sand must be removed to approved solid manure storage areas or applied consistent with agronomic rates consistent with the CAFO Permit and the  ODA-approved AWMP or exported consistent with the CAFO Permit.

### Biolynk

3.11.   After the milk cows are removed, the flush water liquids and accumulated manure solids and sludge must be removed from the biolynk tanks consistent with Paragraph 3.1.3  and moved to approved liquid or solid manure storage areas or applied consistent with agronomic rates consistent with the CAFO Permit and the  ODA-approved AWMP or exported consistent with the CAFO Permit.

### Screen Separators

3.12.   After all of the milk cows have been removed and the clean water flush cycle has been completed for the holding pens and freestall barns as described in Paragraph 3.9, all solid manure must be removed from the screen separators and moved to approved solid manure storage areas or applied consistent with agronomic rates consistent with the CAFO Permit and the ODA-approved AWMP or exported consistent with the CAFO Permit.

### Settling Cells

3.13.   After all of the milk cows have been removed and the clean water flush cycle for the holding pen and freestall barns described in Paragraph 3.9 has been completed, the liquid manure, sludge and solid manure must be removed from settling cells and moved to approved liquid or solid manure storage areas or applied consistent with agronomic rates consistent with the CAFO Permit and the  ODA-approved AWMP or exported consistent with the CAFO Permit. The contents remaining in the settling cells after this step is completed will be a staff gauge

reading of eight (8) large pegs read from the top of the staff gauge. This will be a one-time reading.

### Approved Solid Manure Storage Areas Located Outside of Animal Pens

3.14.   After the milk cows, heifers and calves have been removed from the Facility, all solid manure must be exported consistent with the CAFO Permit or applied consistent with agronomic rates consistent with the CAFO Permit and the ODA-approved AWMP.

### Approved Solid Manure Storage Areas Located Inside of Animal Pens

3.15.   After the milk cows, heifers and calves have been removed from the Facility, all solid manure must be exported consistent with the CAFO Permit or applied consistent with agronomic rates consistent with the CAFO Permit and the ODA-approved AWMP or exported consistent with the CAFO Permit.

### Lagoons and Underground Flush Plumbing

3.16.   By October 31, 2019, the depth of waste remaining in Lagoons 1, 2, and 3, must be at least six (6) large pegs and five (5) small pegs (together 6.5 pegs) as read from the top of the staff gauge. By October 31, 2019, depth of waste remaining in Lagoon 5 must be at least six (6) large pegs read from the top staff gauge. The depth of waste will be a one-time reading. The visibility of the pegs is irrespective of the type of material stored in the lagoons.

    3.16.1. After waste is removed from the lagoons to achieve the remaining depth of waste specified in Paragraph 3.16, the lagoon walls must thereafter be visually free of solid build up.

    3.16.2. By October 31, 2019, flush water accumulated during the cleaning of the lagoon walls, if generated, and the remaining liquid in the lagoons must be land applied or exported according to the CAFO Permit.

    3.16.3. All land applications must be in conformance with the CAFO Permit, the ODA-approved AWMP and this OMA. In addition, all application plans must be prepared and reviewed by or under the direction of a certified agronomist or certified crop advisor to ensure continual compliance with the CAFO Permit and ODA approved AWMP, and all applications records created and maintained as required by the CAFO Permit Special Condition S4.

    3.16.4. Waste must be exported consistent with the terms of the CAFO Permit.

3.17.   By September 30, 2019 all liquid transfer systems in the Production Area must be flushed with clean water and be modified to collect and contain site stormwater in approved settling cells and lagoons. By October 31, 2019, all liquid transfer systems outside the Production Area must be flushed with clean water to a visual standard to be observed at the irrigation pivots.

3.17.1 By October 31, 2019, all land applications resulting from flushing of underground waste lines from the lagoons to the pivots must be applied to crops with a demonstrated agronomic need and at an agronomic application rate as determined by the certified crop advisor. The crop advisor may consider the nutrient required for a full single season crop when planning the land application of the underground waste line flushing water.

3.17.2. Following flushing and application of such flush water in accordance with this OMA, stormwater generated after the last flush date (October 31, 2019) may be stored in the settling cells and lagoons and applied in accordance with the CAFO Permit and ODA-approved AWMP.

### Heifer Sand Lane

3.18   Following removal of all heifers, dry cows and calves from the Facility and by September 30, 2019, all accumulated solid manure, sludge and sand must be removed from the heifer sand lane and moved to approved storage areas or applied consistent with agronomic rates consistent with the CAFO Permit and the ODA-approved AWMP or exported consistent with the CAFO Permit.

### Feed Storage Areas

3.19.   All ensilage and feed inventories existing and stored at the Facility for purposes of feeding livestock as of the date all cows, heifers and calves are removed must be removed from the Facility by October 31, 2019.  All crops grown and harvested on the Facility other than those constituting ensilage may be stored at the Facility in accordance with customary farming practices and otherwise in accordance with the CAFO Permit and ODA-approved AWMP, if and as applicable.   Storage of ensilage from the 2019 crop is allowed up to December 31, 2019, provided that the ensilage grown in the 2019 crop year shall not be  fed to livestock located at the Facility and must be stored in accordance with the terms of the CAFO Permit and ODA-approved AWMP.

### Animal Mortality Storage Area

3.20.   After all the milk cows, heifers and calves have been removed from the Facility, all animal mortalities must be removed from the Facility within 10 days of the last live animal being removed.  Animal mortalities must be handled and disposed of according to the CAFO Permit, the ODA-approved AWMP and this OMA.

### Records

3.21.   In addition, all applications must be properly inspected, monitored, and all records kept as required by the CAFO Permit Special Condition S4.

**Operation of the Facility Pending Issuance of a New CAFO Permit or Decommissioning**

3.22.   During the process of clean-up of the Facility and up until the time a New CAFO Permit is issued or the Facility is decommissioned, the Facility must be operated in compliance with the CAFO Permit and the ODA-approved AWMP (the clean-up permit) and this OMA.

3.23.   Upon completion of the clean-up tasks as described in this OMA and issuance of the Notice of Satisfaction, which shall be issued upon completion of clean-up as described in this OMA, the Facility must thereafter be operated and maintained in compliance with the CAFO Permit and the ODA-approved AWMP (the clean-up permit) and this OMA, until such time that the a New CAFO Permit is issued or the Facility is decommissioned and the CAFO Permit is terminated.

**Decommissioning**

3.24.   The Trustee or the current owner and/or operator of the Facility may request in writing to the ODA that the CAFO Permit be revoked and coverage under the CAFO Permit terminated provided that the Facility is decommissioned as described in this OMA.

> 3.24.1. Decommissioning shall be completed following satisfaction of the obligations under Paragraph 3.24.2 and either, but not both, of Paragraph 3.24.3 or 3.24.4 which obligations may be performed separately or simultaneously but only as consistent with the terms of this OMA.

>> 3.24.2   Manure Removal.  All liquid and solid manure and process wastewater must be removed from the structures and storage areas and either land applied according to the ODA-approved AWMP or exported according to the CAFO Permit.

>> 3.24.3   Lagoon Removal.  The lagoon liners must be removed and disposed of or recycled in a lawful manner, and any earthen structure must be filled with soil and returned to the grade matching the surrounding area.  All soil fill and remaining exposed soil must be seeded to site-appropriate grass or ground cover to prevent erosion.

>> 3.24.4   Lagoon Reuse.  All liquid and solid manure and process wastewater must be removed from the lagoons and either land applied according to the CAFO Permit and the ODA-approved AWMP or exported consistent with the CAFO Permit.

>>> 3.24.4.1.  All liquid storage facilities that could fill with rain water must be flushed with clean water, the flush water land applied or exported and the remaining liquid in the lagoons tested to confirm the *E. coli* level is at or below the water quality standard of 406 CU/100 ml of sample.

**Termination of the CAFO Permit**

3.25.   The CAFO Permit is terminated only upon completion of clean-up as described in this OMA and issuance of a New CAFO Permit for the Facility.

3.26.   In the event that a New CAFO Permit is not issued for the Facility, the CAFO Permit is terminated only upon decommissioning of the Facility as described in this OMA.

3.27.   Upon termination of the CAFO Permit, this OMA shall be deemed of no further force and effect.

3.28.   The Directors of the Oregon Department of Agriculture and the Oregon Department of Environmental Quality reserve the right to institute or cause to be instituted in a court of competent jurisdiction, proceedings to compel compliance with the terms of this OMA.


IT IS SO ORDERED.


_____
ALEXIS M. TAYLOR, Director
Oregon Department of Agriculture

1/17/19
_____
DATE


_____
RICHARD WHITMAN, Director
Oregon Department of Environmental
Quality

1/17/19
_____
DATE



PROPERTY BOUNDARY
FRESHWATER PIPELINE
EFFLUENT PIPELINE
NEW CL STER STATIONS
EXISTING P MP STATIONS
BOOSTER STATION - FRESH WATER
BOOSTER STATION - EFFLUENT

**WILLOW CREEK DAIRY**
SANDLAKE FARM DEVELOPMENT
PIVOTS AND PIPELINES

IRZ
Consulting, LLC

500 N 1ST, HERMISTON, OREGON 97838
OFFICE (541) 567-0252  FAX (541) 567-4239

| DESIGNED | TOM CHHOLT |
| DRAWN | S VA SHAKYA |
| SCALE | NTS | SHEET |
| DATE | 09-10-2015 | |
| DRAWING NO | | M1 |
| 518-15-001 | | |

COPYRIGHT AND REUSE OF THIS DRAWING IS RESERVED BY IRZ CONSULTING, LLC



Lost Valley Dairy
CAFO Production Area

Silage Storage Area 2

Portable Water Holding Tank

North Sand Lane
Milk Parlor & Holding Pen
Freestall Barn
Freestall Barn
Freestall Barn
Freestall Barn

Biofynk
Maturity Barn

Silage Storage Area 1

Cow Lots
Screen Separator
Approved Solid Manure Storage Area
Heifer Pens

Heifer Sand Lane

L1
L2
L3
L5
S1
S2

Silage Bags
Silage Bags

Equipment Storage

N
2000 ft

Google Earth

**Attachment 2**
**Notice of Satisfaction Clean-Up Checklist**

| OMA Section | Clean-Up Item (reference OMA for full description) | Deadline Date* | Completion Date |
|---|---|---|---|
| 3.2.1 | <u>Cessation of Waste Production:</u> All residual by product feed shall be moved from all solid waste and compost storage areas or any other areas where such by product feed may be present on the Facility. | Jan. 31, 2019 | |
| 3.3 | <u>Cessation of Waste Production:</u> All dairy cows whether milking or dry must be moved off of the Facility. An extension of this time period may be allowed by ODA only upon a showing of good cause. | April 15, 2019 | |
| 3.7 (3.1.1, 3.1.2) | <u>Milking Parlor:</u> After the last milking and last milk pickup, all milking parlor systems are cleaned and emptied. | | |
| 3.8 & 3.9 (3.1.1,3.1.2,3.1.4) | <u>Holding Pen and Freestall Barns:</u> All liquid and solid manure and sand bedding from the holding pens and freestall barns must be removed, land applied and/or flushed to settling cells and lagoons. Flushed until liquids flowing through the weir gate into the north sand lane pump vault are visually free of turbidity. | Sept. 30, 2019 | |
| 3.10 (3.1.1, 3.1.2, 3.1.4) | <u>North Sand Lane:</u> All accumulated manure solids, debris and sand must be removed to approved solid manure storage areas or applied consistent with agronomic rates and flushed with clean water to a visual standard to be observed at the center weir gate area. | Oct. 31, 2019 | |
| 3.11 (3.1.1, 3.1.2, 3.1.3) | <u>Biolynk:</u> After the milk cows are removed, the flush water liquids and accumulated manure solids and sludge must be removed from the biolynk tanks and tanks covered. | Oct. 31, 2019 | |
| 3.12 (3.1.1, 3.1.2) | <u>Screen Separators:</u> All solid manure must be removed from the screen separators and moved to approved solid manure storage areas or applied consistent with agronomic rates or exported consistent with the CAFO Permit. | Oct. 31, 2019 | |

| 3.13 | Settling Cells:  Liquid manure, sludge and solid manure must be removed from settling cells and moved to approved storage areas, land applied, or exported.  Contents remaining will be at staff gauge reading of 8 large pegs read from top of the gauge. | Oct. 31, 2019 | |
| 3.14 | Approved Solid Manure Storage Areas Located Outside of Animal Pens: After removal of cows, solid manure must be exported or land applied appropriately. | | |
| 3.15 | Approved Solid Manure Storage Areas Located Inside of Animal Pens: After removal of cows, solid manure must be exported or land applied appropriately. | | |
| 3.16 | Lagoons: Lagoon walls visually free of solid build up. Flush water and waste accumulated in lagoons land applied or exported.  By deadline, depth of waste remaining in Lagoons 1, 2, and 3 must be 6.5 pegs. Depth of waste remaining in Lagoon 5 must be 6 pegs. | Oct. 31, 2019 | |
| 3.17 | Underground Flush Plumbing:  All liquid transfer systems in the Production Area flushed with clean water and modified to collect and contain site storm water in approved settling cells and lagoons. | Sept. 30, 2019 | |
| 3.17 | Underground Flush Plumbing:  All liquid transfer systems outside the Production Area flushed with clean water to a visual standard to be observed at the irrigation pivots. | Oct. 31, 2019 | |
| 3.18 | Heifer Sand Lane:  Following removal of cows, all accumulated solid manure, sludge and sand must be removed from the heifer sand lane and moved to approved storage areas or applied consistent with agronomic rates. | | |
| 3.19 | Feed Storage Areas:  All ensilage and feed inventories existing and stored at the Facility for purposes of feeding livestock as of the date all cows, heifers and calves are removed must be removed from the Facility. | October 31, 2019 | |
| 3.20 | Animal Mortalities:  All Animal mortalities removed to landfill or rendering. | 10 days after last live animal leaves. | |

*To complete all items by October 31, 2019 as anticipated by the OMA, items without specified deadline must be completed in advance of Oct. 31, 2019.