**273**

**WANGER JONES HELSLEY PC**
Riley C. Walter  #91839
Kurt F. Vote   #160496
265 E. River Park Circle, Suite 310
Fresno, CA  93720
Telephone:　(559) 233-4800
Facsimile:　(559) 233-9330
Email:　　　rwalter@wjhattorneys.com
　　　　　　kvote@wjhattorneys.com

**ZUCKERMAN SPAEDER LLP**
Carl S. Kravitz, *pro hac vice*
R. Miles Clark, *pro hac vice*
1800 M Street, NW, Suite 1000
Washington, DC 20036
Telephone:　(202) 778-1800
Facsimile:　(202) 822-8106
Email:　　　ckravitz@zuckerman.com
　　　　　　mclark@zuckerman.com

Attorneys for: Plaintiff RANDY SUGARMAN, Liquidating Trustee

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DIVISION OF CALIFORNIA**

**FRESNO DIVISION**

| | |
|---|---|
| In re<br><br>GREGORY JOHN TE VELDE,<br><br>　　　　　Debtor.<br><br>RANDY SUGARMAN, Chapter 11 Trustee,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>IRZ CONSULTING, LLC aka IRC CONSTRUCTION DIVISION, LLC,<br><br>　　　　　Defendants. | Bankruptcy Case No. 18-11651-A-11<br><br>Chapter 11<br><br>Adv. Pro. No. 19-01033-B<br><br>DCN: MNG-3<br><br>**EXHIBITS TO THE DECLARATION OF R. MILES CLARK IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:　April 23, 2025<br>Time:　11:00 a.m.<br>Place:　2500 Tulare Street<br>　　　　Fresno, CA 93721<br>　　　　5th Floor, Courtroom 13<br>Judge:　Honorable Rene Lastreto II |

1

EXHIBITS TO THE DECLARATION OF R. MILES CLARK IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## INDEX TO EXHIBITS

| Exhibit | Description | Pages (bottom left corner) |
|---|---|---|
| 1 | Transcript of the videotaped deposition of Lindsay and IRZ, pursuant to Fed. R. Civ. P. 30(b)(6), on May 30, 2024, via the designated corporate representative Wayne Downey | 004-040 |
| 2 | E-mail dated Oct. 3, 2015, from Wayne Downey to Fred Ziari, attaching a document named "Tevelde services agreement 10-1-15.docx." The document was produced by IRZ and bears Bates numbers IRZ019757-19771. | 041-056 |
| 3 | E-mail dated Oct. 19, 2015, from Wayne Downey to Fred Ziari, attaching a document named "Tevelde services agreement 10-15-15.docx." The document was produced by IRZ and bears Bates numbers IRZ0022580-22594. | 057-072 |
| 4 | E-mail dated Nov. 4, 2015, from Wayne Downey to Fred Ziari, attaching a document named "Tevelde project management agreement 11-4-15.docx." The document was produced by IRZ and bears Bates numbers IRZ022523-22537. | 073-088 |
| 5 | E-mail dated Nov. 6, 2015, from Wayne Downey to Fred Ziari, attaching a document named "Tevelde project management agreement T&M 11-6-15.docx." The document was produced by IRZ and bears Bates numbers IRZ022488-22504. | 089-106 |
| 6 | Transcript of the videotaped deposition of Lindsay and IRZ, pursuant to Fed. R. Civ. P. 30(b)(6), on May 30, 2024, via the designated corporate representative Farahmand "Fred" Ziari. | 107-115 |
| 7 | Excerpts of the transcript of the deposition of Fred Ziari, on Apr. 26, 2023. | 116-127 |
| 8 | Excerpts of the transcript of the deposition of Wayne Downey, on Apr. 18, 2023. | 128-140 |
| 9 | Chubb/Ace Advantage Contractor's Professional Liability Policy, effective Dec. 1, 2017, to Dec. 1, 2018. The document was produced by IRZ and bears Bates numbers IRZ025154-25185. | 141-173 |

2

EXHIBITS TO THE DECLARATION OF R. MILES CLARK IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## INDEX TO EXHIBITS

| Exhibit | Description | Pages (bottom left corner) |
|---|---|---|
| 10 | Monthly invoices, dated Feb. 1, 2016, through Aug. 1, 2017, from ICD IRZ Construction Division By Lindsay to Willow Creek Dairy. The documents were produced by IRZ and bear Bates numbers IRZ001319-1337. | 174-193 |
| 11 | E-mail dated Aug. 11, 2016, from Wayne Downey to Michael Limas. The document was produced by IRZ and bears Bates numbers IRZ021457-21458. | 194-196 |
| 12 | E-mails sent by Wayne Downey, which attach CAD drawings related to the Willow Creek Dairy project. The documents were produced by IRZ and bear Bates numbers IRZ021884-21887; IRZ021468-21481; and IRZ016014-16024. | 197-226 |
| 13 | Letter dated Apr. 5, 2017, from Wayne Downey to Greg te Velde. The document was produced by IRZ and bears the Bates number IRZ001464. | 227-228 |
| 14 | "Membership Interest Purchase Agreement," dated August 27, 2021, by and among IRZ Holding Company LLC and Lindsay Sales Holding Co., LLC. The document was produced by Lindsay Corporation and bears Bates numbers LINDSAY000003-19. | 226-246 |
| 15 | Ace Advantage Professional Liability Policy for Design Professionals, effective December 1, 2014 to December 1, 2015. The document was produced by IRZ and bears Bates numbers IRZ025271-25296. | 247-273 |

DATED: APRIL 2, 2025           WANGER JONES HELSLEY PC

By: _____/s/ *Kurt F. Vote*_____
Kurt F. Vote
Attorneys for
Randy Sugarman, Chapter 11 Trustee

3

# Exhibit 1

```
                    UNITED STATES BANKRUPTCY COURT

                   EASTERN DIVISION OF CALIFORNIA

                          FRESNO DIVISION
```

| | |
|---|---|
| In re ) | Bankruptcy Case No. |
| ) | |
| GREGORY JOHN TE VELDE, ) | Chapter 11 |
| ) | |
| Debtor. ) | Adv. Pro. No. 19-01033-B |
| _____) | |
| | |
| RANDY SUGARMAN, Chapter ) | |
| 11 Trustee, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| IRZ CONSULTING, LLC aka ) | |
| IRC CONSTRUCTION ) | |
| DIVISION, LLC, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

VIDEO-RECORDED VIDEOTAPED DEPOSITION OF

LINDSAY CORPORATION AND IRZ CONSULTING with

designated corporate representative

WAYNE DOWNEY pursuant to Rule 30(b)(6) at

The Lodge at Columbia Point, 530 Columbia

Point Drive, Richland, Washington,

commencing at 10:06 a.m. PDT, on Thursday,

May 30, 2024, taken remotely via Zoom before

Marla Sharp, RPR, CLR, CCRR, CA CSR 11924,

OR CSR 17-0446, WA CSR 3408.

## Page 2

```
 1  APPEARANCES OF COUNSEL:
 2
 3  FOR THE PLAINTIFF RANDY SUGARMAN, CHAPTER 11 TRUSTEE
 4      ZUCKERMAN SPAEDER LLP
        BY:  R. MILES CLARK, ESQ.
 5      1800 M Street NW, Suite 1000
        Washington, DC 20036
 6      202-778-1800
        mclark@zuckerman.com
 7
 8
    FOR THE DEFENDANT IRZ CONSULTING, LLC
 9
        Miller Nash LLP
10      BY:  KYLE D. SCIUCHETTI, ESQ.
        500 Broadway Street, Suite 400
11      Vancouver, Washington 98660
        360-699-4771
12      kyle.sciuchetti@millernash.com
13
14  FOR THE THIRD-PARTY DEFENDANT VALMONT NORTHWEST, INC.
15      MCGRATH NORTH MULLIN & KRATZ, PC LLO
        BY:  JAMES J. NIEMEIER, ESQ. (via Zoom)
16      First National Tower
        1601 Dodge Street, Suite 3700
17      Omaha, Nebraska 68102
        402-341-3070
18      jniemeier@mcgrathn01ih.com
19
20  FOR THE THIRD-PARTY DEFENDANT VALMONT NORTHWEST, INC.
21      WILD CARTER TIPTON
        BY:  TRACY A. AGRALL, ESQ. (via Zoom)
22      246 West Shaw Avenue
        Fresno, California 93704
23      559-224-2131
        tagrall@wctlaw.com
24
25
                                                 Page 2
```

## Page 3

```
 1  APPEARANCES OF COUNSEL (continued):
 2
 3  FOR THE THIRD-PARTY DEFENDANT JOHN FAZIO DBA FAZIO
    ENGINEERING
 4
        EVANS, WIECKOWSKI, WARD & SCOFFIELD, LLP
 5      BY:  Heather M. Puentes, ESQ. (via Zoom)
        745 University Avenue
 6      Sacramento, California 95825
        916-923-1600
 7      hpuentes@ewwsllp.com
 8
 9  FOR THE THIRD-PARTY DEFENDANT MAAS ENERGY WORKS, INC.
10      MOORE & BOGENER, INC.
        BY:  AARON W. MOORE, ESQ. (via Zoom)
11      1600 West Street
        Redding, California 96001
12      530-605-0355
        amoore@mooreandbogener.com
13
14
    ALSO PRESENT:
15
        Vladimir Korneychuck, videographer
16
17
18
19
20
21
22
23
24
25
                                                 Page 3
```

## Page 4

```
 1                  I N D E X
 2  EXAMINATION                              PAGE
    WAYNE DOWNEY
 3
 4      BY MR. CLARK                         9, 134
 5      BY MR. NIEMEIER                      131
 6      BY MS. PUENTES                       132
 7
 8
 9           DEPOSITION EXHIBITS
10  EXHIBIT         DESCRIPTION              PAGE
11  Exhibit 201  Amended Notice of Taking     9
12               Deposition of the Person Most
13               Knowledgeable of IRZ Consulting,
14               LLC Pursuant to FRCP 30(b)(6)
15               (6 pages, not Bates stamped)
16
17  Exhibit 202  Amended Notice of Taking     9
18               Deposition of the Person Most
19               Knowledgeable of Lindsay
20               Corporation Pursuant to FRCP
21               30(b)(6) (6 pages, not Bates
22               stamped)
23
24
25
                                                 Page 4
```

## Page 5

```
 1                  I N D E X
 2                  (continued)
 3           DEPOSITION EXHIBITS
 4  EXHIBIT         DESCRIPTION              PAGE
 5  Exhibit 203  10-3-15 e-mail to Fred Ziari from   36
 6               Wayne Downey (15 pages, Bates Nos.
 7               IRZ019757 - IRZ019771)
 8
 9  Exhibit 204  10-19-15 e-mail to Fred Ziari from  47
10               Wayne Downey (15 pages, Bates Nos.
11               IRZ022580 - IRZ022594)
12
13  Exhibit 205  1-4-15 e-mail to Fred Ziari from    56
14               Wayne Downey (15 pages, Bates Nos.
15               IRZ022523 - IRZ022537)
16
17  Exhibit 206  11-6-15 e-mail to Fred Ziari from   60
18               Wayne Downey (17 pages, Bates Nos.
19               IRZ022488 - IRZ022504)
20
21  Exhibit 207  8-16-18 e-mail to Lindy Widner      96
22               from Wayne Downey (12 pages, Bates
23               Nos. IRZ019480 - IRZ019491)
24
25
                                                 Page 5
```

## Page 6

```
           I N D E X
            (continued)

     PREVIOUSLY MARKED DEPOSITION EXHIBITS
EXHIBIT          DESCRIPTION              PAGE
Exhibit 112   9-30-15 Work Order (4 pages, Bates   16
              Nos. IRZ001459 - IRZ001462)

Exhibit 113   Design, Engineer, and Project        64
              Management Services for Greg
              Tevelde [sic] Willow Creek Dairy
              Construction Project November 2015
              (15 pages, Bates Nos. IRZ001379 -
              IRZ001393)
```

## Page 7

　　　　　　RICHLAND, WASHINGTON
　　　　　　THURSDAY, MAY 30, 2024
　　　　　　10:06 A.M. PDT,
　　　　　　　　- - -
　　　THE VIDEOGRAPHER: Good morning. My name is Vladimir Korneychuck. I'm your videographer. And I represent Imagine Court Reporting. I'm not financially interested in this action, nor am I a relative or employee of any attorney or parties.
　　　This begins media 1 of the videotaped deposition of Wayne Downey as PMK for Lindsay Corp and PMK for IRZ Consulting in the matter of Gregory John te Velde, et al., versus IRZ Consulting, Case No. 18-11651-A-11, held via Zoom remote videoconference and at The Lodge at Columbia Point in Richland, Washington.
　　　Today's date is May 30th, 2024. The time is approximately 10:06 a.m.
　　　The certified court reporter from Imagine is Marla Sharp.
　　　This deposition is being recorded at all times unless all counsel agree to go off the video record.
　　　Would all counsel present please state their appearances and affiliations, after which the court

## Page 8

reporter will swear in the witness.
　　　MR. CLARK: Miles Clark from Zuckerman Spaeder on behalf of the plaintiff, Randy Sugarman, the Chapter 11 trustee in this action.
　　　MR. SCIUCHETTI: Kyle Sciuchetti from Miller Nash, representing IRZ and Lindsay.
　　　MS. AGRALL: Tracy Agrall appearing for Valmont Northwest Industries.
　　　MR. NIEMEIER: James Niemeier also. I am Nebraska counsel for Valmont Northwest Industries.
　　　MS. PUENTES: Heather Puentes on behalf of John Fazio d/b/a Fazio Engineering.
　　　MR. MOORE: Aaron Moore for Maas Energy Works.
　　　MR. CLARK: All right. I think that's everyone.
　　　Good morning, Mr. Downey.
　　　THE COURT REPORTER: Oh, one second. Let me swear our witness in. Apologies.
　　　MR. CLARK: Oh, I'm sorry. I keep trying to jump in there.
　　　　　　WAYNE DOWNEY,
　　　having been first duly sworn,
　　　was examined and testified as follows:
　　　THE COURT REPORTER: Thank you.

## Page 9

　　　Counsel, you may proceed.
　　　　　　EXAMINATION
BY MR. CLARK:
　Q　Third time's a charm. Morning, Mr. Downey.
　A　Good morning.
　Q　My name is Miles Clark. I represent Randy Sugarman, the bankruptcy trustee in this action. We met earlier. I appreciate your appearance here this morning. I understand you've been deposed in this matter over two days about a year ago.
　　　I will do my best to limit the repetition, but there will be some necessary repetition because, unlike your prior deposition when you were appearing in your personal capacity, today you're appearing on behalf of Lindsay Corporation and on behalf of IRZ Consulting LLC as the person most knowledgeable of certain topics.
　　　Do you understand that?
　A　Yes.
　　　(Deposition Exhibit 201 and
　　　Exhibit 202 were marked for
　　　identification.)
BY MR. CLARK:
　Q　I'd like to go ahead and show you, first,

what I've marked as Exhibit 201, which is an "Amended Notice of Taking of Deposition of the Person Most Knowledgeable of IRZ Consulting, LLC."

And I'll also show you what I've marked as Exhibit 202, which is an "Amended Notice of Taking of Deposition of the Person Most Knowledgeable of Lindsay Corporation Pursuant to FRCP 30(b)(6)."

Do you see both of those documents?

A   Yes.

Q   Have you seen them before?

A   Yes.

Q   Now, they are substantively identical other than one is directed to Lindsay Corporation and one is directed to IRZ Consulting LLC; is that correct?

A   To my knowledge.

Q   To your knowledge?

And I understand you've been identified for certain of the topics; is that correct?

A   Yes.

Q   Am I correct, looking at Exhibit 201, you've been designated on behalf of both Lindsay and IRZ?

And, I guess -- strike that.

When I say "Lindsay," I'm referring to Lindsay Corporation.

Does that make sense to you?

Page 10

A   Yes.

Q   And, similarly, I'll refer to both IRZ Consulting LLC, including IRZ Consulting LLC doing business as IRZ Construction Division, as "IRZ."

Is that understandable to you?

A   Correct.

Q   Okay. So, again, looking at Exhibit 201 on page 3, there are the PMK categories. Do you see that?

A   Yes.

Q   And, as I understand, you are designated on behalf of both IRZ and Lindsay to testify about topic No. 1. Is that correct?

A   Yes.

Q   It's the terms of the work order.

And you are similarly designated to testify on topic No. 2:

"The terms of the design, engineer, and project management services contract."

Is that correct?

A   Yes.

Q   Mr. Downey, did you do anything to prepare on those two topics?

A   I reviewed my previous depositions. I

Page 11

reviewed three other documents: the work order that's being discussed and the contract that's being discussed, and I also reviewed a letter of construction status dated 7-12-2016.

Q   And that was a letter from you to Mr. te Velde?

A   Correct.

Q   Pretty good memory.

Did you speak with any individuals to prepare?

A   Fred and Kyle.

Q   Any -- and "Kyle," you mean Mr. Sciuchetti?

A   Our attorney.

MR. SCIUCHETTI: "Shuh-ketty."

MR. CLARK: Sciuchetti.

BY MR. CLARK:

Q   Did you talk to anyone else?

A   No.

Q   You are also designated, as I understand, to testify about topic No. 3, which is:

"The work you" -- and that's "you," defined as Lindsay and IRZ -- "performed and/or services you provided relating to the work order and the design, engineer, and project

Page 12

management services contract."

Is that correct?

A   Yes.

Q   Did you do anything to prepare for that topic?

A   Just what I previously stated. I reviewed those three documents and discussed it with Kyle and Fred.

Q   When did you discuss it with your attorney and Mr. Ziari?

A   Yesterday.

Q   Yesterday. Okay. And how long was that?

A   Forty minutes.

Q   Okay. Nothing else to prepare?

A   No.

Q   And, finally, I understand you've been designated to testify on topic No. 6. Do you see that?

A   Yes.

Q   Is that accurate?

A   Correct.

Q   And that's:

"Prior to the date of the work order, any experience or expertise" Lindsay or IRZ "had relating to

Page 13

**Page 14**

```
 1            design, engineering, and project
 2            management services relating to the
 3            construction and development of
 4            commercial dairy facilities."
 5       Is that correct?
 6   A  Yes.
 7   Q  And I suspect I know the answer, but did you
 8 do anything to prepare for that?
 9   A  The --
10   Q  Just the same --
11   A  Just the same documents.
12   Q  Okay.
13       All right.  Mr. Downey, you can --
14   A  Can I ask a question --
15   Q  -- put those documents aside -- oh,
16 absolutely.
17   A  -- about topic No. 6?
18   Q  Yes.
19   A  So this is the experience I'm aware of that
20 IRZ and Lindsay had or me personally?
21   Q  Well, the -- I would say both.
22   A  Okay.
23   Q  I mean, it's the experience that -- because
24 "you" in the topics is defined to include IRZ,
25 Lindsay, their subsidiaries, their parents, employees
```

**Page 15**

```
 1 and whatnot.
 2   A  Okay.
 3   Q  So you were -- you would be included.
 4   A  Okay.
 5   Q  Does that make sense?
 6   A  Yes.
 7   Q  And that's actually a very good point.  I
 8 know you've been deposed in this case before.
 9       Have you been deposed otherwise?  I can't
10 remember.
11   A  Otherwise...
12   Q  In other cases?
13   A  Oh, yes.
14   Q  Okay.  So you've been deposed many times.
15 So that's --
16   A  Not "many," but too many.
17   Q  So the main -- so I didn't -- you know,
18 because you've been through this before --
19   A  Yeah.
20   Q  -- I -- there's usually a spiel I give to
21 witnesses who haven't been deposed before.
22       I didn't because you've been deposed before,
23 and I know you have a hard stop this afternoon.
24       But the one thing -- I will admonish you
25 that if -- partially because I'm new to this matter,
```

**Page 16**

```
 1 the subject matter is new to me, I may get
 2 terminology, you know, incorrect or I may not say
 3 certain things clearly.
 4       If, for any reason, you don't understand one
 5 of my questions, you know, please let me know, or if
 6 I say something incorrect.
 7       Not trying to trick you here at all.  I
 8 mean, this is only going to be successful if we have
 9 a meeting of the minds.  I want us to understand each
10 other and not speak over each other.  But, please, if
11 you don't understand, need clarification, please let
12 me know.
13   A  I will.
14   Q  Okay.  And if -- related to that, if you
15 answer my question, is it fair for me to expect that
16 you did understand it?
17   A  Yes.
18   Q  Okay.  I will now show you the work order,
19 which I understand has previously been marked as
20 Exhibit 12 -- or 112.
21       Do you recognize this document?
22   A  I do.
23   Q  And this is a work order between IRZ and
24 Mr. te Velde --
25   A  Correct.
```

**Page 17**

```
 1   Q  -- dated September 30th, 2015?
 2   A  Correct.
 3   Q  Mr. Downey, if you look at about the fifth
 4 line down on the right for the "Fee Quoted," it says
 5 "NTE $100,000."
 6   A  Yes.
 7   Q  Now, that's trade -- it's time and materials
 8 not to exceed $100,000?
 9   A  That's correct.
10   Q  Okay.  And I understand you're not
11 designated today to testify about actual invoices
12 that were submitted to Mr. te Velde.  So I'll hold
13 off that until later.
14       But I will -- like to ask you a little bit
15 about some of the terms of -- other terms of this
16 contract.  Okay?
17   A  Yes.
18   Q  So turning down to the tasks that IRZ is to
19 provide under this work order, there are a bunch of
20 bullet points.  Do you see that?
21   A  Yes.
22   Q  The first one is:
23          "GPS generated site map with
24       elevations."
25       Can you explain what that means?
```

**Page 18**

1   A   That means our survey technician would go
2 out and take a grid, I think, possibly 100 feet or
3 200 feet -- I don't recall what it is, but he takes a
4 reading at a grid across the construction site to get
5 the topography.
6   Q   Okay.  And, just stepping back a little bit,
7 what is the construction site?  What is the subject
8 matter of this work order?
9   A   It is the CAFO site proper, or the dairy
10 site.
11   Q   And that is the dairy site of a property
12 that Mr. te Velde, at this point, had either
13 purchased or was in the process of purchasing and was
14 desiring to have a dairy built on a larger piece of
15 that property, correct?
16   A   He was -- I know he was desiring to build a
17 dairy on the approximate 400 acres that we did the
18 GPS on.
19   Q   Okay.
20   A   As far as whether he was purchasing or what
21 stage he was in, I don't have any knowledge.
22   Q   Okay.  And when I use the term "dairy"
23 today, I'm referring to the dairy that's the subject
24 of this contract, the subject of this litigation.
25      Do you understand that?

**Page 19**

1   A   Yes.
2   Q   And that's -- sometimes it's the Lost Valley
3 Farm, I've seen.  Sometimes Willow Creek Dairy.
4   A   That is correct.  I've seen both.
5   Q   Okay.  And there's also another Willow Creek
6 Dairy, correct, that Mr. te Velde had prior to this?
7   A   He leased it.
8   Q   Okay.  So I'll -- when I say "dairy" today,
9 you'll understand that I'm referring to the dairy
10 that IRZ was retained to do project management and
11 other services for, correct?
12   A   Correct.
13   Q   Okay.  So did -- back to the GPS-generated
14 site map with elevations.
15      Did IRZ perform that work?
16   A   Yes.
17   Q   Okay.  Who at IRZ?
18   A   To my recollection, it would have been
19 Josh Rowell.
20   Q   Okay.  And what is the purpose of a
21 GPS-generated site map with elevations?
22   A   It helps the excavation contractor design
23 the site as well as locating the different components
24 of the dairy on the site.
25   Q   All right.  The next bullet point is:

**Page 20**

1      "Site plan with structure, corral,
2      and waste handling component
3      locations."
4      Do you see that?
5   A   Yes.
6   Q   Can you explain what that means?
7   A   You take the GPS-generated site map and
8 place those components on that site map at the most
9 strategic location for the dairy operation.
10   Q   All right.  And you just said "most
11 strategic location."
12      Is that the most -- were you referring to
13 the most strategic location for the actual structures
14 within the dairy location?
15   A   Correct.
16   Q   Okay.  Not the most strategic location for
17 the dairy within the entire property?
18   A   No.
19   Q   Okay.  Was IRZ involved in selecting the
20 actual site for the dairy within the broader
21 property?
22   A   No.
23   Q   Who made that decision?
24   A   Mr. te Velde, to my knowledge.  I know IRZ
25 did not.

**Page 21**

1   Q   Did IRZ have any involvement in it?
2   A   No.
3   Q   Did IRZ have an opinion of whether it was a
4 choice location --
5   A   Yes.
6   Q   -- for the new property?
7   A   Yes.
8   Q   And what was that opinion?
9   A   It was a good location to site the dairy.
10   Q   Were there better locations to site the
11 dairy?
12   A   I don't know.  In my opinion, I didn't see
13 any.  But we didn't look for any, either.
14   Q   Why did you think it was a good location?
15   A   It's a -- it was a good location because
16 it's in the low point of the property.  And a CAFO
17 permit requires that there is no waste discharge from
18 the CAFO site proper or the dairy.  So there would
19 have been no runoff of effluent because the dairy was
20 situated in the low point.
21      And as well -- the irrigation water pumping
22 structure was a few hundred yards away from this
23 site.  And you would mix the effluent water from the
24 lagoons with the irrigation water at that point to
25 here -- to put the nutrients on the rest of the farm.

## Page 22

1    Q    There any other reasons why you thought it
2 was a good site?
3    A    Yes. There was enough elevation change to
4 limit the amount of horsepower required to flush the
5 dairy.
6    Q    Any other reasons?
7    A    Not to my knowledge. That's all I remember.
8    Q    Any other considerations in choosing, as a
9 general matter, a dairy site on a piece of property?
10    A    On this particular job, no. Mr. te Velde
11 made the decision, and that's where we sited the
12 dairy.
13    Q    Okay. Did he make the decision before this
14 work order was entered into?
15    A    Yes.
16    Q    Okay. Do you know how long before?
17    A    No.
18    Q    So, I guess, in summary, according to your
19 testimony, IRZ was not involved in selecting the site
20 of the dairy within the property, but IRZ thought it
21 was a good site?
22    A    Correct.
23    Q    Okay. And had IRZ been involved, it may
24 have been the same location?
25    A    Yes.

## Page 23

1    Q    Now, I know you testified about the site
2 plan before, so I won't repeat a lot.
3       But did -- IRZ did prepare a site plan?
4    A    We did the drafting of the site plan.
5    Q    Okay. And who was involved in that process?
6    A    Mr. te Velde mainly; Travis Love, his dairy
7 manager; and then the team from ICD, which consisted
8 of myself, Josh Rowell, Josh Obendorf, and Ian Brown.
9    Q    I'm sorry. The last was Ian Brown?
10    A    Yes.
11    Q    And is -- so who did the actual drafting?
12    A    It would -- our lead draftman was Ian Brown.
13    Q    Okay. And I gather it's an iterative
14 process, a moving process. There were multiple
15 drafts.
16    A    Correct.
17    Q    Okay. Was there ever a final site plan
18 prepared?
19    A    There was a site plan prepared that was
20 adequate to meet the requirements of the ODA and ODEQ
21 to issue the CAFO permit.
22    Q    And, just for the record, that's the Oregon
23 Department of Agriculture, ODA?
24    A    Correct.
25    Q    And ODEQ is the Oregon Department of

## Page 24

1 Environmental Quality?
2    A    Correct.
3    Q    And the work on the site plan continued
4 after the application for the permit?
5    A    Mr. te Velde changed several things on the
6 site plan that I'm not aware of. So I would have to
7 say yes.
8    Q    Okay. You said he changed things you were
9 not aware of.
10    A    Correct.
11    Q    I mean, are you aware of changes he made?
12    A    No.
13    Q    Okay. And I'm just curious how you would be
14 aware of the changes he made.
15    A    People talking. I'm not -- I can't testify
16 to the changes he made, but I heard he made changes.
17    Q    Did he do any drafting?
18    A    No.
19    Q    Okay. So he did not change a document; is
20 that --
21    A    No, he did not change the document.
22    Q    And, again, I don't know if I got an answer
23 to this, and I apologize if I did.
24       But was there ever a final site plan?
25    A    No.

## Page 25

1    Q    No. Okay.
2    A    A final site plan would be an as-built, and
3 there was never an as-built done.
4    Q    When you say "an as-built" --
5    A    That --
6    Q    -- there was never an as-built -- I'm sorry.
7    A    That is the plan as it was built.
8       After it's built, you finalize the plan.
9 That's the as-built.
10    Q    So an as-built of the entire plan is what
11 you were just referring to?
12    A    The dairy site.
13    Q    The entire dairy site?
14    A    Yes.
15    Q    Because there were actual facilities and
16 structures that were completed, correct?
17    A    That were built, is that what you mean?
18    Q    Yes.
19    A    Yes, there were buildings and structures
20 built.
21    Q    Were there any as-built drawings prepared,
22 completed for any of the structures or facilities
23 that were built?
24    A    No. Not to my knowledge. IRZ did not do
25 any.

**Page 26**

```
 1   Q   Okay.  If you could take a look again at
 2  Exhibit 112, at the third bullet point, which I'll
 3  read into the record:
 4           "Preliminary grading plan to be
 5           used for mass excavation
 6           calculations."
 7       Do you see that?
 8   A   Yes.
 9   Q   Could you explain what that is?
10   A   We generate that from the topog- --
11  GPS-generated topography map to assist the bidding
12  process for the mass excavation.  That's how many
13  yards of cut there is and how many yards of fill
14  there is.
15       That's, generally speaking, how a
16  earth-moving contractor would bid on a project.
17   Q   And was a preliminary grading plan
18  completed?
19   A   It was completed to the point that we got
20  bids from dirt-moving contractors.
21   Q   Now, I noted a bit of hesitation in your
22  answer.
23       Was it -- was any aspect of it not
24  completed?
25   A   The final grading plan was done by the
```

**Page 27**

```
 1  selected earth-moving contractor.
 2   Q   And who was that?
 3   A   Laser Land Leveling.
 4   Q   Okay.  Now, we are looking at this contract,
 5  this work order, which says nothing about
 6  subcontractors, correct?
 7   A   Correct.
 8   Q   And which we'll look at a little bit later
 9  as a subsequent contract between IRZ and Mr. te Velde
10  which has phases of the broader project that includes
11  some of these same bullet points.
12       Are you familiar with that?
13   A   Yes.
14   Q   So some of these tasks set forth here in the
15  work order were not completed -- let me strike that.
16       Some of these tasks set forth in the work
17  order were also included in the subsequent contract,
18  and the work was performed, for some of it, for weeks
19  or years; is that correct?
20   A   So the tasks in this work order --
21   Q   Mm-hmm.
22   A   -- were completed as Mr. te Velde requested
23  them.  And I don't recall if we completed all these
24  tasks, but I do know we completed enough of them to
25  move on to more of the design he wanted.
```

**Page 28**

```
 1   Q   Okay.  And I've seen from some of the
 2  earlier testimony that this work order -- variously
 3  described as feasibility work, preliminary work.
 4       Would you -- how would you characterize it?
 5   A   I would characterize it that way.
 6   Q   Okay.  Moving back to the preliminary
 7  grading plan, who at IRZ would have worked on that?
 8   A   It would have been the whole team of ICD,
 9  the four I mentioned previously.
10   Q   Okay.  And I see you distinguished ICD from
11  IRZ.
12   A   Correct.
13   Q   Okay.  Why do you make that distinction?
14   A   Because ICD was IRZ Construction Division.
15  That's what it stood for at that time.
16   Q   Okay.
17   A   It was doing business as.  And it was
18  collectively the management between Lindsay and IRZ
19  to separate the construction division from the
20  engineering and consulting.
21   Q   Okay.  So was ICD, in your mind, IRZ
22  Consulting LLC doing business as ICD or Lindsay
23  Corporation doing business as ICD?
24   A   I can't answer that.  I don't know.
25   Q   Okay.
```

**Page 29**

```
 1   A   It's above my level.
 2   Q   Okay.  And I only ask because you mentioned
 3  Lindsay and -- when I asked why you distinguished ICD
 4  and IRZ in your mind.
 5       And you had mentioned management at Lindsay
 6  and IRZ, correct?
 7   A   Correct.
 8   Q   Okay.  Moving next to the -- the next bullet
 9  point in the work order, "Preliminary infrastructure
10  plan..."  Do you see that?  It's the fourth bullet
11  point.
12   A   Yes.
13   Q        "Preliminary infrastructure plan
14           to include on site drain lines,
15           underground water lines and
16           underground power lines."
17       Was a preliminary infrastructure plan done?
18   A   There was a one-line drawing done, which
19  would be what is referred to as preliminary
20  infrastructure.
21   Q   A one-line drawing?  Who --
22   A   Yeah.  A one-line drawing is a drawing that
23  just -- that you put lines on the site plan where you
24  think the best location for the infrastructure
25  components are:  Electricity, water, effluent
```

**Page 30**

```
 1  water.
 2     Q   All right.  And who made that decision for
 3  where the components of the infrastructure plan would
 4  be located?
 5     A   Mr. te Velde.
 6     Q   Okay.  With any input from IRZ or ICD?
 7     A   We discussed it when we were drafting it,
 8  but it is a copy of the dairy that Mr. te Velde
 9  leased over at Threemile Canyon Farms.
10     Q   I'm sorry.  The infrastructure plan was a
11  copy of the infrastructure plan --
12     A   The whole dairy was a copy.  It had a few
13  different components, but, generally speaking, if you
14  walked out there and looked at that dairy, it'd look
15  just like the one he leased in -- on Threemile Canyon
16  Farms.
17     Q   So did the team from ICD that you referred
18  to, the four individuals -- yourself, the two
19  Joshes -- I think it's Obendorf and Rowell -- and
20  Ian Brown --
21     A   Yes.
22     Q   -- did you all have a copy of any
23  ready-for-construction or design documents or other
24  design documents regarding Mr. te Velde's dairy that
25  he was leasing at Threemile Canyon?
```

**Page 31**

```
 1     A   No.
 2     Q   So, then, how was it a carbon copy if you
 3  didn't have the underlying documents?
 4     A   I managed the construction of that dairy
 5  too.
 6     Q   Okay.
 7     A   And we -- we were allowed to go and look at
 8  some of the stuff we forgot about.
 9     Q   So essentially off of memory and then off of
10  just sight --
11     A   Visual.
12     Q   -- visual?
13     A   Yes.  It's only 5 miles away from the dairy
14  we're talking about.
15     Q   Okay.  So you didn't have any of the
16  engineer design documents for the other dairy?
17     A   There's no engineer design documents on any
18  of the dairies in Oregon that I'm aware of.  They're
19  not required.
20     Q   So, then, no, you didn't have --
21     A   No --
22     Q   -- copies?
23     A   -- we did not have any documents.
24     Q   And when you say they're not required,
25  they're not required by whom?
```

**Page 32**

```
 1     A   The regulatory agencies, which would be ODA,
 2  DEQ and the county building department.
 3         At that time.  Let me qualify that.  I don't
 4  know what the rules are now.
 5     Q   Actually, when you say "at that time," that
 6  reminds me of another --
 7         Are you -- I know when you were deposed
 8  earlier, you were still an employee of IRZ.
 9         Are you still an employee today?
10     A   Yes.
11     Q   Okay.  Moving to the next bullet point in
12  the work order.  I believe it's the fifth one down.
13         "Preliminary effluent water flow
14         line plan to include lines from site
15         drainage, structures, corrals, and
16         effluent handling components to lagoon
17         system."
18         Do you see that?
19     A   Yes.
20     Q   Was such a line -- plan, rather, prepared?
21     A   Yes.
22     Q   Who prepared it?
23     A   ICD.
24     Q   The same four individuals were involved in
25  that?
```

**Page 33**

```
 1     A   Yes, with Travis Love and Greg te Velde.  On
 2  every design that we drafted, they -- those two
 3  individuals were the final say.  Ultimately, it was
 4  Greg te Velde, but...
 5     Q   What is the purpose of a preliminary
 6  effluent water flow line plan?
 7     A   It's basically to make sure you can get the
 8  effluent and all the runoff to flow to the lagoon --
 9  or to flow to the separation system and then to the
10  lagoon.
11     Q   Okay.  Was the plan ever finalized?
12     A   It was finalized to the point where the CAFO
13  permit was approved.
14     Q   And could we take a look at the next bullet
15  point?
16         "Preliminary lagoon design
17         detailed enough to satisfy CAFO
18         application requirements."
19         Do you see that?
20     A   Yes.
21     Q   Was that performed?
22     A   Yes.
23     Q   Who did that?
24     A   John Fazio did the lagoon design.
25     Q   Was IRZ involved in that?
```

**Page 34**

1  A   We did some of the drafting, and he
2  discussed his designs with us and Mr. te Velde
3  because, ultimately, the decision was Mr. te Velde's
4  of what those lagoons looked like.
5  Q   Do you know, is Mr. te Velde an engineer?
6  A   I don't know.
7  Q   So following up on something you said
8  earlier, moving back to bullet point No. 2, the "Site
9  plan." Do you see that?
10 A   Yes.
11 Q   Was any engineering work done by IRZ to
12 prepare the site plan?
13 A   No.
14 Q   Any hydraulic studies?
15 A   No.
16 Q   And the same when we talked about the site
17 plan, we talked about the location of the site within
18 the farm, correct? Do you remember that?
19 A   Yes.
20 Q   And IRZ wasn't involved in choosing the
21 location, correct?
22 A   Correct.
23 Q   So, then, I gather IRZ also did not do any
24 engineering work in choosing the site. Correct?
25 A   They did not.

**Page 35**

1  Q   And did not do any hydraulic studies,
2  correct?
3  A   They did not.
4  Q   The preliminary grading plan, did IRZ do any
5  engineering work in preparing that?
6  A   No.
7  Q   Okay. Same with the -- same question
8  regarding the preliminary infrastructure plan.
9  A   There was no engineering done on any of
10 these except for the engineering John Fazio did on
11 the lagoon.
12 Q   Okay. And, just for the record, when you
13 say "any of these," you're referring to any of the
14 tasks that --
15 A   Correct.
16 Q   -- IRZ had or ICD pursuant to this work
17 order?
18 A   Correct.
19 Q   Okay. And was there any review of
20 Mr. Fazio's engineering work?
21 A   ODA and DEQ reviewed it.
22 Q   Okay. Any review by IRZ?
23 A   No.
24 Q   Why not?
25 A   Mr. Fazio's the engineer. ICD has no

**Page 36**

1  engineers in its team.
2  Q   Does IRZ have engineers?
3  A   Yes.
4  Q   Does Lindsay have engineers?
5  A   I don't know.
6  Q   You can put that exhibit to the side.
7      Or, before you do, can you just take a look
8  at the date? It's September 30th, 2015. Do you see
9  that?
10 A   I do.
11 Q   And I'm now going to show you a document
12 that I'll mark as Exhibit 203, which is an e-mail
13 from you to Mr. Ziari dated October 3rd, 2015,
14 attaching a draft contract for design, engineer, and
15 project management services for Greg te Velde.
16     And the -- for the record, the Bates numbers
17 for the document are IRZ019757 through 19771.
18     (Deposition Exhibit 203 was marked for
19     identification.)
20 BY MR. CLARK:
21 Q   If you could take a moment to review that.
22 A   Okay.
23     This is marked --
24 Q   Yeah. If you could take a look, Mr. Downey,
25 yes.

**Page 37**

1  A   Yes, I see it.
2  Q   Okay. Do you recognize this document?
3  A   I don't recall this document.
4  Q   Okay. Do you recall drafting a contract --
5  drafting -- putting together a draft of a contract
6  that ultimately became a executed contract between
7  IRZ and Mr. te Velde?
8  A   Yes.
9  Q   Okay. Does this look like a draft of that
10 contract to you?
11 A   No.
12 Q   Why not?
13 A   Because it -- this is a contract that was
14 for general contractor services. We did not perform
15 any general contractor services for Mr. te Velde.
16 Q   And I'll -- and just -- I'm going to show --
17 walk you through a series of these, in part, because
18 there has been testimony, you know, to that effect,
19 that IRZ was not retained, at least under the
20 contract, to perform general contracting services.
21     And I think you will see, in these
22 documents, the change from "general contractor" to
23 "project management."
24     But I -- is this a draft of what ultimately
25 became the contract?

```
 1   A   These contracts --
 2   Q   Mm-hmm.
 3   A   -- are a result of a standard form, and then
 4   the wording is changed to accommodate what services
 5   we provide.
 6   Q   Okay.  And would you have provided the
 7   language?
 8   A   Some of it, yes.
 9   Q   Okay.  So let's just look at page 2.  And I
10   see here this -- under the "Scope of Work," this
11   clearly says "General Contractor Services."  Do you
12   see that?
13   A   I do.
14   Q   And I gather that was -- was that your
15   intention at first, to have IRZ be a general
16   contractor on this project?
17   A   Our intention at first was to offer our
18   services to Greg te Velde.  He decided what services
19   we provided.
20   Q   Okay.  And we'll see in a bit that he -- or
21   we'll see in a bit that the final contract identifies
22   Mr. te Velde as the general contractor, correct?
23   A   Yes.
24   Q   Okay.  But this one identifies IRZ, correct?
25   A   Yes.
                                                  Page 38
```

```
 1   Q   Okay.  Looking on page 2 to the duties of
 2   the general contractor, do you see paragraph 2?
 3   A   Yes.
 4   Q   And I'll just go ahead and read it.
 5           "ICD will oversee the design and
 6           engineering of this project with the
 7           owner, as needed, but on a minimum
 8           hold weekly progress meetings with the
 9           owner and project team."
10       And the project is team is IRZ ICD, correct?
11   A   Project team is ICD.
12   Q   Next sentence:
13           "ICD will oversee the design and
14           engineering of the project to
15           insure [sic] that all objectives of
16           the project are met in the final and
17           complete design."
18       Do you see that?  Did I read that correctly?
19   A   Yes.
20   Q   Okay.  And that was in this -- at least in
21   this draft.  I understand this was never executed,
22   but at least in this draft of the contract -- I
23   apologize.  The --
24           I apologize for that delay, Mr. Downey.
25           The paragraph I just read, as I understand
                                                  Page 39
```

```
 1   it, this was what at least you were proposing for
 2   ICD -- one of ICD's duties as a general contractor,
 3   correct?
 4   A   In this contract.  We're not talking about
 5   the same contract.
 6   Q   Yeah.  This was never signed --
 7   A   This is a different --
 8   Q   Yeah.
 9   A   This is a different contract from what we
10   did with Mr. te Velde.
11   Q   No, I understand.  This -- this document
12   here was never signed, correct?
13   A   It was never presented --
14   Q   And if you look at the last page --
15   A   -- to Mr. te Velde.  He didn't want it.
16       THE COURT REPORTER:  One at a time.
17       THE WITNESS:  Oh.
18       THE COURT REPORTER:  Can you repeat your
19   answer?
20       THE WITNESS:  It was never presented to
21   Mr. te Velde.  He did not want general contractor
22   services.
23   BY MR. CLARK:
24   Q   Well, I guess, was it ever presented to him
25   and he said, "No, I don't want that"?
                                                  Page 40
```

```
 1   A   I don't -- I know he said he does not want
 2   general contractor services.
 3   Q   Okay.  Do you know if you ever presented him
 4   with a document that --
 5   A   I don't remember.
 6   Q   Okay.  And that's perfectly fair.  It was a
 7   long time ago.
 8   A   It was.
 9   Q   This draft contract, again, which I
10   understand was never executed, also within the scope
11   of work beginning on section -- subsection 2, "Work
12   Phases to be Performed During the Project."  Do you
13   see that?
14   A   Yes.
15   Q   And there are 21 items listed over the
16   following several pages.  Do you see that?
17   A   Yes.
18   Q   And it may look familiar.
19       It's similar to the final executed contract,
20   correct?
21   A   Yes.
22   Q   These bullet points on this section of this
23   draft contract, which was never executed, I
24   understand to be -- the bullet points, that is --
25   services that ICD was to provide during these various
                                                  Page 41
```

**Page 42**

```
 1  work phases; is that accurate?
 2    A   Yes.
 3    Q   Okay.  Now, we're almost done with this
 4  draft document.  If you could take a look again at
 5  page 2 under "General Contractor Services," the last
 6  sentence of the first paragraph or this -- might be
 7  the second to last.  I'll go ahead and read.
 8    A   Okay.
 9    Q       "It is understood by the
10           owner..."
11        Do you see that?
12    A   Yes.
13    Q   Okay.  I'll go ahead and read it.
14           "It is understood by the owner and
15           project team that all services
16           provided by the project team for this
17           project will be on a time and material
18           basis based on the fee schedule
19           attached herein."
20        Do you see that?
21    A   Yes.
22    Q   So at least this current draft --
23        MR. SCIUCHETTI:  Object to the terminology
24  of "current draft."
25        MR. CLARK:  Okay.  The draft --
```

**Page 43**

```
 1        THE COURT REPORTER:  I'm sorry.  Could the
 2  objectioner please state their name?
 3        MR. SCIUCHETTI:  I'm sorry.  Kyle
 4  Sciuchetti.
 5  BY MR. CLARK:
 6    Q   So this document we're looking at here,
 7  which I understood you drafted, correct?
 8    A   These documents that we're looking at are
 9  preliminary documents that were used to develop ICD's
10  contracting documents.
11        They're all similar because I started with a
12  boilerplate document that I was provided by our --
13  IRZ at -- when I started working there, which was not
14  much before the te Velde project.
15    Q   Okay.  But, again, just the words on the
16  paper of this particular draft contract, which was
17  never executed.
18        MR. SCIUCHETTI:  Again, object to the
19  terminology "draft."
20        THE COURT REPORTER:  Mr. Sciuchetti, could
21  you turn your camera on so I can tell when you're
22  speaking?
23        MR. SCIUCHETTI:  You bet.
24        THE COURT REPORTER:  And speak up because
25  the mike's far from you.  Thank you.  And could you
```

**Page 44**

```
 1  repeat that?  I apologize.  Repeat the objection.
 2        MR. SCIUCHETTI:  A continuing objection to
 3  the term "draft."
 4  BY MR. CLARK:
 5    Q   Mr. Downey, is this a draft contract?
 6    A   No.
 7    Q   This is not a draft contract?
 8    A   No.
 9    Q   Then how would -- what would you --
10    A   I wouldn't say that it's even a draft
11  contract.
12    Q   Why?
13    A   It's a preliminary document to develop a
14  draft contract.
15    Q   Okay.  So this -- I'm sorry.
16        What -- how did you describe it again?
17    A   A preliminary document.
18    Q   Okay.  This preliminary document provided
19  that ICD would be paid on a time and materials basis
20  for general contracting services, correct?
21        MR. SCIUCHETTI:  Objection to the extent
22  that it references ICD.  I believe it says "IRZ
23  Construction Division."
24        THE COURT REPORTER:  Can you speak up,
25  Mr. Sciuchetti?
```

**Page 45**

```
 1        MR. SCIUCHETTI:  I have the microphone right
 2  here.  Is that -- is that not --
 3        MR. CLARK:  Oh, you know what?
 4        THE COURT REPORTER:  The microphone --
 5        MR. CLARK:  This is the only mike.
 6        THE COURT REPORTER:  -- that I can hear from
 7  is a small round thing on the table.
 8        MR. SCIUCHETTI:  Oh.
 9        THE COURT REPORTER:  So project your voice
10  towards that.  Thank you.
11        MR. SCIUCHETTI:  Apologize.  So this is for
12  the video, then.  Okay.  Apologize.  I will try to
13  speak up.
14        I just note for the record the document says
15  "IRZ Construction Division," short for ICD, I
16  suppose.
17        THE WITNESS:  So what was the question?  I'm
18  not sure I -- I lost my train of thought.
19  BY MR. CLARK:
20    Q   So this particular document provided that
21  IRZ Construction Division was going to be paid on a
22  time and materials basis, correct?
23    A   So this document and the document that the
24  agreement was signed for Mr. te Velde were generated
25  from the same preliminary documents.
```

**Page 46**

```
 1        The wording "based on the fee schedule
 2   attached herein" does not apply to general
 3   contracting.
 4   Q   Okay.  So moving on to the cover page, your
 5   e-mail, your second sentence here -- and then I'll
 6   show you another document that I think may give you
 7   some comfort -- your second sentence in your e-mail
 8   here, which I'll read:
 9             "After thinking about it I believe
10         we should add a nominal fee for our GC
11         license, say 2 or 3% of the cost of
12         material and labor of the project that
13         is not a part of what we are directly
14         charging for our other services."
15         Do you see that?
16   A   Yes.
17   Q   So you're -- at least here, I understand it,
18   you're beginning to talk about an additional
19   percentage-based fee for general contracting work,
20   correct?
21   A   No.
22   Q   No?  Okay.
23   A   No.
24   Q   So what are you talking about?
25   A   For a license.
```

**Page 47**

```
 1   Q   Okay.
 2   A   The license is worth something.  It's not
 3   for general contracting.
 4   Q   Okay.  All right.  You can put that aside.
 5       Showing you now a document which I will mark
 6   as Exhibit 204.
 7       (Deposition Exhibit 204 was marked for
 8        identification.)
 9   BY MR. CLARK:
10   Q   Take a few moments to review.
11       And while you're doing that, for the record,
12   this is an e-mail from you to Mr. Ziari dated Monday,
13   October 19th, 2015, attaching a document that's,
14   according to its title, "Tevelde services agreement,
15   10-15-15.doc."
16   A   Yes.
17   Q   Do you recognize this document?
18   A   I don't recall, no.
19   Q   Okay.  This appears, at least to me, as a
20   further iteration of an internal draft agreement.
21   And I'll again represent this particular document is
22   not executed and, as far as I know, never was.
23   A   That's correct.
24   Q   Okay.  And, I guess, before this particular
25   document, I mean, do you remember you and Mr. Ziari
```

**Page 48**

```
 1   discussing drafts of a contract with Mr. te Velde?
 2   A   I don't recall the details of the
 3   discussions, but I know we had them.
 4   Q   Okay.  Do you recall exchanging draft
 5   documents?
 6   A   I would send draft documents to Fred for
 7   review, yes.
 8   Q   Okay.  And are these -- understanding
 9   there's a template that you're working off of.  But,
10   to the extent there's a deviation from the template
11   to add particulars for this project, would you have
12   done the first draft?
13   A   Yes.
14   Q   Okay.  So turning to page 2 -- and, I guess,
15   the -- under "Scope of Work," "General Contractor
16   Services," I guess the first thing I will do is read
17   again paragraph 2 within that section.  Do you see
18   paragraph 2?
19   A   Yes.
20   Q       "ICD will oversee the design and
21         engineering of this project with the
22         owner, as needed, but on a minimum
23         hold weekly progress meetings with
24         the owner and project team.  ICD
25         will oversee the design and
```

**Page 49**

```
 1         engineering of the project to
 2         insure [sic] that all objectives of
 3         this project are met in the final
 4         and complete design."
 5       Do you see that?
 6   A   Yes.
 7   Q   And that, at least in this draft, is
 8   identified as a general contractor task or duty,
 9   correct?
10   A   Yes.
11   Q   Okay.  And, now, the language in this draft
12   up above regarding the fees that ICD is to receive is
13   different from the last version we looked at.
14   A   Yes.
15   Q   "It is understood."  Do you see that?
16   A   Yes.
17   Q   So I'll read it.  I'll just go ahead and
18   read into the record those two sentences.
19             "It is understood by the owner and
20         project team that all services
21         provided by the project team other
22         than the general contractor service
23         for this project will be on a time and
24         materials basis based on the fee
25         schedule attached herein.  For the
```

**Page 50**

```
 1              general contractor service provided by
 2              ICD, owner will compensate ICD eight
 3              percent of the total cost of the
 4              project excluding any changes [sic]
 5              for other services the project team
 6              provides to the owner."
 7         Do you see that?
 8    A    Yes.
 9    Q    So this has a completely different -- and I
10  think this is the type of fee structure you were
11  getting at earlier when I showed you the prior
12  document.  Correct?
13    A    Correct.
14    Q    Okay.  And was this fee structure identified
15  in this document or this document ever showed to
16  Mr. te Velde?
17    A    I don't recall.
18    Q    Okay.  But you do recall the concept of ICD
19  or IRZ providing general contractor services was
20  presented to Mr. te Velde in some form, and he
21  rejected it.
22    A    That's correct.
23    Q    Okay.  And, again, just take a quick gander
24  under "Scope of Work" in subsection 2, the "Work
25  Phases."  And, again, there's the 1 through 21.  It
```

**Page 51**

```
 1  goes on for a few pages with the bullet points.  And
 2  these don't appear to have changed in these two
 3  documents.
 4         Is that correct?  I don't know if you've had
 5  a chance to read it all, but...
 6    A    You'd have to wait for several hours for me
 7  to read all this.  But I don't know.
 8    Q    Okay.  I will represent that I don't recall
 9  seeing any, but I skimmed it.
10         All right.  You can put that one aside.
11         Actually, before you do that, can you just
12  take a look at the cover e-mail from you to
13  Mr. Ziari?
14    A    Yes.
15    Q    And you're asking Mr. Ziari to review this
16  version because you have -- you'd like to provide it
17  to Mr. te Velde; is that correct?
18    A    That's correct.
19    Q    And I think you were scheduled to meet with
20  him later that week.  Is that correct?
21    A    It says I was scheduled to meet with him on
22  Friday.
23    Q    Okay.  Does that refresh your recollection
24  whether a draft contract providing for general
25  contractor services was ever presented to
```

**Page 52**

```
 1  Mr. te Velde?
 2    A    It does not.
 3    Q    Okay.
 4    A    Mr. te Velde was not a fan of any paperwork.
 5    Q    Do you know why he was not a fan of --
 6    A    I don't.
 7    Q    -- hiring ICD to be a general contractor?
 8    A    Oh, yes, I do.
 9    Q    And why was that?
10    A    He was afraid -- he felt that he could act
11  as his own general contractor and save money.
12    Q    Okay.  How would he do that?
13    A    By not paying us the 8 percent or whatever
14  we would have agreed to.
15    Q    Okay.  And one thing I didn't ask you about
16  the work order -- I was waiting for later on --
17  there's a -- actually, let's just take a look.  Well,
18  let's take a look at the work order.  If you could
19  look at Exhibit 112 again.
20    A    What did I do with it?  There it is.
21    Q    Should be the -- yeah.  I think it's the
22  seventh bullet point for ICD's tasked -- tasks is:
23              "Preliminary cost estimates for
24              the project."
25    A    Correct.
```

**Page 53**

```
 1    Q    And then it says "(already provided)."
 2    A    Correct.
 3    Q    So I gather this means ICD already provided
 4  Mr. te Velde with preliminary cost estimates for the
 5  project.
 6    A    Yes.
 7    Q    Did you do that?
 8    A    Yes.
 9    Q    Did you do that orally?
10    A    I believe there is a spreadsheet that has
11  been entered into evidence that is a cost estimate.
12    Q    Okay.  So you --
13    A    But I don't recall.
14    Q    Okay.  You recall seeing a document at some
15  point, though?
16    A    Yes.
17    Q    And you say entered in evidence in this
18  case?
19    A    Yes.
20    Q    Okay.  So when you just said you don't --
21  you don't recall in real time whether a document was
22  prepared, but you've subsequently seen a document.
23    A    Oh, it was prepared.
24    Q    Okay.  It was --
25    A    I know that.
```

```
 1    Q    Okay.
 2    A    Yeah.
 3    Q    So do you recall what the figure was, what
 4  the cost estimate was?
 5    A    No.
 6    Q    What's your best recollection?
 7    A    I think it was somewhere around 50 million.
 8    Q    Okay.
 9    A    I'm not sure.
10    Q    Okay.  So 8 percent of 50 million is --
11    A    I'm not a mathematician.
12    Q    And neither am I.  But I just did that one
13  in my head.
14    A    Ten percent is 5 million.
15    Q    Exactly.
16    A    I know that.
17    Q    So 8 percent would be 4 million.  And he --
18  in your recollection, Mr. te Velde didn't want to pay
19  IRZ 4 million?
20    A    That's correct.
21    Q    Okay.  And you think that was the primary
22  reason why he didn't want to retain you all for --
23    A    Yes.
24    Q    -- general contracting services?  Okay.
25    A    That's the primary reason.  The other reason
```
Page 54

```
 1  is he felt that he was qualified to be his own
 2  general contractor.
 3    Q    And what's your basis for saying that?
 4    A    He's done smaller dairy projects, you know,
 5  additions and remodels on his dairies in California.
 6    Q    Okay.  I guess what I'm -- a little more
 7  specifically, did -- is that your impression of
 8  Mr. te Velde, or did he outright tell you?
 9    A    I don't recall.
10    Q    Okay.  Okay.  You can put Exhibit 112 aside
11  again.
12         Another draft.  Now I'm going to show you a
13  document that I will mark as Exhibit 205.
14         THE COURT REPORTER:  Are you skipping 204?
15         MR. CLARK:  I believe I gave him 204, but
16  maybe I'm wrong.  Yeah, I did -- maybe I forgot to
17  put it on the record, but I did provide the witness
18  with Exhibit 204, which was the last document.
19         You know what?  Let's -- should we quickly
20  go off the record, just to clarify this point?
21         Can we go off the record?
22         THE VIDEOGRAPHER:  Okay.  Off the record at
23  11:12 a.m.
24         (Recess taken from 11:12 a.m.
25         to 11:13 a.m.)
```
Page 55

```
 1         THE VIDEOGRAPHER:  Back on the record at
 2  11:13 a.m.
 3         (Deposition Exhibit 205 was marked for
 4         identification.)
 5  BY MR. CLARK:
 6    Q    All right.  Mr. Downey, apologize for that
 7  interruption.  I will show you what I've marked as
 8  Exhibit 205, which, for the record, is an e-mail from
 9  you to Mr. Ziari dated November 4th, 2015.  And the
10  Bates numbers are IRZ022523 through 22537.  And it's
11  an e-mail, again, attaching another -- what appears
12  to be te Velde project management agreement document.
13         First of all, do you recognize this
14  document?
15    A    No.
16    Q    Okay.
17    A    I don't recall this document, no.
18    Q    Okay.  Any reason to believe you didn't
19  send --
20    A    No.
21    Q    -- this e-mail?  Okay.
22    A    I'm sure that I did.
23    Q    And the same with the prior two documents --
24    A    Yes.
25    Q    -- that you -- you have no reason to --
```
Page 56

```
 1  okay.
 2         THE COURT REPORTER:  Sorry to interrupt, but
 3  if the witness could just wait for the question to be
 4  fully out so I can hear you both.  Thank you.
 5         MR. CLARK:  That was my fault.  I apologize.
 6  BY MR. CLARK:
 7    Q    This appears to me to be a further iteration
 8  of the internal draft documents we've been looking
 9  at.  Again, this is not signed, and I have not seen
10  this document ever being signed.
11         But is that an accurate description?  This
12  looks like a further iteration of the documents we've
13  been looking at.
14    A    That is correct.
15    Q    All right.  Turning to page 2 of the draft
16  unexecuted agreement, under "Scope of Work," it no
17  longer says "General Contractor."  Do you see that?
18    A    I do.
19    Q    Now it says "Project Management Services,"
20  correct?
21    A    Yes.
22    Q    Okay.  And is that your general recollection
23  of the evolution of this contract --
24    A    Yes.
25    Q    -- prior to its execution?
```
Page 57