**116**

MILLER NASH LLP
Kyle D. Sciuchetti, Admitted Pro Hac Vice
   *kyle.s@millernash.com*
Bernard Kornberg, CSB No. 252006
   *Bernie.kornberg@millernash.com*
Benjamin P. Tarczy, CSB No. 308367
   *benjamin.tarczy@millernash.com*
1140 SW Washington St, Ste 700
Portland, OR 97205
Telephone:    503.224.5858
Facsimile:    503.224.0155

MCCORMICK, BARSTOW, SHEPPARD,
WAYTE & CARRUTH LLP
Hagop T. Bedoyan, CSB No. 131285
7647 North Fresno Street
Fresno, California 93720
Telephone:    559.433.1300
Facsimile:    559.433.2300

Attorneys for IRZ Consulting, LLC and Lindsay
Corporation

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| In re | Bankruptcy Case No. 18-11651-A-11 |
| GREGORY JOHN TE VELDE, | Chapter 11 |
| Debtor. | Adv. Pro. No. 19-01033-B |
| | DC No. DCT-2 |
| RANDY SUGARMAN, CHAPTER 11 TRUSTEE, | **INDEX OF EXHIBITS IN SUPPORT OF DEFENDANTS' OPPOSITION TO DARI-TECH INC.'S SECOND MOTION FOR SUMMARY JUDGMENT** |
| Plaintiff, | |
| v. | |
| IRZ CONSULTING, LLC et al.; | |
| Defendants. | Hearing Date:  April 23, 2025 |
| | Time:  11:00 a.m. |
| AND RELATED CROSS-ACTIONS | Place:  Dept. B, Ctr. 13, 5th Fl.<br>U.S. Bankruptcy Court<br>2500 Tulare Street<br>Fresno, CA |
| | Judge:  Hon. Rene Lastreto |

| EXHIBIT | DESCRIPTION | PAGE NO. |
|---------|-------------|----------|
| | DECLARATION OF WAYNE DOWNEY | |
| A | Work Order | 4 |
| B | Services Agreement | 9 |
| C | Proposals for closed loop Biolynk flushing system | 25 |
| D | Plans for Components of Manure Management Systems created by Dari-Tech | 30 |
| E | Communications concerning opinions on sand lane sloping and pump depths sent by Dari-Tech | 55 |
| | DECLARATION OF BENJAMIN P. TARCZY | |
| F | Deposition Transcript of Wayne Downey, Volume 1 | 58 |
| G | Deposition Transcript of Wayne Downey, Volume 2 | 74 |
| H | Deposition Transcript of Wayne Downey, Volume 3 | 82 |
| I | Deposition Transcript of Travis Love | 97 |
| J | Deposition Transcript of Personal Most Knowledgeable of Dari-Tech, Inc. | 112 |

Dated: April 2, 2025      MILLER NASH LLP

By: */s/ Kyle D. Schiuchetti*
     Kyle D. Sciuchetti, OSB No. 965705, admitted *pro hac vice*
     Bernard Kornberg, CSB No. 252006
     Benjamin P. Tarczy, CSB No. 308367
     Hagop T. Bedoyan, CSB No. 13285

     Attorneys for IRZ Consulting, LLC and Lindsay Corporation

MILLER NASH LLP
ATTORNEYS AT LAW
PORTLAND

- 2 -

# EXHIBIT A



## Work Order

Client: __Greg Tevelde__    Date: __9/30/15__

Phone: __559-799-9111__    Fax: __559-752-4033__

Address: __5850 Ave. 160 Tipton Ca. 93272__

Project Name: __Willow Creek Dairy__    Project #: __16-001__

Project Leader: __Wayne Downey__    Fee Quoted: __NTE $100,000.00__

Select one: ___ Fixed Fee (lump sum) ___ Time & Material  X  Time & Material (NTE without permission)

IRZ Construction Division, an Oregon limited liability company (ICD) and CLIENT agree as follows:

CLIENT hires ICD to perform the following services and work:

IRZ Construction Division located at 500 N. 1st street, Hermiston Oregon 97838 will be retained by __Greg Tevelde__ (OWNER). ICD will provide the following tasks:

- GPS generated site map with elevations
- Site plan with structure, corral, and waste handling component locations
- Preliminary grading plan to be used for mass excavation calculations
- Preliminary infrastructure plan to include on site drain lines, underground water lines and underground power lines
- Preliminary effluent water flow line plan to include lines from site drainage, structures, corrals, and effluent handling components to lagoon system
- Preliminary lagoon design detailed enough to satisfy CAFO application requirements
- Preliminary cost estimates for project (already provided)
- Estimated schedule to construct project (already provided)
- All information provided by OWNER and others are assumed to be accurate.

Project Start Date: __9/30/15__    Estimated Finish: __12/30/15__

Additional terms: __This contract can be expanded and modified only by a written permission from Owner__

**Payment.** Unless other payments terms are specified herein, CLIENT shall pay invoice within 30 days. CLIENT shall incur a late fee of 1.5% per month on any unpaid balance.

**Termination of Services.** ICD may unilaterally terminate this contract and not conclude the services and work upon the following circumstances: CLIENT fails to make payment when due; or CLIENT refuses to cooperate with ICD's services and work or provide information or access to data, equipment, or land as requested and as determined

500 North 1st st.    Hermiston, Oregon 97838    541-567-0252   www.irz.com      Page | 1

## Providing all your Design and Construction needs

IRZ001459



by ICD in its sole opinion and discretion. **Upon termination of services, CLIENT shall be responsible for paying contract in full within 30 days of billing.**

**Equipment and Data.** The parties agree that the equipment and data prepared for the services and work are instruments of and the property of ICD.

**Litigation Testimony.** With these services and work, ICD provides no rights for litigation testimony and if litigation testimony is needed, prior arrangements must be made with ICD.

**Full Agreement; Modification; Time of the Essence; Venue.** This writing is the full and complete agreement between the parties concerning ICD'S services to CLIENT for the above services and work. This agreement may not be modified except by an agreement signed by ICD and CLIENT. Time is of the essence of this agreement. Venue for any litigation to enforce this agreement or arising out of this agreement shall lie in the State of Oregon in Umatilla County, or in the Oregon county in which the land is located.

**Liabilities:** The client agrees to limit ICD's liability to the client and to all construction contractors and sub-contractors on the project, due to ICD's or any employee of ICD's negligent acts, errors, or omissions, such that the total aggregate limit of ICD to all those names shall not exceed $50,000, or the amount of ICD's fees, whichever is less.

**Attorney's Fees.** If any legal action is filed to enforce a party's rights under this contract, or to interpret this contract, the prevailing party shall be entitled to his reasonable attorney's fees, costs and expenses from the other at trial, in arbitration, and on appeal.

**Contract Via Fax.** The parties may enter into this contract by exchanging faxed copies of this contract with the signature of both parties.

**Severability.** If any term, provision, covenant, or condition in this agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the rest of the agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

**Assignment.** ICD may assign this Agreement without the consent of the Client.

Providing all your Design and Construction needs

**IRZ001460**



**I R Z**

**Construction Division**

**AGREED:**

IRZ CONSTRUCTION DIVISION , an Oregon limited liability company

By: _____   Printed Name: _Fred Ziari_____   as

Agent for IRZ CONSTRUCTION DIVISION    Date: ___9/30/15_____
Director of Construction Wayne Downey

Name of CLIENT: _Greg Tevelde____

Signature: _____   Title:__Owner_____

Date: _9/30/15_____   Purchase Number _____

Contact Person & Phone:
_Greg Tevelde_____
_559-799-9111_____

Providing all your Design and Construction needs



## Service Fee Schedule 2015

## Design, Engineer and Project Management Services

Service charges for this project will be based on Time and Materials. The hourly charges are listed below. ICD will use based on their judgment one or many qualified persons to conduct these tasks. Invoice will be provided that shows the total hours and date spent for each individual. More detailed breakdown of billing information can be provided based on requests by the client.

| | | |
|---|---|---|
| **Principal [1]** | **$165** | **per hour** |
| **Director [1]** | **$160** | **per hour** |
| **Senior Engineer (PE) [1]** | **$160** | **per hour** |
| **Senior Hydrologist [1]** | **$150** | **per hour** |
| **Project Manager [1]** | **$150** | **per hour** |
| **Superintendent [2]** | **$135** | **per hour** |
| **Environmental Specialist [2]** | **$135** | **per hour** |
| **Project Engineer [2]** | **$135** | **per hour** |
| **Foreman [2]** | **$130** | **per hour** |
| **Estimator [2]** | **$130** | **per hour** |
| **Tradesman [2]** | **$120** | **per hour** |
| **Technical Staff [2]** | **$105** | **per hour** |
| **Technician** | **$ 80** | **per hour** |
| **Field Labor** | **$ 60** | **per hour** |
| **Clerical** | **$ 60** | **per hour** |
| **Outside Consultant / Services** | **Cost plus 20%** | |

**Daily Rates**

| | | |
|---|---|---|
| **[1] Per Day (>4 hours portal to portal)** | **$1500 per day** | |
| **[2] Per Day (>4 hours portal to portal)** | **$1250 per day** | |

| | |
|---|---|
| **Mileage Charge** | **at GSA Rates** |
| **Meal & Lodging** | **cost plus 20%** |

*Providing all your Design and Construction needs*

IRZ001462

# EXHIBIT B



**IRZ**

**Construction Division**

## Design, Engineer, and Project Management Services for
## Greg Tevelde
## Willow Creek Dairy Construction Project
## November 2015

917 - 16 - 003

Greg Tevelde (OWNER) intends to design engineer and construct a dairy facility "the Willow Creek Dairy-WCD" near Boardman Oregon beginning in November 2015. IRZ Construction Division (ICD) (a division of IRZ Consulting LLC) is pleased to offer our professional design, engineering, and project management services to assist OWNER in accomplishing this goal.

### BACKGROUND

The Willow Creek Dairy site is an approximately 9,000-acre farm currently being used to grow trees approximately 12 miles Southeast of Boardman Oregon. The dairy site by itself may utilize approximately 400-500 acres that will consist of a milking facility, freestall cow housing, open lot replacement facility, calf raising facility, commodity storage and processing facility, effluent handling system and solids storage. The remainder of the acreage will be phased in to center pivot irrigation systems to provide forage crops for the dairy with a rotation of various row crops.

### PROJECT OBJECTIVE

ICD will assist the OWNER to make sure that the project is designed and constructed to operate at maximum efficiencies while using quality materials and qualified personnel to minimize costs and achieve a long lasting and sustainable project.

ICD will act on behalf of the OWNER and will oversee all tasks associated with the project. These tasks may include but are not limited to, maintaining relationships with all governmental entities and assist in securing all necessary permits and approvals. Preparing take offs/List of Materials, pricing, ordering, logistics, receiving, inventory, tracking and insuring proper use of all equipment and materials for the project. Assist OWNER in hiring and overseeing all Sub Contractors. Developing, maintaining and tracking the construction schedule. Insure that the project is constructed to the quality and standards set forth by the industry. ICD will assist the OWNER in achieving this goal by completing a series of design and engineering tasks, as well as assisting OWNER in overseeing construction tasks, in phases. The phases will include but are not limited to:

1. Preliminary site design
2. Preliminary structure design
3. Request for quotes from pre-engineered building suppliers
4. Review and engineer all relevant structural designs ready for construction
5. Review and engineer all relevant civil site design ready for construction
6. Oversee construction of civil work
7. Design and engineer underground infrastructure
8. Oversee installation of underground infrastructure
9. Review and engineer all relevant lagoon design ready for construction
10. Oversee construction of lagoons
11. Review and engineer all relevant open lot replacement facility ready for construction
12. Oversee construction of open lot replacement facility
13. Review and engineer calf facility ready for construction
14. Oversee construction of calf facility,

500 North 1st st.    Hermiston, Oregon 97838    541-567-0252   www.irz.com       Page | 1

**IRZ001379**



**I R Z**

**Construction Division**

15. Review and engineer commodity storage and processing facility ready for construction
16. Oversee construction of commodity storage and processing facility
17. Review and engineer milking facility ready for construction
18. Oversee construction of milking facilities
19. Review and engineer freestall cow housing facilities ready for construction
20. Oversee construction of freestall cow housing facilities.
21. Design and engineer concrete construction. This is to include all flat work and foundations for the project.

These phases will be explained in the Scope of Work, and the tasks for each phase will be detailed in Work Orders for each phase. These phases may not be listed in chronological order and all or part of them may be undertaken concurrently.

# SCOPE OF WORK

## 1 – Project Management Services

Prior to the acceptance of this contract, it is understood by the OWNER and ICD:
- This project will be undertaken under the supervision and control of ICD as **Project Manager**.
- It is also understood that ICD will be acting on behalf of the OWNER as **Agent for the OWNER** and will report actual costs of all permits, materials, equipment, labor, sub contracts and any other costs that may be incurred for this project during the course of this project on or before they are incurred whenever possible.
- It is understood by Owner and ICD that the OWNER will be acting as the **General Contractor** for this project and will be responsible for all duties, responsibilities, and liabilities generally known to be General Contractor responsibilities, or found to be General Contractor responsibilities, under Oregon law.
- It is understood by Owner and ICD that as a GC the Owner is responsible for all safety and regulatory safety requirements on this project.
- It is understood that the OWNER will have all necessary equipment and trained operators for performing General Contractor duties.

It is also understood by the OWNER and ICD that all services provided by ICD for this project will be on a Time and Material basis, based on the fee schedule plus expenses attached herein. The duties of ICD may include but are not limited to:

1. ICD will oversee the design and engineering of this project. Will meet with the OWNER as needed, but on a minimum hold weekly progress meetings with the OWNER to discuss design changes. ICD will oversee the design and engineering of the project to insure that all objectives of the project are met in the final and complete design.

2. ICD and OWNER will develop a schedule in the form of a Gantt chart that includes all phases and tasks for the project and the project will be tracked in projected and actual progress so as to track the efficiency and actual progress of the project. To the best of ICD's ability this chart will be updated weekly.

3. ICD will assist OWNER to ensure that all approvals, inspections, licenses and permits for the construction of this project will be secured and in place. ICD will also assist OWNER with relevant information and data to develop and maintain working relationships with all governmental

IRZ001380



**I R Z**

**Construction Division**

agencies involved in this project so that they are aware and approve of all activities during construction of this project.

4. ICD will generate schedules, materials lists with costs, and other documents to assist in creating bid documents for sub-contractors. These schedules and lists will also be used for purchasing, tracking and insuring that the correct materials are being used on the project.

5. ICD will be responsible for developing subcontract documents and recommending to the OWNER all subcontractors and personnel to be hired on the project so as to insure continuity in the work schedule and procurement of equipment and materials to facilitate smooth logistics throughout the project.

## 2 – WORK PHASES TO BE PERFORMED DURING PROJECT

This section of the agreement will list the known phases of work to be performed for the successful completion of the project. This list may not contain work phases that are unknown at the date of this writing, but will include all phases that are known to be required for the successful completion of the project. The work phases are not intended to be listed in the order in which they may need to be performed in this document. The chronological order in which they will be performed will be determined when the schedule for the project is developed.

1. **Preliminary Site design:** The preliminary site design will consist of:

   - Preliminary design in this document shall mean, the design that is not the final stamped construction drawings but in enough detail necessary for CAFO approval and OWNER review and approval.

   - GPS generated topography map with existing elevations of the dairy site.

   - Preliminary staking of construction area locations to accommodate stump removal

   - Site plan with structure, corral, and effluent handling component locations

   - Preliminary grading plan to be used for mass excavation calculations

   - Preliminary infrastructure plan to include on site drain lines, underground water lines and underground power lines

   - Preliminary waste water flow line plan to include lines from site drainage, structures, corrals, and waste handling components to lagoon system

   - Preliminary lagoon design detailed enough to satisfy CAFO application requirements

   - Preliminary cost estimates for project (already provided)

   - Estimated schedule to construct project (already provided)

   - All information provided by OWNER and others are assumed to be accurate.

**IRZ001381**



2. **Preliminary structure design**: The preliminary structure design will consist of:

   - Provide Non-engineered drawings of all structures where pre-engineered structures will be used for construction, in detail sufficient enough for suppliers to design and quote each structure.

   - Provide specifications sufficient enough for suppliers to design and quote each structure. Drawings and specifications to include structure dimensions and floor plan layouts.

3. **Request for quotes from pre-engineered building suppliers**

   - Prepare bid documents and drawings and send to selected pre-engineered structure suppliers.

   - Receive and review quotes and designs from pre-engineered structure suppliers for complete compatibility with construction drawings.

   - Meet with OWNER to review bids and select structure supplier.

4. **Engineered structure designs ready for construction**

   - Meet with OWNER to finalize structure layout and details sufficient enough to design and engineer drawings for building permits and review and approval of OWNER.

   - After review and approval of drawings by the OWNER and the building authority make any necessary modifications and make drawings ready for construction.

   - Prepare bid packages and review with OWNER.

   - Submit bid packages to contractors for bid.

   - Meet with OWNER to review bids and select contractor for structure construction. This could be multiple contractors.

5. **Engineered site design ready for construction**

   - Meet with OWNER to finalize the site design, and layout of all structures, facilities, and infrastructure to be placed on site so that final grading can be designed for the site.

   - After site is designed meet with OWNER and ODA to get approval on the final design.

   - Make drawings ready for construction.

   - Prepare bid packages and review with OWNER.

   - Submit bid packages to contractors for bid

   - Meet with OWNER to review bids and select contractor for site construction.

6. **Construction of site design**

   - Oversee contractors during site construction.

   - Provide survey control to be used during construction of site.

   - Provide oversite of compaction testing during site construction.

IRZ001382



- Provide QA / QC during site construction.

7. **Design and engineer underground infrastructure**

- Meet with OWNER and service providers to determine appropriate routes for all underground infrastructure. Underground infrastructure to include but are not limited to electrical, water, communication, drain, effluent and sanitary sewer lines.

- After determining routes to be taken ICD will oversee the design & engineering of all conduit cable and pipe to insure that they will appropriately handle the demand and loads required.

- Meet with the service providers, permitting agencies and assist OWNER to get necessary approvals.

- After review and approval of drawings by the services providers, OWNER and permitting agencies, make any necessary modifications and make drawings ready for construction.

- Prepare bid packages for infrastructure installation and review with OWNER.

- Submit bid packages to contractors for bid

- Meet with OWNER to review bids and select contractor for infrastructure installation.

8. **Installation of underground infrastructure**

- Oversee contractor during underground installation.

- Provide control to be used during installation.

- Provide oversite of backfill and compaction during installation.

- Provide QA / QC during installation.

9. **Engineered lagoon design ready for construction**

- Meet with OWNER, to determine final design of lagoon system.

- Oversee lagoon design and engineering to insure proper design.

- Meet with OWNER and permitting agencies to obtain necessary approvals

- After review and approval of drawings by the OWNER and permitting agencies, make any necessary modifications and make drawings ready for construction.

- Prepare bid packages and review with OWNER.

- Submit bid packages to contractors for bid

- Meet with OWNER to review bids and select contractor for lagoon construction.

IRZ001383



10. **Construction of lagoons**

- Oversee contractor during lagoon construction.
- Provide control to be used during construction of lagoons.
- Provide oversite of compaction testing during lagoon construction.
- Provide oversite of lagoon liner installation
- Provide QA & QC during lagoon construction.

11. **Engineered open lot replacement facility design ready for construction**

- Meet with OWNER to finalize facility layout and details sufficient enough to design and engineer drawings for review and approval by OWNER and ODA.
- After review and approval of drawings by the OWNER and ODA make any necessary modifications and make drawings ready for construction.
- Prepare bid packages and review with OWNER.
- Submit bid packages to contractors for bid
- Meet with OWNER to review bids and select contractor for open lot facility construction. This could be multiple contractors.

12. **Construction of open lot replacement facility**

- Oversee contractor during open lot construction.
- Provide control to be used during construction of open lot.
- Provide oversite of fencing and shades during open lot construction.
- Provide QA / QC during open lot construction.

13. **Engineered calf facility design ready for construction**

- Meet with OWNER to finalize calf facility layout and details sufficient enough to design and engineer drawings for review and approval by OWNER.
- After review and approval of drawings by the OWNER make any necessary modifications and make drawings ready for construction.
- Prepare bid packages and review with OWNER.
- Submit bid packages to contractors for bid
- Meet with OWNER to review bids and select contractor for open lot facility construction. This could be multiple contractors

IRZ001384



### 14. Construction of calf facility

- Oversee contractor during calf facility construction.
- Provide control to be used during calf facility construction.
- Provide QA / QC during calf facility construction.

### 15. Engineered commodity storage and processing facility design ready for construction

- Meet with OWNER to finalize commodity storage and processing facility layout and details, sufficient enough to design and engineer drawings for review and approval by OWNER.
- After review and approval of drawings by the OWNER make any necessary modifications and make drawings ready for construction.
- Prepare bid package and review with OWNER.
- Submit bid package to contractors for bid
- Meet with OWNER to review bids and select contractor for commodity storage and processing facility construction. This could be multiple contractors

### 16. Construction of commodity storage and processing facility

- Oversee contractor during commodity storage and processing facility construction.
- Provide control to be used during commodity storage and processing facility construction.
- Provide QA / QC during commodity storage and processing facility construction.

### 17. Engineered milking facility designs ready for construction

- Meet with OWNER and permitting authorities to finalize milking facility layout and details, sufficient enough to design and engineer drawings for review and approval by OWNER and permitting authorities.
- After review and approval of drawings by the OWNER and permitting authorities make any necessary modifications and make drawings ready for construction.
- Prepare bid package and review with OWNER.
- Submit bid package to contractors for bid
- Meet with OWNER to review bids and select contractor for milking facility construction. This could be multiple contractors

### 18. Construction of milking facilities

- Oversee contractor during milking facility construction.
- Provide control to be used during milking facility construction.
- Provide QA / QC during milking facility construction.

IRZ001385



### 19. Engineered freestall cow housing facilities design ready for construction

- Meet with OWNER and permitting authorities to finalize freestall cow housing facilities layout and details, sufficient enough to design and engineer drawings for review and approval by OWNER and permitting authorities.

- After review and approval of drawings by the OWNER and permitting authorities make any necessary modifications and make drawings ready for construction.

- Prepare bid package and review with OWNER.

- Submit bid package to contractors for bid

- Meet with OWNER to review bids and select contractor for freestall cow housing facilities construction. This could be multiple contractors

### 20. Construction of freestall cow housing facilities

- Oversee contractor during freestall cow housing facilities construction.

- Provide control to be used during freestall cow housing facilities construction.

- Provide QA / QC during freestall cow housing facilities construction.

### 21. Design and engineer concrete construction

- Design and engineer all types of concrete construction for the project. This is to include all slab on grade, poured in place walls, footings, and any other type of concrete construction to be used on the project.

- After review and approval of drawings by the OWNER and permitting authorities make any necessary modifications and make drawings ready for construction.

- Prepare bid package and review with OWNER.

- Submit bid package to contractors for bid

- Meet with OWNER to review bids and select contractor for concrete construction. This could be multiple contractors.

IRZ001386

16 of 116



## 3 - PROJECT SCHEDULE

ICD understands that time is of essence due to milestone dates set by the lease of a dairy where Willow Creek Dairy currently operates. The design, engineering and project management services work will begin immediately upon approval of this Agreement. The schedule for the Scope of Work is understood to begin immediately upon approval, and to be in effect through the completion of the design, engineering, construction, commissioning and into actual facilities operation, as needed.

ICD will develop and manage a construction and administrative activity Gantt chart and regularly update and distribute to OWNER and SUB-CONTRACTORS.

**Please Note** that the ICD cannot guarantee this timeline as the acquisition and delivery of construction material, the construction timeline, contractor workforce and equipment, weather, financial, government licensing, government regulations and others are outside of the control of ICD.

### Estimated Timeline for the Willow Creek Dairy Design, Engineering and Construction Project

– ICD has, based on certain assumptions, made an attempt to estimate the timeline and schedule for completion of this project. Some of the timeline activities may happen concurrently. ICD will refine this estimate after meeting with OWNER/representatives.  Time begins with proposal acceptance:

1. Agreement Signing and Final Contract Negotiation – 1 month
2. Construction – 18-24 months
3. Start-up and Commissioning – 3 months

*NOTE: Since the cost of materials fluctuates over time, and since ICD has no control over the cost of services and equipment furnished by others, cost estimates herein are based on ICD's experience and qualifications and represent their best judgment as experienced professionals. ICD cannot guarantee that the final costs will not vary from opinions of probable cost prepared by ICD for this project.*

**IRZ001387**



# AGREEMENT BETWEEN OWNER AND ICD FOR SERVICES

This is an Agreement effective as of date of signing by OWNER ("Effective Date") between **Greg Tevelde** ("**OWNER**") and **IRZ Consulting, LLC** (d/b/a IRZ Construction Division) (together IRZ Consulting, LLC and IRZ Construction Division shall be referred to as "**ICD**"). OWNER retains ICD to perform design, engineering, and project management services, in connection with the design, engineering, and construction of The Willow Creek Dairy Construction Project as described in the enclosed Scope of Work ("Assignment")

OWNER and ICD, in consideration of their mutual covenants as set forth herein, agree as follows:

## ARTICLE 1-- SERVICES

### 1.01 Scope

     A.   ICD shall provide the services set forth in SCOPE OF WORK.

     B.   Upon this Agreement becoming effective, ICD is authorized to begin service as set forth in the SCOPE OF WORK

     C.   If authorized in writing by OWNER, and agreed to by ICD; services beyond the SCOPE OF WORK will be performed by ICD for additional compensation either by amending this contract or a new contract. All such contracts will be completed through a "CHANGE ORDER" document.

## ARTICLE 2--OWNER'S RESPONSIBILITIES

### 2.01 General

OWNER is responsible for and shall do the following in a timely manner so as not to delay the services of the ICD:

     A.   OWNER will act as a General Contractor for this project and will be responsible for all duties, responsibilities, and liabilities generally known to be General Contractor responsibilities, or found to be General Contractor responsibilities, under Oregon law.

     B.   As a General Contractor, the Owner is responsible for all safety and regulatory safety requirements on this project.

     C.   OWNER will have all necessary equipment and trained operators for performing General Contractor duties.

     D.   Provide all criteria and full information as to OWNER'S requirements for the Assignment.

     E.   Furnish to ICD all existing studies, reports and other available data pertinent to the Assignment, obtain or authorize ICD to obtain or provide additional reports and data as required, and furnish to ICD services of others as required for the performance of ICD'S services.

IRZ001388



F.  ICD shall be entitled to use and rely upon all such information and services provided by OWNER
or others in performing ICD'S services under this Agreement. Provide all relevant data and
information to ICD in a timely manner.

G.  To the extent possible there shall be regular meetings between OWNER, ICD and SUB-
CONTRACTORS. ICD and OWNER shall work in good faith to develop a conflict resolution
protocol to facilitate smooth construction and start-up of the project.

H.  OWNER agrees that it shall not disclose the results of any services performed or any work
product generated under this Agreement or any Scope of Work attached hereto without ICD's
prior written consent, which will not be unreasonably withheld. As a condition to granting its
consent, ICD may require OWNER to add disclaimers in order to disclaim ICD's liability to third
parties in connection with such disclosure.

I.  All financial issues.

J.  All land ownership, easement for pipe crossing, all government surveying, etc.

K.  All safety meetings and safety compliance requirements and any other contact with or
requirements from OSHA.

L.  All warranties and repairs of workmanship, construction, construction materials, equipment and
any other warranties or repairs that may arise under the Scope of Work for this project.

## ARTICLE 3 –CONTRACTORS AND MATERIAL SUPPLIERS RESPONSIBILITIES

**3.01**    ICD will assist OWNER in developing relevant contracting documents that define the SUB-
CONTRACTORS roles and responsibilities, time for completion of all construction activities,
protocol for communications and construction methodologies, penalties for non-compliance, etc.
For the sake of clarity, ICD shall not be liable for the negligence, errors and omissions of SUB-
CONTRACTORS and OWNER shall sign off on all contract terms between OWNER and SUB-
CONTRACTORS.

A.  Prior to tendering the prospective SUB-CONTRACTOR will be responsible for visiting
the site with an OWNER or ICD representative, so that the SUB-CONTRACTOR has
a complete visual perspective of the work being required.

B.  The prospective tendering SUB-CONTRACTOR will be expected to submit a tender
quotation covering the tasks as they are specified, according to the relevant contract
and according to the drawings and specifications provided to them.

C.  The SUB-CONTRACTOR's tender will include all equipment, materials and labor
costs required to complete the work as specified by ICD, with the required materials
and within the Time Schedule determined.

D.  The SUB-CONTRACTOR will provide all the required construction survey staking to
complete the works of the contract. OWNER/ICD will provide GPS control and
elevations and location for the sites finish grade and for the placement of the
concrete and facilities.

E.  The SUB-CONTRACTOR will be responsible for maintaining the construction and/or
material quality as specified by ICD and as defined in the OWNERS tendering
documents. The SUB-CONTRACTOR will be responsible for correcting any quality

IRZ001389



deficiencies according to the specification and as determined by ICD during routine inspections during construction. Any cost or time delays as a result of these corrections will be the sole responsibility of the SUB-CONTRACTOR.

F. During construction the SUB-CONTRACTOR will participate in project management meetings with the OWNERS and ICD representatives to discuss construction progress, logistics, quality, and timeline. These meeting will occur at least once weekly at a mutually agreed location and regularly scheduled time.

## ARTICLE 4 -- TIMES FOR RENDERING SERVICES

**4.01** ICD shall use its commercially reasonable efforts to perform its services upon the estimated timelines. Notwithstanding the foregoing, OWNER acknowledges that the timeline is largely outside ICD's control and ICD shall not be liable for delays in the estimated timeline. If ICD services are substantially delayed or suspended in whole or in part by OWNER, Government actions, natural disasters, floods and weather, erroneous data provided by OWNER and/or Contractors, financial issues, ICD shall be entitled to equitable adjustment of the time for performance and rates and amounts of compensation provided for elsewhere in this Agreement to reflect reasonable costs incurred by ICD in connection with, among other things, such delay or suspension and reactivation and the fact that the time for performance under this Agreement has been revised.

**4.02** ICD's design services will be in effect for six months after project completion and/or project startup to deal with minor changes and adjustments, and providing of final documentation and As-Build drawings. Any work beyond this period will be billed based on ICD's standard Time and Material rates. A schedule of such is attached herein.

## ARTICLE 5--PAYMENTS TO ICD

**5.01**

A. **DESIGN, ENGINEERING AND PROJECT MANAGEMENT SERVICES**: For the service provided by ICD under the Scope of Work, OWNER shall compensate ICD in accordance with ICD's standard hourly rate schedule attached herein, plus expenses. These charges will be calculated on a monthly basis and be submitted for payment in the regular monthly progress payment. Payment shall be due within 30 days of the respective monthly invoice.

B. **CHANGE ORDER**: OWNER and ICD shall negotiate in good faith fees based on substantial change in scope of work and/or duration of the project. All Change Orders shall be in writing.

C. **OTHER SERVICES NOT SPECIFIED IN THE SCOPE OF WORK:** Upon written approval from the OWNER, any other tasks requested by the OWNER that are not included under this agreement, OWNER shall pay ICD for Services as follows:

   1. A **Per Hour** amount based on ICD's standard hourly rate schedule attached herein, plus expenses. This amount represents an hourly fee for any time that the OWNER requests ICD to provide services outside this agreement and the accompanying SCOPE OF WORK.

IRZ001390



**ARTICLE 6—MISCELLANEOUS**

6.01

   A.  **ICD LIABILITY:** It is agreed by OWNER and ICD that ICD may be liable for damages directly caused by negligent acts, errors, and omissions made by ICD. Under no circumstances shall that amount exceed $500,000 or the amount of ICD's fees, whichever is lower. Under no circumstances shall ICD be liable for negligent acts, errors and omissions of OWNER or SUB-CONTRACTORS.

   B.  **Equipment and Data.** The parties agree that the equipment and data prepared for the services and work are instruments of and the property of ICD.

   C.  **Litigation Testimony.** With these services and work, ICD provides no rights for litigation testimony and if litigation testimony is needed, prior arrangements must be made with ICD.

   D.  **Full Agreement; Modification; Venue.** This writing is the full and complete agreement between the parties concerning ICD's services to OWNER for the above services and work. This agreement may not be modified except by an agreement signed by ICD and OWNER. Venue for any litigation to enforce this agreement or arising out of this agreement shall lie in the State of Oregon in Umatilla County, or in the Oregon county in which the land is located.

   E.  **Attorney's Fees.** If any legal action is filed to enforce a party's rights under this contract, or to interpret this contract, the prevailing party shall be entitled to his reasonable attorney's fees, costs and expenses from the other at trial, in arbitration, and on appeal.

**ARTICLE 7—Deliverable**

**7.01**   The following items shall be provided by ICD:

   A.  Printable, electronic copies of all new design documents and drawings created during this Agreement period, and all other related and relevant data, for this project in PDF format.

   B.  Printable, electronic copies of all completed construction As-Built drawings, and relevant data for this project in PDF format.

   C.  Printable, electronic copies of all completed reports, studies, cost estimates and any other documents requested by the OWNER, during this Agreement period for this project.

500 North 1st st.    Hermiston, Oregon 97838    541-567-0252    www.irz.com    Page | 13

IRZ001391

21 of 116



## Service Fee Schedule 2015

## Design, Engineer and Project Management Services

Service charges for this project will be based on Agreed Lump Sum or Time and Materials and Expenses as listed below. ICD will use based on their judgment qualified persons to conduct these tasks.

| | | |
|---|---|---|
| Principal [1] | $165 | per hour |
| Director [1] | $160 | per hour |
| Senior Engineer (PE) [1] | $160 | per hour |
| Senior Hydrologist [1] | $150 | per hour |
| Project Manager [1] | $150 | per hour |
| Superintendent [2] | $135 | per hour |
| Environmental Specialist [2] | $135 | per hour |
| Project Engineer [2] | $135 | per hour |
| Foreman [2] | $130 | per hour |
| Estimator [2] | $130 | per hour |
| Tradesman [2] | $120 | per hour |
| Technical Staff [2] | $105 | per hour |
| Technician | $ 80 | per hour |
| Field Labor | $ 60 | per hour |
| Clerical | $ 60 | per hour |
| Outside Consultant / Services | Cost plus 20% | |

**Daily Rates**

| | |
|---|---|
| [1] Per Day (>4 hours portal to portal) | $1500 per day |
| [2] Per Day (>4 hours portal to portal) | $1250 per day |

| | |
|---|---|
| Mileage Charge | at GSA Rates |
| Meal & Lodging | cost plus 20% |

IRZ001392



**AGREED:**

IRZ Consulting, LLC (d/b/a IRZ Construction Division through Wayne Downey as Director of
Construction)

By: _____

Printed Name: Fred Ziari, President

Date: _____ 11/17/15 _____


Greg Tevelde (OWNER)

Signature: _____ Title: _____ Owner _____

Date: _____ 11/14/15 _____ Purchase Number _____

Contact Person & Phone:

_____ Travis Love _____

_____ 509-201-0560 _____

IRZ001393

# EXHIBIT C



**8540 Benson Road, Lynden, WA 98264**
**Phone 360-354-6900  Toll Free 800-701-3632  Fax 360-354-7522**
**www.daritech.com**

## PURCHASE AGREEMENT

| | |
|---|---|
| Date:  March 17, 2016 | |
| Dairyman:  Willow Creek Dairy | Dealer: DariTech, Inc. |
| Contact:    Greg TeVelde | Contact: Steve Peerce |
| Address:    67500 Taggares Lane | Address: 8540 Benson Road |
| City, State, Zip:  Boardman, OR  97818 | City, State, Zip: Lynden, WA 98264 |
| Phone:  559-799-9111 | Phone: 206-417-1472 |
| Fax:     559-752-4033 | Fax: 253-880-0892 |

| Description | Price |
|---|---|
| BIOLYNK SYSTEM | $340,943.00 |
| MANURE PUMPS | $139,627.00 |
| WATER STORAGE TANK | $231,511.00 |
| FLUSH VALVES W/CONTROL | $150,871.00 |
| SEE ATTACHED PROPOSAL FOR ITEMIZATION | |

| | | | | |
|---|---|---|---|---|
| **Minimum Down Payment** | 10% | $   86,295.20 | **Sub Total** | $862,952.00 |
| **Due Upon Delivery** | 70% | $ 604,066.40 | **Sales Tax** | EXEMPT |
| **Net 30 After Completion** | 20% | $ 172,590.40 | **Installation** | INCLUDED |
| **Remaining Balance** | (%      ) ($          ) | | **Labor** | INCLUDED |
| **Finance Charge** | (%      ) ($          ) | | **Less Trade-In** | |
| **# Months/Payment Per Month** | (#      ) ($          ) | | **TOTAL** | $862,952.00 |

### ACCEPTANCES

The undersigned purchasers are in accordance to purchase the listed products in the description of this agreement.

A letter from the lending institution verifying financing and agreement of payment schedule will be provided prior to placement of order.  A UCC 1 will be filed for all equipment delivered to the farm and it is agreed the purchaser's insurance company will insure all products.

| | |
|---|---|
| **BUYER:** The above conditions, prices and specifications are satisfactory, and authorization is hereby made to proceed. | **SELLER:** We agree to fulfill this contract as written and hereby acknowledge receipt of deposit. |
| Signature: _____ _ 3/22/16_ | Signature: _____  _/_/__ |

Dealer's guaranty and manufacturer warranty appear on the following
page of this contract and are an integral part thereof.



March 18, 2016

To: Wayne Downey
From: Steve Peerce

Subject: Proposal for manure system for Willow Creek Dairy

Dear Wayne-

On behalf of all of us at Daritech, I thank you for the opportunity to quote the manure system for the new Willow Creek Dairy. We take great pride in our Biolynk systems, which have proven over the years to provide the dairy with the highest capture rate of solids, along with consistent, top quality flush water. We encourage you to visit some of our installations and speak with the owners, and we will make any arrangements as needed.

This proposal is shown in three sections:
- Complete turnkey Biolynk tank system, piping, and PLC control, installed
- All manure pumps and agitators with controls
- CST Storage water storage tank, with roof (concrete floor)

**Biolynk System**

Includes, as shown on drawing:
- 70'x28' CST Storage Process Tank, engineered with Oregon stamp
- 11'x28' CST Storage Buffer Tank, engineered with Oregon stamp
- Galvanized center baffle
- Labor to build tanks
- All piping, valves and penetrations, including labor to install
- PLC control panel, includes all pump control (detail attached)

**Complete price: $340,943**

**Manure pumps and agitators**

Includes:
- Primary separator feed 8x6 Greenline 60hp 3 pump skid with all valves, vibration isolators, and suction side cleanouts
  - $46,989
- Primary effluent feed 8x6 Greenline 60hp 3 pump skid with all valves and vibration isolators
  - $46,086
- Secondary separator feed 8x6 Greenline 20hp pump skid with all valves and vibration isolators
  - $11,057
- Heifer lot flush 8x6 Greenline 40hp pump skid with all valves and vibration isolators
  - $12,236
- Heifer lot separator feed 8x6 Greenline 30hp 2 pump skid with all valves, vibration isolators, and suction side cleanout
  - $23,258
- PLC pump control panels (detail attached) **(included in Biolynk pricing)**
  **Pump total: $139,627**

**Flush valves and control**
- (54) 15" popups- Freestalls
  - $70,740
- (11) 15" popups Heifer lot
  - $14,410
- (8) 15" popups parlor
  - $10,480
- (3) 15" popups hospital
  - $$3,930
- Control package
  - $51,311
**Flush valve total: $150,871**

**Water storage tank**

Includes:
- 58'x28' CST Storage water tank with Aquastore Dome
- Labor to install
- (3) tank penetrations
- Freight

**Complete price: $231,511**

**Above does not include:**
- **Site work**
- **Concrete tank foundations**
- **Miscellaneous concrete**
- **Underground piping**
- **Buildings**
- **All electrical connections at site**
- **Permits**
- **Engineering (other than pre-engineered CST tanks)**
- **Flush valve installation**

Thanks for your consideration.

Best regards-

Steve Peerce
Daritech

# EXHIBIT D



Separation (S4 & S5)

Biolynk (S1)

Reception Pit (S3)

Pump Tank 30'x30' to separator or pump to other system

Sand Lane (15' x 400')

(2) GL250 8x6 30HP Pump

15" End Alley Flush Valves (3 total)

(3) 12" Flush Valve

15" End Alley Flush Valves 2 per Alley (6 total)

TYP Flush Barn 4 per barn, Parlor Flush Valves 12" fed by 12" line, 6 per parlor
All other flush valves 15" pop-up, 15" line

© DARITECH, INC 2016. THESE DRAWINGS HAVE BEEN PROVIDED TO YOU TO ALLOW YOU TO CONSIDER A PURCHASE OR UPGRADE OF DAIRY EQUIPMENT AND ON THE CONDITION THAT SUCH IS THEIR SOLE USE. IN YOUR HANDS, THIS DOCUMENT CONTAINS CONFIDENTIAL, PROPRIETARY, PATENTED AND PATENT PENDING INFORMATION THAT CANNOT BE REPRODUCED OR DIVULGED, IN WHOLE OR IN PART, WITHOUT WRITTEN AUTHORIZATION FROM DARITECH, INC.

DARITECH
8540 Benson Rd., Lynden, Wa 98264
Phone: (360)354-6900
Fax: (360)354-7922
www.daritech.com

| NO. | DATE | REVISION | BY |
|-----|------|----------|-----|

Site Layout

Willow Creek Dairy

Cross Section

Scale: 1/8" = 1'

1

18" Mouth

12" Overflow

12" Butterfly Valve

6" Blow out Valve

3 1/2"

10'

5'

Overflow to Lagoon or Flush Lane

18" Flush Line to Northwest Freestalls

18" Flush Line to Northeast Freestalls

18" Butterfly Valve

18" Butterfly Valve

Biolynk Tank
(17' x 26')

18" Line from Pump Tank

18" Check Valve + Butterfly Valve

12" Overflow Line to Lagoon or Flush Lane

Floor drain line to tie-into Overflow line

14" Line

14" Butterfly Valve

14" Auto Valve

Pressure Transducer with alcove

Mixer Nozzle

Service Ladder

Man Door

6" Auto Valve

Air Compressor

Control Cabinet

GL250-8x6 40HP Pump

Pressure Transducer

8" Butterfly Valve

8" Auto Valve

8" Line to Secondary feed tank

Buffer Tank
(11' x 26')

10' Overhead Door

15" Flush to heifer corral

NO.  DATE    REVISION    BY

DARITECH
8540 Benson Rd., Lynden, WA 98264
Phone: (360)354-6900
Fax: (360)354-7922
www.daritech.com

| | | | | |
|---|---|---|---|---|
| JOB NO. | | 20120511 | | |
| DESIGNED | DARITECH | | | |
| DRAWN | RLT | | | |
| CHECKED | N/A | | | |
| DATE | 11/8/2018 | | | |

11 X 17

Biolynk Layout
Willow Creek Dairy

S1

SHEET

Biolynk Layout        Willow Creek Dairy



18" Flush Line to
Northwest Freestalls

28'

2'

18'

24'

12'

70'

1'-6"

1'

Biolynk
Tank

In-feed baffle

18" Line from
pump tank

12" Overflow Line
to Lagoon or Flush
Lane

8" Line to secondary
feed tank

Pump
House

Overflow

20'

Buffer
Tank

11'

28'

DARITECH INC
8540 Benson Rd. Lynden, Wa 98264
Phone: (360) 354-6900
Fax: (360) 354-7332
www.daritech.com

NO. DATE　REVISION　BY

DRAWN: DARITECH
DESIGN: RLT
CHECKED: N/A

DWG NO. 20120511
REV: 0
SHEET: 11 X 17

Willow Creek Dairy
Biolynk Elevation

S2

Biolynk Elevation　　Willow Creek Dairy



To Trash Lagoon 4

To Trash Lagoon 3

To Trash Lagoon 2

To Trash Lagoon 1

STORAGE

Separation above
Pump & Feed Tanks
(See S4)

(3) GL250 8x6 60HP
Biolynk Feed Pumps

FEED

18" Line to Biolynk

Effluent From
Primary Separation
Feeds into Biolynk
Pump Tank

Biolynk
Pump Tank
(30' x 30' x 12')

Overflow

Overflow

7"

Secondary Feed
Tank
(30' x 30' x 12')

8" Feed from Buffer Tank

Effluent from
Secondary Separation

(2) GL250 8x6 20HP
Secondary Feed Pumps

DARITECH
8540 Benson Rd., Lynden, Wa 98264
Phone: (360) 354-6900
Fax: (360) 354-7302
www.daritech.com

Separation Pumps/Tanks

Willow Creek Dairy

S4

Separation Pumps/Tanks       Willow Creek Dairy



Feed From Reception Pit

32'

(4)Primary Separation
DT-360 48' with DT 2-Roller
Air Press 72'

(4) 18" Auger

Solids

FEED

Effluent From
Primary Separation
Feeds into Biolynk
Pump Tank Below

Separation Building
Enclosed or Open

100'

Effluent From
Secondary Separation
Feeds into Trash Lagoons

(4)Secondary Separation
DT-360 48' with DT 2-Roller
Air Press 72'

FEED

Solids

DARITECH INC.
8540 Benson Rd. Lynden, WA 98264
Phone: (360)354-6900
Fax: (360)354-7002
www.daritech.com

NO. DATE   REVISION   BY

Separation Equipment

Willow Creek Dairy

S5

Filed 04/02/25　　　　Case 19-01033　　　　Doc 793





18" Flush Line to Northwest Freestalls

18" Line from pump tank

12" Overflow Line to Lagoon or Flush Lane

8" Line to secondary feed tank

28'

2'

20'

24'

12'

70'

1'-6'

1'

In-feed baffle

Biolynk Tank

Pump House

Overflow

Buffer Tank

20'

11'

28'

DARITECH
8540 Benson Rd. Lynden, WA 98264
Phone: (360)354-6900
Fax: (360)354-7522
www.daritech.com

DRAWN BY: RLT
DATE: 10/27/16
JOB NO: N/A

20120511

Biolynk Elevation

Willow Creek Dairy

S2



Sand Deposit
(50' X 50' ID)

Ramp

15'

Ramp

Mixer

Mixer

Mixer

Mixer

18" Line to
primary separation

13'

26'

13'

Stairs

Drain
+ Pump

15'

52'

52'

Reception Pumps Elevation
Scale: 1/8" = 1'

16" Steel Line expands
to 18" PVC underground

(3) GL250 6x6
60HP Primary
Feed Pumps
2 Primary
1 auto redundant

14'

12'

24'

DARITECH
8540 Benson Rd, Lynden, WA 98264
Phone: (360)354-6900
Fax: (360)354-7922
www.daritech.com

Sand Deposit Pit Layout

Willow Creek Dairy

S3



To Trash Lagoon 4

To Trash Lagoon 3

To Trash Lagoon 2

To Trash Lagoon 1

STORAGE

Separation above
Pump & Feed Tanks
(See S4)

(3)GL250 8x6 60HP
Biolynk Feed Pumps
2 Primary
1 Auto Redundant

18" Line to Biolynk

FEED

Stem Mixer

Biolynk
Pump Tank
(20' x 20' x 12')

Overflow

Effluent From
Primary Separation
Feeds into Biolynk
Pump Tank

1"

Stem Mixer

Secondary Feed
Tank
(20' x 20' x 12')

8" Feed from Buffer Tank

Effluent from
Secondary Separation

(2)GL250 8x6 20HP
Secondary Feed Pumps
1 Primary
1 Auto Redundant

DARITECH INC

8540 Benson Rd. Lynden, WA 98264
Phone: (800)204-5600
Fax: (360)354-7522
www.daritech.com

DARITECH          20120511
RLT               N/A
—                 0

11 X 17

Separation Pumps/Tanks

Willow Creek Dairy

S4

Feed From
Sand Deposit Pit

32'

(2) 2'-0 x 40'-0"
Stacking Auger

(2) 18" Auger

(4)Primary Separation
DT-360 48" with DT 2-Roller
Air Press 96"

(1) Primary Separation
Heifer Lots

Solids

100'

In-feed from
Heifer Lots

Separation Building is
Enclosed on 3 Sides

Effluent From
Primary Separation
Feeds into Biolynk
Pump Tank Below

(5)Secondary Separation
DT-360 48" with DT 2-Roller
Air Press 96"

Effluent From
Secondary Separation
Feeds into Trash Lagoons

Solids

DARITECH
8540 Benson Rd. Lynden, Wa 98264
Phone: (800)284-6900
Fax: (360)354-7502
www.daritech.net

Separation Equipment

Willow Creek Dairy

S5



(2)GL250 8x6 20HP
Secondary Feed Pumps
1 Primary
1 Auto Redundant

DT-360 48-in
Separator

DT 2-Roller
8-ft Press

Bypass Flap

18-in Auger

(2) 2'-0 x 40'-0"
Stacking
Auger @ 30°

Solids

37"

DARITECH

Separation Building
Elevation

Willow Creek Dairy

S6



# Primary Seperator Feed Pump Skid

Primary Feed Pumps

Willow Creek Dairy

Willow Creek Dairy

Primary Feed Pumps

Primary Effluent Pump Skid

DARITECH INC

Primary Effluent

Willow Creek Dairy

2

# Secondary Separator Feed Pump Skid











# Heifer Lot Flush Pump Skid











Heifer Lot Flush　　　　　Willow Creek Dairy

# Heifer Lot Separator Feed Pump Skid











Heifer Lot Sep

Willow Creek Dairy

**47 of 116**

**Cross Section** — Scale: 1/8" = 1'

18" Mouth

12" Overflow

12" Butterfly Valve

6" Blow out Valve

Overflow to Lagoon or Flush Lane

18" Flush Line to Northwest Freestalls

18" Flush Line to Northeast Freestalls

18" Butterfly Valve

18" Butterfly Valve

Biolynk Tank (70' x 28')

18" Flush to heifer corral

Service Ladder

Man Door

Mixer Nozzle

6" Auto Valve

10' Overhead Door

Air Compressor

Control Cabinet

GL.250-8x6

GL.250-8x6

40 HP Pump

20 HP Pump

Pressure Transducer

8" Butterfly Valve

8" Line to Secondary

Buffer Tank (11' x 28')

Floor drain line to tie-into Overflow line

12" Butterfly Valve (lower pipe)

12" Overflow Line to Lagoon or Flush Lane

18" Line from Pump Tank

18" Check Valve + Butterfly Valve

14" Line

14" Line

14" Butterfly Valve

14" Auto Valve

Pressure Transducer with alcove

**DARITECH** INC
8540 Benson Rd., Lynden, WA 98264
Phone: (360)354-6900
Fax: (360)354-7552
www.daritech.net

Biolynk Layout

Willow Creek Dairy

S1



18" Flush Line to Northwest Freestalls

18" Line from pump tank

12" Overflow Line to Lagoon or Flush Lane

In-feed baffle

8" Line to secondary feed tank

Biolynk Tank

Pump House

Overflow

Buffer Tank

28'
20'
2'
24'
12'
70'
1'-6"
1'
20'
11'
28'

DARITECH

8540 Benson Rd. Lynden, Wa 98264
Phone: (360)354-6900
Fax: (360)354-7522
www.daritech.com

DARITECH
20/05/11
RLT
N/A
11 X 17

Biolynk Elevation
Willow Creek Dairy

S2



© DARITECH, INC. 2016. THESE DRAWINGS HAVE BEEN PROVIDED TO YOU TO ALLOW YOU TO CONSIDER PURCHASE OR UPGRADE OF DAIRY EQUIPMENT AND ON THE CONDITION THAT SUCH IS THEIR SOLE USE IN YOUR HANDS. THIS DOCUMENT CONTAINS CONFIDENTIAL, PROPRIETARY, PATENTED AND PATENT PENDING INFORMATION THAT CANNOT BE REPRODUCED OR DIVULGED, IN WHOLE OR IN PART, WITHOUT WRITTEN AUTHORIZATION FROM DARITECH, INC.

4 x #5 GR60 rebar
w/ 8" L bend

Trust Block

Finish alley elevation

2'-7" min

**DARITECH**

Phone: (360)354-6900
Fax: (360)354-7822
www.daritech.com

Pop-up flush valve typ. elv veiw

Willow Creek Dairy
Boardman, OR

Pop-up flush valve typ. elv     Willow Creek Dairy



Bolt Ring

Gasket

Part: 15" Pop up Flush Valve

Daritech Inc.

Date: 6/06    By: Ryan



# EXHIBIT E

**To:**      Wayne Downey[wayne.downey@irz.com]; Ian Brown[ian.brown@irz.com]
**Cc:**      Dave DeWaard[dave@daritech.com]; Steve Peerce[steve@cnw.com]
**From:**    Josh McCort
**Sent:**     Thur 5/5/2016 10:44:38 PM
**Subject:**   RE: sand lane pit
Willow Creek Pump Skids 5-5-16.pdf

Wayne,
As far as function, are you sloping sand lanes at 1% for the entire length? Or us this just at this end section?

I have to agree with Dave's comments.. Would it be possible to make pump pit a little wider? I'm Thinking 14'
inside of walls would give good working room for stairs or just service.


Thank you, Josh McCort



**Cell:** 360-815-2796
**Office:** 360-354-6900

---

**From:** Dave DeWaard
**Sent:** Tuesday, May 3, 2016 3:03 PM
**To:** Wayne Downey; Steve Peerce; Josh McCort
**Subject:** Re: sand lane pit

Wayne,

How soon do you need reply on this Josh will not be back in office till Thursday, and at that time all the pumps will
be drawn up also.

In a quick review The depth distance in the drywell will need to be minimum of !3 ft. to allow access to equipment
from the back side, this is using a ladder as access if wanting to use a stairway will need a bit more.

Thank

Dave DeWaard
DariTech Inc.
8540 Benson Rd.
Lynden Wa. 98247
Off. 360-354-6900
Cel 360-815-5295


---

**From:** Wayne Downey <wayne.downey@irz.com>
**Date:** Tuesday, May 3, 2016 at 1:32 PM
**To:** Dave DeWaard <dave@daritech.com>, Steve Peerce <steve@cnw.com>
**Subject:** sand lane pit

This work for you?

Wayne Downey
Director of Construction



500 N. 1st st. Hermiston Oregon 97838
Office 541-567-0252
Mobile 208-995-5125
Email: wayned@irz.com

# EXHIBIT F

Filed 04/02/25                Case 19-01033                Doc 793

Volume I                                                Sugarman vs.
Wayne Downey                                     IRZ Consulting, LLC

```
 1              UNITED STATES BANKRUPTCY COURT

 2              EASTERN DIVISION OF CALIFORNIA

 3                    FRESNO DIVISION

 4

 5   In re                          )
                                    )
 6   GREGORY JOHN TE VELDE,         )   Bankruptcy Case No.
                                    )
 7            Debtor.               )   18-11651-A-11
     _____)
 8                                  )
     RANDY SUGARMAN, Chapter 11     )
 9   Trustee,                       )
                                    )
10            Plaintiff,            )
                                    )
11        vs.                       )   Adv. Pro. No.
                                    )
12                                  )   19-01033-B
     IRZ CONSULTING, LLC aka IRC    )
13   CONSTRUCTION DIVISION, LLC,    )
                                    )
14            Defendant.            )
     _____)
15                                  )
     AND RELATED THIRD-PARTY COMPLAINT )
16                                  )   Job No. 10115548
     AND CONSOLIDATED ACTIONS.      )
17   _____)

18

19           DEPOSITION OF WAYNE DOWNEY

20                    VOLUME I

21         Taken in behalf of the Plaintiff

22                 April 18, 2023

23                 Portland, Oregon

24

25   Reported by Jacqueline Lee Butler
     RPR, CSR, CCR
```

1   projects like dairies?

2        A    Yes.

3        Q    And that would include either acting as a

4   general contractor or a project manager?

5        A    It could, yes.

6        Q    When you were -- strike that.

7             Before you joined IRZ, did you have

8   discussions with Mr. Ziari about what he was looking for

9   if you were to join the company?

10       A    Yes.

11       Q    What did he tell you?

12       A    Someone to start up a construction division.

13       Q    And was that something you were interested in

14   doing?

15       A    Yes.

16       Q    Prior to IRZ, where were you employed?

17       A    Vance Dairy Construction.

18       Q    Where was Vance Dairy Construction located?

19       A    Homedale, Idaho.

20       Q    Did Vance Dairy Construction have a different

21   name?

22       A    No.  There was -- I was the operations vice

23   president for Vance Dairy Construction and general

24   manager for ARC -- Agricultural Resource Consulting.

25       Q    Did Vance Dairy Construction and ARC

1    Consulting have the same ownership?

2         A    Yes.

3         Q    It was the Vance family?

4         A    Yes.

5         Q    What were you doing for Vance Dairy

6    Construction between the time you started there and the

7    time you left to go to IRZ?

8         A    I was involved in managing the construction of

9    dairies.

10        Q    And how long were you at Vance Dairy

11   Construction?

12        A    I started with Vance Dairy Construction in

13   2003 and worked there until 2015.

14        Q    Did Vance Dairy Construction, while you were

15   there, build dairies outside of Idaho?

16        A    Yes.

17        Q    Whereabouts did they build dairies?

18        A    There were several states.  I'm sure I won't

19   remember all of them.  But Washington, California,

20   Colorado, Utah.  I believe that's all that I remember.

21        Q    Okay.  And once you transitioned over to IRZ,

22   was the te Velde Willow Creek Dairy your first dairy

23   project for IRZ?

24        A    Yes.

25        Q    During the time that you were at Vance Dairy

1   Construction, what was the largest dairy by number of

2   head that you were involved with building?

3        A    Approximately 30,000.

4        Q    And what was the name of the owner of that

5   project?

6        A    Luis Bettencourt.

7        Q    Where was Mr. Bettencourt's dairy located?

8        A    Idaho.

9        Q    And in terms of size of project by acreage,

10  what was the largest project you've been involved with

11  at Vance Dairy Construction?

12       A    I can't answer that exactly.  Most of the

13  projects we were involved with acreage-wise would have

14  been anywhere from 150 to 600 acres.

15       Q    When you and Mr. Ziari were discussing you

16  potentially joining IRZ, did you and he discuss at all

17  whether IRZ had ever actually constructed dairies in the

18  past?

19       A    No.

20       Q    After you started working at IRZ, did you

21  discuss with anybody there whether IRZ had built dairies

22  in the past or not?

23       A    Yes.

24       Q    And what did you find out?

25       A    They had not.

Filed 04/02/25                    Case 19-01033                    Doc 793

Volume I                                              Sugarman vs.
Wayne Downey                                    IRZ Consulting, LLC

1      Q    And in terms of your duties from -- when you
2   started IRZ in 2015 until 2018, did they generally stay
3   the same?

4      A    Yes.

5      Q    And what did those duties involve?

6      A    Starting a construction division for IRZ.

7      Q    And other than the te Velde Willow Creek
8   Dairy, was IRZ building any other dairies during the
9   time period 2015 to 2018?

10     A    I'm not sure of the time period, but we
11  built -- we remodeled Nick DeRuyter's dairy in Idaho,
12  but I don't know what year it was.

13     Q    And was your job for IRZ to lead that project
14  also?

15     A    Yes.

16     Q    And what size dairy operation, in terms of
17  number of head, was Mr. DeRuyter's?

18     A    1,200.

19     Q    And in terms of acres?

20     A    120.  150.

21     Q    What was your first involvement with
22  Mr. te Velde or the Willow Creek project?

23     A    Which one?  Mr. te Velde or the Willow Creek
24  project?

25     Q    Well, did you -- that's a fair question.  So

1    let me ask you this:  Did you first meet Mr. te Velde or

2    first hear about Willow Creek?

3        A    First met Mr. te Velde.

4        Q    And how did that come about?

5        A    I was employed by R.D. Offutt-Northwest at the

6    Threemile Canyon Farm project.  I was responsible for

7    overseeing the construction of three dairies on that

8    project, and Mr. te Velde leased one of those dairies.

9        Q    And where was Threemile Canyon Farms located?

10       A    Boardman, Oregon.

11       Q    And how long did you work for the Threemile

12   Canyon Farms project?

13       A    I worked for R.D. Offutt-Northwest for

14   approximately four years.

15       Q    And is that prior to ARC?

16       A    Yes.

17       Q    I'm going to show you what we'll mark as

18   Exhibit 166.

19            (Exhibit No. 166 marked.)

20   BY MR. VOTE:  (Continuing)

21       Q    And do you recognize this document?

22       A    Not verbatim; but, yes, I recognize the

23   document.

24       Q    Is that a copy of your LinkedIn page from the

25   LinkedIn website?

1       A    John Fazio.

2       Q    And was he working -- well, strike that.

3            Was the fees to Mr. Fazio included in the

4    $100,000, or was it outside that?

5       A    It was outside that.

6       Q    And ICD was also going to provide a

7    GPS-generated site map with elevations; correct?

8       A    Yes.

9       Q    You're familiar with the Willow Creek Dairy

10   site?

11      A    Yes.

12      Q    And would you agree that the elevation of the

13   site, generally speaking, was higher to the south and

14   lower to the north?

15      A    Correct.

16      Q    There's also a discussion in Exhibit 112 about

17   a site plan with structure corral and waste-handling

18   component locations.  Do you see that?

19      A    Yes.

20      Q    And who prepared the site plan?

21      A    It was a team effort at that time.  I'm sure

22   that Mr. Fazio was under contract with Mr. te Velde.  So

23   IRZ's draftsman would have drafted the proposal from

24   Mr. te Velde and Mr. Fazio.

25      Q    Did you have any discussions with either

1       Q     And following the work on the work order, did

2    IRZ or ICD pursue the subsequent contract with

3    Mr. te Velde?

4       A     Yes.

5       Q     And was the original proposal to run the

6    entire project?

7             MR. SCIUCHETTI:  Object to the question.

8    Specificity as to "who."

9             THE WITNESS:  Which is the original?

10   BY MR. VOTE:  (Continuing)

11      Q     Well, after the preliminary work was done --

12      A     After.

13      Q     After.  Correct.

14      A     Okay.

15      Q     Did you propose to Mr. te Velde that IRZ would

16   handle the design of the remainder of the facility?

17      A     No.

18      Q     How about do the engineering on the project?

19      A     No.

20      Q     How about be the general contractor?

21      A     No.

22      Q     Project manager?

23      A     Yes.

24      Q     And were there draft agreements prepared as

25   part of that process?

**Volume I**                         **Sugarman vs.**
**Wayne Downey**              **IRZ Consulting, LLC**

1      A    Yes.

2      Q    And what do you call this agreement?

3      A    This is just our standard general contracting

4 and project and construction management template.

5      Q    So Exhibit 156 would be used as a template for

6 a project where you're going to be both the general

7 contractor and the project manager?

8      A    No.

9      Q    Okay.  What would Exhibit 156 be used as a

10 template for?

11      A    Either one of those.  Not both.

12      Q    If you look at page 2 at the top, in the very

13 first sentence, there's a reference to ICD being a

14 licensed general contractor by the State of Oregon.  Do

15 you see that?

16      A    Yes.

17      Q    Was ICD ever a licensed contractor by the

18 State of Oregon?

19      A    No.

20      Q    In terms of the cost for this type of an

21 arrangement, was this going to be a fixed fee project or

22 a time and materials?

23      A    That's to be determined.  It doesn't specify

24 in this document which one it is.

25      Q    And did you discuss with Mr. te Velde the

1   various methods of delivering the project in terms of --

2        A    Briefly.  He wasn't interested in us being the

3   general contractor.

4        Q    And so was a further version of this agreement

5   done to limit your work to being the project manager?

6        A    Yes.

7        Q    I'm going to show you next what we've marked

8   as Exhibit 113.

9             (Exhibit No. 113 marked.)

10  BY MR. VOTE:  (Continuing)

11       Q    And do you recognize Exhibit 113?

12       A    Yes.

13       Q    And is this a copy of the contract between ICD

14  and Mr. te Velde for the building of the dairy?

15       A    For the project management, yes.

16       Q    And was this a document that you prepared?

17       A    This is a template that I prepared, and it was

18  reviewed by legal counsel -- Lindsey legal counsel.

19       Q    And Lindsey is the parent company of IRZ

20  Consulting?

21       A    At this time, yes.

22       Q    And are they still?

23       A    No.

24       Q    When did that change?

25       A    I don't know; so I'm not privy to that.

1    Q    Okay.  This purports to be a set of notes from

2  a December 7, 2015, staff meeting.  Let me ask you:  On

3  the bottom of page 2, there is the first mention of

4  Willow Creek Dairy, but it's got a different job number

5  than the one you gave us before lunch.  Was IRZ doing

6  two different projects involving Willow Creek at least

7  at the end of 2015?

8    A    No.  Not that I'm aware of.  That's -- the job

9  numbers were for accounting purposes more than actual

10  operational purposes; so I don't know the answer to that

11  question.

12    Q    Okay.  At the top of page 3, there's a red

13  arrow that says "Fred and Wayne to work together on some

14  contracts."  Do you know what that refers to?

15    A    I can assume that it refers to the work order

16  and the project management services contract.

17    Q    There's also a reference toward the bottom of

18  the first section on page 3 that's says "A total

19  surveying station will be leased for the job."  Was a

20  total surveying station leased for the job?

21    A    I don't know the answer to that.

22    Q    Did ICD or IRZ hire any outside surveyors

23  for -- at any point at Willow Creek?

24    A    No.

25    Q    When the preliminary site plan was being

1   prepared, whose job was it to figure out the site plan

2   and make sure everything would fit?

3       A    Greg te Velde.

4       Q    Did he provide you with any sketches or

5   drawings or anything of a site plan as part of that

6   process?

7       A    No.  We duplicated the Willow Creek Dairy at

8   Threemile Canyon Farms.  We started with a duplicate of

9   that.

10      Q    And then you went and made revisions after

11  that?

12      A    Correct.

13      Q    And was Josh Rowell involved in determining

14  how many different types of cows could fit in different

15  parts of the site?

16      A    No.

17      Q    Did -- in terms of the different types of

18  animals that are being planned for -- you've got milking

19  cows; right?

20      A    Yes.

21      Q    Heifers?

22      A    Yes.

23      Q    You've got hospital animals?

24      A    Yes.

25      Q    And then calves?

1      A     Absolutely, yes.

2      Q     And any other subs also?

3      A     No.  The subs weren't involved in the site

4   plan design.

5      Q     What about John Fazio?

6      A     He would have been involved after we got more

7   specific about what Mr. te Velde wanted.  And then, yes,

8   Mr. Fazio would be involved.

9      Q     Did Mr. te Velde ever send you any email or

10  other correspondence where he had any kind of directives

11  about what it was he was looking for in a site?

12     A     No.  Mr. te Velde wasn't much of a paper

13  communicator.  It was all verbal.

14     Q     Let me show you next what I've marked as

15  Exhibit 161.

16            (Exhibit No. 161 marked.)

17  BY MR. VOTE:  (Continuing)

18     Q     Do you recognize Exhibit 161?

19     A     Yes.

20     Q     And is this a couple of emails -- one between

21  Josh Rowell and yourself, and then another from you to a

22  group of folks from December 21st?

23     A     Yes.

24     Q     And what was your purpose in forwarding the

25  site plan to the people that received Exhibit 161?

1      Q    And did Mr. Fazio make similar requests on

2    other projects you'd done besides Willow Creek?

3      A    I don't recall, but I would have to assume the

4    answer is "Yes."

5      Q    Okay.  What was your understanding of why you

6    would be interfacing with the ODA during the design

7    process?

8      A    We were the draftspeople; so we were drafting

9    this site plan.  So when we'd make changes to the site

10   plan at Mr. Fazio, Mr. te Velde's direction, we'd keep

11   the ODA in the loop to hopefully make the review and

12   approval process more seamless.

13     Q    If there was something somebody at the ODA had

14   a concern about, it could be addressed rather than just

15   presented at the end?

16     A    Exactly.

17     Q    Now, this is December of 2015.  What's your

18   best recollection of when the CAFO permit finally got

19   issued?

20     A    I don't have that recollection, but it's

21   public record.

22     Q    Okay.  Did the final requirements of the CAFO

23   permit influence, in your view, any of the design of the

24   facility?

25     A    No.

1    back up a little bit to where we left off, which was the

2    end of 2015.  Did you involve a gentleman named Steve

3    Peerce in the design process?

4         A    I didn't involve Steve Peerce.  Steve Peerce

5    was an employee of Daritech.

6         Q    Okay.  And what was your understanding of what

7    Daritech's involvement with the project was going to be?

8         A    They were going to -- they made a proposal to

9    design and supply the flush system.

10        Q    And so that we're all clear, what does the

11   flush system do?

12        A    The flush system -- this particular flush

13   system that was selected by Mr. te Velde is a Biolynk

14   flush system that Daritech -- it's a patented

15   prioritized flush system that Daritech manufacture --

16   designs, manufactures, and installs.

17        Q    Okay.  And it flushes what?

18        A    It flushes all the cow alley traffic lanes and

19   the parlor.

20        Q    So that the traffic lanes would be where the

21   cows go from the free stall barns into the milking

22   parlor and back?

23        A    And the free stalls themselves have lanes in

24   them.

25        Q    Okay.  Were the heifer pens to be flushed

# EXHIBIT G

1          UNITED STATES BANKRUPTCY COURT

2          EASTERN DIVISION OF CALIFORNIA

3                FRESNO DIVISION

4

5   In re                        )   Bankruptcy Case No.
                                 )   18-11651-A-11
6   GREGORY JOHN TE VELDE,       )
                                 )   Chapter 11
7          Debtor.               )
    _____      )   Adv. Pro. No.
8   RANDY SUGARMAN, Chapter 11   )   19-01033-B
    Trustee,                     )
9                                )
           Plaintiff,            )
10                               )
        v.                       )
11                               )
    IRZ CONSULTING, LLC aka IRC  )
12  CONSTRUCTION DIVISION, LLC,  )
                                 )
13         Defendant.            )
    _____      )
14  AND RELATED THIRD PARTY      )
    COMPLAINT AND CONSOLIDATED   )
15  ACTIONS.                     )
    _____      )

16

17

18

19        CONTINUED DEPOSITION OF WAYNE DOWNEY

20        Taken on Behalf of the Plaintiff

21          Volume II - Pages 215 to 382

22              April 19, 2023

23                   * * *

24

25  JOB NO. 10115549

Filed 04/02/25          Case 19-01033          Doc 793

Volume II                                    Sugarman vs.
Wayne Downey                          IRZ Consulting, LLC

1  achieve or get the CAFO permit, is that something that IRZ

2  does in its business?

3          A.      No.

4          Q.      Was there anything at the Willow Creek Dairy,

5  was there anything that IRZ did to assist Mr. Fazio in

6  getting the CAFO permit issued?

7          A.      Yes.

8          Q.      Can you describe that for me, please?

9          A.      We did the drafting for the site plan.

10         Q.      Now, there were a lot of discussions yesterday

11 about the site plan, but can you -- and this is a bad

12 question, I recognize, but can you give me a little bit of a

13 description of what the site plan is or a definition of what

14 the site plan is?

15         A.      It's the CAFO site proper.

16         Q.      I'm sorry.  But you say it's the CAFO site?

17         A.      Proper.  The 400 acres that the dairy sits on.

18         Q.      Okay.  Now, in terms of that site plan, sir,

19 how much detail is in that site plan?  Is it the actual

20 structures, or is it just kind of a layout of where things

21 are going to go?

22         A.      It's a layout of where things are going to go.

23         Q.      And did Mr. Fazio assist in that site plan?

24         A.      It was a team effort between Mr. Te Velde,

25 IR -- ICD, and Mr. Fazio.

1        Q.      From your perspective, sir, who had the final

2    say on the location of what was -- where things were going to

3    go on this site plan?

4        A.      Mr. Te Velde.

5        Q.      And do you know in your experience and working

6    there, sir, did Mr. Te Velde ever have anybody there with him

7    that you observed to be a consultant or someone who kind of

8    had his ear on developing or designing this site plan?

9        A.      I don't know.

10       Q.      Okay.  Yesterday you mentioned a gentleman

11   named Travis Love.  I think you mentioned he was the -- I

12   don't remember, the foreman or the general manager for the

13   Threemile Canyon Farm.

14       A.      He was -- he was the general manager for

15   Willow Creek Dairy.  He was Mr. Te Velde's general manager

16   for his dairies.

17       Q.      Okay.  Including the dairies in California?

18       A.      I don't know.

19       Q.      All right.  At least the dairies in Oregon, or

20   the one in Oregon, right?

21       A.      Correct.

22       Q.      Did you know Mr. Love prior to getting involved

23   with the Willow Creek Dairy?

24       A.      I met Mr. Love when the Willow Creek Dairy was

25   on Threemile Canyon Farms.

1      Q.    And can you describe for me what role IRZ had

2   with the preliminary design for the lagoons?

3      A.    We, as draft people, we would put John Fazio's

4   design for the lagoons on the site plan.

5      Q.    Okay.  Do you recall is this one of the

6   decisions made by Te Velde as to where the lagoons would be

7   located, that he made that decision?

8      A.    Ultimately the decision was his.

9      Q.    Okay.  So I was a little confused yesterday, so

10  I want to ask a clarifying question of you, sir, about IRZ,

11  ICD's role.

12            So IRZ, ICD was involved in the design of the

13  dairy?

14      A.    To the extent that we did the drafting that

15  Mr. Te Velde requested.

16      Q.    Okay.  So is that to say that his ideas, his

17  information that he gave to you put on paper form?

18      A.    Yes.

19      Q.    And I thought -- a couple times yesterday I

20  thought you referenced there was basically a duplicate of the

21  Threemile Canyon Farm.  Is that what he wanted?

22      A.    Yes.

23      Q.    Now, prior to working on the Willow Creek Dairy

24  Farm, had you made a trip or trips to Threemile Canyon Farm?

25      A.    I was the project manager when those dairies

1  BY MR. TURNER:  (Continuing)

2      Q.    Did you recommend that Mr. Te Velde use the

3  Daritech equipment?

4      A.    I recommended that Mr. Te Velde explore using

5  the Daritech equipment.

6      Q.    Did you make any recommendations to him as to

7  the quality of their products based on past experience?

8      A.    My opinion of Daritech equipment is that they

9  provide a quality product.

10      Q.    And you communicated that to Mr. Te Velde; is

11  that right?

12      A.    Yes.

13      Q.    You know, we're going to talk about flush

14  dairies and so forth, and the Biolynk tank system.  And I

15  want to -- I want to define our terms a little bit, if I

16  might.  Because I've heard people use some terms fairly

17  loosely.  And so using this screen share, I'm going to show

18  you what is Exhibit 505.

19                    (Exhibit No. 505 marked for

20                     identification.)

21  BY MR. TURNER:  (Continuing)

22      Q.    Do you see that chart that says,

23  "Manure Management"?

24      A.    I do.

25      Q.    Okay.  Now, what I'd like to do is relate some

1       Q.      Do you know who decided to move it?

2       A.      Mr. Te Velde.

3       Q.      Okay.  Was Mr. Te Velde ultimately responsible

4   for all the locations of all the equipment that was on the

5   dairy?

6       A.      Yes.

7       Q.      And if one of the contractors proposed it in

8   one place and he wanted it in another, did he have the final

9   say so in that?

10      A.      Yes.

11      Q.      Now, harking back to that cycle that we were

12  looking at with the diagram, there were a number of

13  components to it.  I want to ask you.  This flow of water, we

14  see that it goes from the barns.  It goes down sand lanes.

15  It goes to a collection area.  It's separated.  Some of the

16  liquid goes back to the Biolynk tank.  It gets processed.  It

17  goes back to the barn.

18              Daritech didn't design all of that, did they?

19      A.      I'm not aware of what all of that is.

20      Q.      Well, I just described that.  Did Daritech have

21  any part in designing the cow lines?

22      A.      No.

23      Q.      The milking parlour?

24      A.      No.

25      Q.      The corrals?

1      A.      Yes.

2      Q.      And what was the comment about -- the

3 commentary about that? What was the colloquy between the two

4 of you?

5      A.      The general discussions that I had with Josh

6 Obendorf after I left the project and cows were on the

7 project was that the project wasn't completed and that the

8 operation of the manure management system was woefully

9 inadequate.

10      Q.      Did he give you any specifics about what parts

11 were woefully inadequate?

12      A.      The flushing was woefully inadequate due to the

13 lack of water at the dairy.

14      Q.      In other words, they couldn't add enough fresh

15 water to make the system work properly?

16      A.      Correct.

17      Q.      But you've seen the Biolynk tank system working

18 properly on other dairies.

19             Did those dairies have a proper water supply?

20      A.      Yes.

21      Q.      Are you familiar with any of the operating

22 parameters for the Biolynk tank system including, for

23 instance, the need to supply it with water occasionally?

24      A.      No. I'm not familiar with the particulars of

25 how much water the Biolynk system needs.

# EXHIBIT H

UNITED STATES BANKRUPTCY COURT

EASTERN DIVISION OF CALIFORNIA

FRESNO DIVISION


In re                          ) Bankruptcy Case No.
                               )
GREGORY JOHN TE VELDE,         ) Chapter 11
                               )
            Debtor.            ) Adv. Pro. No. 19-01033-B
_____)
                               )
RANDY SUGARMAN, Chapter        )
11 Trustee,                    )
                               )
            Plaintiff,         )
                               )
      vs.                      )
                               )
IRZ CONSULTING, LLC aka        )
IRC CONSTRUCTION               )
DIVISION, LLC,                 )
                               )
            Defendants.        )
_____)


VIDEO-RECORDED VIDEOTAPED DEPOSITION OF

LINDSAY CORPORATION AND IRZ CONSULTING with

designated corporate representative

WAYNE DOWNEY pursuant to Rule 30(b)(6) at

The Lodge at Columbia Point, 530 Columbia

Point Drive, Richland, Washington,

commencing at 10:06 a.m. PDT, on Thursday,

May 30, 2024, taken remotely via Zoom before

Marla Sharp, RPR, CLR, CCRR, CA CSR 11924,

OR CSR 17-0446, WA CSR 3408.

Wayne Downey

```
1      Q      Okay.   Looking on page 2 to the duties of
2   the general contractor, do you see paragraph 2?
3      A      Yes.
4      Q      And I'll just go ahead and read it.
5              "ICD will oversee the design and
6          engineering of this project with the
7          owner, as needed, but on a minimum
8          hold weekly progress meetings with the
9          owner and project team."
10         And the project is team is IRZ ICD, correct?
11     A      Project team is ICD.
12     Q      Next sentence:
13             "ICD will oversee the design and
14         engineering of the project to
15         insure [sic] that all objectives of
16         the project are met in the final and
17         complete design."
18         Do you see that?  Did I read that correctly?
19     A      Yes.
20     Q      Okay.  And that was in this -- at least in
21   this draft.  I understand this was never executed,
22   but at least in this draft of the contract -- I
23   apologize.  The --
24             I apologize for that delay, Mr. Downey.
25             The paragraph I just read, as I understand
```

1  it, this was what at least you were proposing for

2  ICD -- one of ICD's duties as a general contractor,

3  correct?

4  　　A　　In this contract.  We're not talking about

5  the same contract.

6  　　Q　　Yeah.  This was never signed --

7  　　A　　This is a different --

8  　　Q　　Yeah.

9  　　A　　This is a different contract from what we

10  did with Mr. te Velde.

11  　　Q　　No, I understand.  This -- this document

12  here was never signed, correct?

13  　　A　　It was never presented --

14  　　Q　　And if you look at the last page --

15  　　A　　-- to Mr. te Velde.  He didn't want it.

16  　　　　THE COURT REPORTER:  One at a time.

17  　　　　THE WITNESS:  Oh.

18  　　　　THE COURT REPORTER:  Can you repeat your

19  answer?

20  　　　　THE WITNESS:  It was never presented to

21  Mr. te Velde.  He did not want general contractor

22  services.

23  BY MR. CLARK:

24  　　Q　　Well, I guess, was it ever presented to him

25  and he said, "No, I don't want that"?

Wayne  Downey

1   request.

2       Q    Did there come a time when IRZ stopped

3   working on the project?

4       A    Yes.

5       Q    Do you recall when that was?

6       A    No.

7       Q    Do you recall why?

8       A    Lack of payment.

9       Q    Was it an IRZ decision or Mr. te Velde's

10   decision?

11       A    It was Mr. te Velde's decision.  He didn't

12   want to pay us -- he didn't want to pay us anymore.

13   He didn't have the money is what he said.

14       Q    And I want to make sure we're understanding

15   each other here.

16            Did IRZ decide it was not going to work

17   anymore because Mr. te Velde stopped paying?  Or did

18   Mr. te Velde tell IRZ, "I want you to stop working"?

19       A    Mr. te Velde told us to stop working.

20       Q    Okay.  Was that orally?  In writing?

21       A    Orally.

22       Q    Okay.  And you don't recall when?

23       A    No, not exactly.  No.

24       Q    Moving back to the sand lanes, was IRZ still

25   on-site when the sand lanes were constructed?  And

Wayne  Downey

1      Q     Do you know who designed the reception pit?

2      A     I know who sized the reception pit finally.

3      Q     And when you say "sized," can you explain

4    what you mean?

5      A     Basically, there's a standard size of

6    reception pit on these dairies of this size.  This --

7    it was recommended by Daritech the size of the

8    reception pit.

9            Mr. te Velde did not like it.  He cut it way

10   down, almost 50 percent, I think, and built it that

11   way, as did he go against our recommendations with

12   having redundant pipes from the reception pit to the

13   screens.  Instead of putting in two, he only put in

14   one.

15     Q     And that redundancy is in case one gets

16   clogged?

17     A     Correct.

18     Q     So that was a recommendation that IRZ

19   made --

20     A     No.

21     Q     -- or a subcontractor --

22     A     Daritech --

23     Q     Okay.

24     A     -- would have made that recommendation, and

25   we would have agreed.  I would have agreed, yes.

1    large.  It's a fair amount of water.

2        A    It is.

3        Q    And the dairy site itself -- in addition to

4    the rain coming off the roof, rain from the dairy

5    site ground, in general, is ultimately routed to the

6    waste management system?

7        A    Correct.

8        Q    Did IRZ document its disagreement with

9    Mr. te Velde --

10       A    No.

11       Q    And just -- I apologize.  I'm going to --

12   for the record, the disagreement I was referring to

13   was Mr. te Velde's decision to cut the size of the

14   reception pit in the center of the sand lanes

15   approximately in half.

16            No, you did not document that?

17       A    We did not.  Those discussions would have

18   been held between Daritech and Mr. te Velde.

19       Q    Were there no discussions between IRZ and

20   Mr. te Velde about --

21       A    I don't recall.

22       Q    -- the size of --

23       A    I would assume --

24            THE COURT REPORTER:  I'm sorry.  Could you

25   repeat the question?  Could you try not to overlap?

1  the piping from the reception pit to the screen

2  separators?

3     A    No.

4     Q    Do you recall whether IRZ communicated that

5  disagreement to Mr. te Velde?

6     A    It would have been communicated from

7  Daritech to Mr. te Velde.  Daritech was his

8  components supplier.

9     Q    So, then, I gather you -- IRZ did not --

10    A    I don't recall if I did or didn't.

11         THE COURT REPORTER:  I'm sorry.  "I don't

12  recall" what?

13         THE WITNESS:  I don't recall if I did or did

14  not.

15  BY MR. CLARK:

16    Q    Continuing on, and I won't belabor this, but

17  I also understand Mr. te Velde may have made

18  decisions contrary to subcontractors regarding

19  equipment used at the screen separator location; is

20  that correct?

21    A    Originally, they were going to use rotating

22  screens from Daritech.  He changed it to slope

23  screens from US Farms.

24    Q    Could you describe the difference?

25    A    A rotating screen is a barrel screen.  The

1      Q    So from these screen separators, where does

2   the waste travel?

3      A    The solids get piled in front of the

4   separators.  The effluent water on this particular --

5   because it was -- it had a Biolynk, it went to the

6   Biolynk tank, more of the fine set- -- it's designed

7   so more of the fine settle out in the Biolynk tank,

8   and then the liquid goes to the lagoon.

9      Q    When it goes to the lagoon, does it first go

10  to settling cells?

11     A    Yes.  I forgot about the settling cells.

12  Yes.

13     Q    Does some of the water, the wastewater from

14  the Biolynk tank also go into flushing the barn --

15     A    Yes.

16     Q    -- and the milking parlor?

17     A    Yes.

18     Q    And I gather Daritech recommended the

19  Biolynk tank.

20     A    It was part of their system, and that's what

21  Greg chose.

22     Q    Did IRZ express a view?

23     A    I probably -- Wayne Downey personally

24  probably expressed a view prior to this project when

25  he was at the rental dairy, Willow Creek Dairy.  But

Wayne  Downey

1    I -- at IRZ, no, because he was working with

2    Daritech.

3        Q    Do you recall the view that you probably

4    would have expressed?

5        A    That was my go-to type of flush system was

6    the Biolynk system.

7        Q    Do you think it's a good system?

8        A    Yes.

9        Q    I seem to have misplaced --

10           Before we get to the lagoon system, the

11   lagoon design, I want to step back for a moment to

12   phase No. 8 in the contract on page 5 of Exhibit 113.

13           Do you see work phase No. 8:

14               "Installation of underground

15               infrastructure"?

16       A    Yes.

17       Q    The first bullet point is:

18               "Oversee contractor during

19               underground installation."

20           Do you see that?

21       A    Yes.

22       Q    Did IRZ do that work?

23       A    I don't recall if we were there doing that

24   work or not.

25       Q    And, I'm sorry, I should have -- that was a

Wayne Downey

```
 1        Q    Did that occur?
 2        A    We met with the owner to discuss the lagoon
 3   design, and I know he knew what the final design was,
 4   but I don't recall when we did it.
 5        Q    When you say "we did it," when IRZ did it?
 6   When John --
 7        A    Fazio would have been involved with that as
 8   well.
 9        Q    The next bullet point is:
10             "Oversee" -- I'm sorry.
11             "Oversee lagoon design and
12        engineering to insure [sic] proper
13        design."
14        Do you see that?
15        A    Yes.
16        Q    Did IRZ oversee Mr. Fazio's lagoon design
17   and engineering?
18        A    We were aware of it.  We reviewed it, yes.
19        Q    Reviewed the engineering?
20        A    No.
21        Q    Okay.  Reviewed the design?
22        A    Reviewed how it would fit with the rest of
23   the components of the dairy.
24        Q    I guess, reviewed it in connection with the
25   overall site design?
```

Wayne  Downey

```
1       A      Yes.

2       Q      The fourth bullet point includes:

3              "Make drawings ready for

4       construction."

5              Did IRZ make drawings ready for construction

6  regarding the lagoons?

7       A      No.

8       Q      And then the next couple bullet points here

9  under No. 9 relate to bids to subcontractors.  I

10 think you testified earlier IRZ did not do that.

11      A      We did not.

12      Q      Moving to the next page, in phase No. 10,

13 "Construction of the lagoons," the first bullet point

14 is:

15             "Oversee contractor during lagoon

16      construction."

17             Did IRZ perform that task?

18      A      I don't believe we were there at that time.

19 I can say that Mr. Fazio was overseeing the

20 construction of the -- the construction of the

21 lagoons at ODA's requirement with the CAFO.  He had

22 to make sure that the lagoons were constructed

23 according to the CAFO permit.

24      Q      And, if I recall correctly, he was the

25 engineer who signed the animal waste management plan
```

30(b)(6)
Wayne  Downey                                        May 30, 2024

1   construction of the free-stall cow barns?

2       A    Partially.  They weren't completed.

3       Q    The ones that were completed.

4       A    The ones that were completed while we were

5   there, yes.

6       Q    Okay.

7       A    I don't know if there was any more completed

8   or not.

9       Q    The last one here is:

10              "Design and engineer concrete

11          construction."

12          And the very first bullet point says:

13              "Design and engineer all types of

14          concrete construction for the

15          project."

16          Did IRZ design and engineer all types of

17  concrete construction for the project?

18      A    No.

19      Q    Did I- --

20      A    We weren't required -- engineering wasn't

21  required.

22      Q    And, just to clarify, are you saying

23  engineering wasn't required for the concrete

24  construction or engineering wasn't required under

25  this contract?

Wayne  Downey

```
 1      A     It wasn't required for concrete
 2   construction.
 3      Q     And is that -- you're referring to what you
 4   said earlier, it's not required by the regulatory
 5   authorities?
 6      A     Correct.
 7      Q     Do you think it's required for sound
 8   construction?
 9      A     Yes.  If I recall, there are -- when you get
10   an engineered structure, I think that Nucor had some
11   type of concrete recommendations.
12      Q     Could you explain that?
13      A     They would recommend what it took to hold
14   their buildings up.
15      Q     Okay.  So you're referring, then, to the
16   free-stall barns and the milking facility?
17      A     Correct.
18      Q     So continuing on this first bullet point,
19   under "Design and engineer concrete construction,"
20   after providing that IRZ will "Design and engineer
21   all types of concrete construction for the project,"
22   this bullet point goes on to say:
23              "This is to include all slab on
24          grade, poured in place walls,
25          footings, and any other type of
```

Wayne  Downey

1              concrete construction to be used on

2              the project."

3              Do you see that?

4      A    Yes.

5      Q    So I gather there's a lot more concrete on

6  the project than just what's under the free-stall

7  barns and the milking facility.

8      A    Yes.  There's a lot of working slabs.

9      Q    In a project like this, are there decisions

10  to be made on what type of concrete to use?

11      A    Yes.

12      Q    Was IRZ involved in any decision-making with

13  respect to what types of concrete were used on this

14  project?

15      A    No.

16      Q    Do you recall if IRZ had an opinion that

17  poor decisions were made regarding types of concrete

18  that was used?

19      A    No.

20      Q    And you don't recall communicating that to

21  Mr. te Velde?

22      A    No.  There was a concrete contractor with a

23  portable batch plant on-site.  So all of those

24  discussions would have been between him and

25  Mr. te Velde.

# EXHIBIT I

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

_____

| | |
|---|---|
| In re | ) |
| | ) |
| GREGORY JOHN TE VELDE, | ) |
| | ) |
| Debtor, | )Bankruptcy Case No. |
| | )18-11651-A-11 |
| _____ | ) |
| RANDY SUGARMAN, CHAPTER 11 | )Chapter 11 |
| TRUSTEE, | ) |
| | )Adv. Pro. No. 19-01033-B |
| Plaintiff | ) |
| | )District Ct. Case No. |
| v. | )19-CV-0055520-DAD |
| | ) |
| IRZ CONSULTING, LLC, and | ) |
| LINDSAY CORPORATION, doing | ) |
| business under the | ) |
| fictitious name of IRZ | ) |
| CONSTRUCTION DIVISION, LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| IRZ CONSULTING, LLC a/k/a | ) |
| IRZ CONSTRUCTION DIVISION, | ) |
| LLC, | ) |
| | ) |
| Third-Party Plaintiff, | ) |
| | ) |
| U.S. FARM SYSTEMS; 4 CREEKS, | ) |
| INC.; JOHN FAZIO d/b/a FAZIO | ) |
| ENGINEERING; DARI-TECH, | ) |
| INC.; LASER LAND LEVELING, | ) |
| INC.; MAAS ENERGY WORKS, | ) |
| INC.; GEORGE CHADWICK d/b/a | ) |
| GEORGE CHADWICK CONSULTING; | ) |
| VALMONT NORTHWEST, INC.; and | ) |
| NUCOR BUILDING SYSTEMS UTAH | ) |
| LLC, | ) |
| | ) |
| Third-Party Defendants. | ) |
| | ) |

Reported by:  Kelli A. Diaz, CSR No. 13930

1        REMOTE DEPOSITION

2               OF

3          TRAVIS LOVE

4     Thursday, May 23, 2024

5      Kennewick, Washington

6             -o0o-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   it flushes down the barns, goes into the sand lanes,

2   then it would go to S1 and S2 after the separators.  So

3   it would go to the separators first and we try to

4   separate out the easy, larger material.  And then  S1

5   and S2 would separate out the heavier-type material.

6   And then we -- the goal was to have just water in the

7   lagoons itself.

8      Q.   And then what happens to the water in the

9   lagoons?

10      A.   The water in the lagoons?  Well, we ended up

11   having to use the water in L5 to support the BioLink

12   because the BioLink filled with sand because it didn't

13   work.  The other -- the other lagoons we used is

14   fertilizer for the crops.

15      Q.   So let's talk about the BioLink.  What is the

16   role of the BioLink?

17      A.   The BioLink, or bio-bottom-removal system, was

18   a huge tank that we would fill with water -- lagoon

19   water or whatever you want to call it.  It's wastewater.

20   We would use that water to clean the barns, the

21   freestall barns.

22      Q.   So we were talking about the bottom-removal

23   system earlier, is that the BioLink?

24      A.   Yeah, it's called a BioLink, but bottom-removal

25   and BioLink it the same thing.

1  have 50-mile per hour winds, it causes problems.  So I

2  guess if we would have designed our lagoons to handle

3  50-mile per hour winds, it wouldn't have been an issue.

4  We put in wave blockers all the way across the lagoon.

5      Q.   You might have anticipated my next question

6  there.  What exactly were the corrections to the lagoon

7  system designs?  Was there anything besides installation

8  of wave blockers that was included in the changes to the

9  design?

10     A.   No, just the wave blockers.  And I don't know

11 if that's a proper term, but that's what I called them.

12     Q.   Do you know if those were ever actually

13 installed into the lagoons?

14     A.   Yeah, they were.  I helped install them.

15     Q.   Were those installed by you and your employees

16 or were there other contractors or subcontractors

17 involved?

18     A.   There was some Valmont guys involved and a few

19 of my employees involved.

20     Q.   And once those wave blockers were installed,

21 were they effective in preventing some of the overflow

22 issues that the lagoons had been dealing with?

23     A.   Yeah, they knocked the waves down a little bit.

24     Q.   Let's go to Paragraph 27.  So there's an entry

25 for December 5, 2017.  In Subparagraph A it says, "An

1    earthen pit in the northwest corner of the BioLink area
2    was filled with wastewater."  Then, "Area is not
3    approved for a wastewater storage.  The cause of the
4    wastewater overflow into the earthen pit was a blockage
5    in the wastewater conveyance line."  Do you recall what
6    this is referring to?
7        A.   This is what we talked about earlier.  The
8    BioLink filled with sand and we couldn't flush anymore.
9    The thing was completely plugged up with sand.  So there
10   was a big cap on the BioLink and we took it off and we
11   put straw bales to divert it to an area that is approved
12   for wastewater storage.
13           This was when the state was really coming after
14   us.  All that waste went into an approved corral where
15   we could store manure, or wastewater, however you want
16   to say it.  Then we had to shovel out - I don't even
17   know how much -- it took a week of us shoveling to get
18   all the sand out of that pit because the BioLink didn't
19   work.  The BioLink was the death of that dairy besides
20   Te Velde's problems.
21       Q.   I want to elaborate a little on that.  You
22   mentioned Te Velde's problems.  Were there any issues
23   besides a lack of funding that you're referring to when
24   you say, "Te Velde's problems"?
25       A.   Te Velde had some personal issues that didn't

1    Q.   And you -- I think you used the term "foreman"

2    a couple times.  Were you referring to Josh Obendorf?

3    A.   Yeah.  I don't know what his exact title was,

4    but...

5    Q.   And then there was also a Josh Ruelle or

6    Rowell.  Do you recognize that name?

7    A.   No, that I don't.

8    Q.   Okay.  So today we talked about several things

9    that went wrong with the dairy, so I just want to make

10   sure I'm capturing it all.  So you testified about the

11   issues with the sand lane.  You testified about the

12   issues with the BioLink and bottom-removal system.  You

13   mentioned that you couldn't get wastewater out of the

14   lagoons because you didn't have the infrastructure to

15   transfer the lagoon water to the pivots.

16   A.   Yes.

17   Q.   And that there was a combination of Te Velde

18   having personal issues and a lack of financing possibly.

19   Were there any other issues with the dairy operations

20   that, as you sit here today, you can remember that we

21   haven't discussed?

22   A.   No.

23   Q.   And I think you said that the two issues that

24   you would pinpoint as being the essential

25   causes -- or -- the main causes of the failure of the

Travis Love                                        May 23, 2024

1  dairy operations was the BioLink and Te Velde's personal

2  issues and money issues; is that accurate?

3      A.   The BioLink, the sand lanes, and the boxes at

4  the end.  I don't know what you want to call them, but

5  where the flush water would drain into.  Those were the

6  three structural things.  And then, yeah, Te Velde had

7  issues, so yeah.

8      Q.   If there had been available financing to

9  continue construction, do you think -- would you see

10 a -- let me rephrase.

11         Had there been sufficient financing to perform

12 additional construction activities on the project site,

13 do you believe that the dairy eventually would have been

14 able to be successful?

15     A.   We would have to have fixed the BioLink or

16 removed it.  And yes, if we had -- that could have been

17 fixed.  The dairy itself would have ran fine if we had

18 enough financing to feed the cows and pay the workers

19 and continue.  The dairy would have made it.  It would

20 have been quite a fix, but it would have made it.

21     Q.   And so we touched on not having financing to

22 feed the cows, did you have to lay off employees from a

23 lack of financing?

24     A.   No.  No, the bank covered the labor when we

25 went into bankruptcy.  And Greg was paying all the

```
 1   of them.  They're a couple of feet off the ground.
 2   They're a couple stories off the ground, aren't they?
 3       A.   Yes.
 4       Q.   So when you pump this liquid up to them, what
 5   happens at the top?
 6       A.   At the top of the separator?
 7       Q.   Yes.
 8       A.   The separator is like a slide with a bunch of
 9   little holes in it that lets the water fall through and
10   any bigger material slides down and gets conveyor-belted
11   into a pile.
12       Q.   Okay.  And, at this point, shouldn't the sand
13   already be out of the system?
14       A.   Should be, yes.
15       Q.   Okay.  And so what happens after the separator
16   to the liquid?  Where does it go?
17       A.   That goes back to the BioLink.
18       Q.   Okay.  And so this is liquid that's been with
19   sand removed hopefully, right?
20       A.   Well, in theory, yes.
21       Q.   Okay.  And on -- well, if the system is working
22   properly up to that point, the sand has been pulled out,
23   right?
24       A.   You would hope, yeah.  The majority of it, yes.
25       Q.   Okay.  And so -- and then if it goes into the
```

1  BioLink tank, do you know how -- what happens inside of

2  the tank?

3      A.   I didn't engineer it, but I -- how I understood

4  it is the BioLink will evacuate solids every so often to

5  keep the water -- more water in the tank itself for

6  flush.  But --

7      Q.   So --

8      A.   -- ours is the sand would not evacuate and it

9  just filled with sand.

10     Q.   Okay.  Now, we talked about a separator.  Is

11 there another kind of machinery that you see in dairies

12 called a sand separator?

13     A.   I've heard of them and seen them, yes.  We

14 didn't have one.

15     Q.   You didn't have one?

16     A.   No.

17     Q.   Since you were using sand for bedding, do you

18 think it would have been advisable to have a sand

19 separator?

20     A.   I can only speak from experience.  We put one

21 in at Threemile and it lasted five months and it wore

22 out and we never put it back in.

23     Q.   Do you know if at the start of the process

24 here, whether Mr. -- whether Dari-Tech recommended to

25 Mr. Te Velde or to Wayne Downey that IRZ -- sorry, let

Travis Love                                             May 23, 2024

```
 1   affect the separators at that time.  The separators,
 2   especially on our side as the dairy at that time, and
 3   even the Willow Creek where we had separators, they run
 4   so much they don't freeze up.
 5       Q.   Did you ever have to bypass the separators in
 6   any way?
 7       A.   Yes.
 8       Q.   When was that?
 9       A.   We had to bypass if -- well, for example, one
10   time the sand lanes where they drain into their
11   collection pit, that was full and we had too much flow
12   to go over to the separators so we bypassed.  But, yes,
13   there was multiple reasons why did bypass.
14       Q.   When you bypassed, what did you do?  Did you
15   just put the water into the BioLink tank straight from
16   the collection pit?
17       A.   Yes.
18       Q.   And did you do that in 2017 in December?
19       A.   I don't know the date, but did I do that at
20   Lost Valley, yes, it's been bypassed.
21       Q.   And you did that many times you said, correct?
22       A.   Occasionally, yes.
23       Q.   Earlier you said "many times."  I'm just trying
24   to get what that means.
25       A.   I'm not sure what that means either.  If you're
```

Travis Love        May 23, 2024

```
 1   asking me if we bypassed, yes, I did.
 2       Q.   Did you ever pump water from the lagoons into
 3   the BioLink tank without passing it through a separator?
 4       A.   Yes.
 5       Q.   And when you did that, was that about the time
 6   that you were having trouble with solids collecting
 7   inside the BioLink tank?
 8       A.   That was post.
 9       Q.   That was post?
10       A.   Post the problem with the BioLink tank.  The
11   only way I could keep flushing was adding water into the
12   BioLink tank.
13       Q.   Did you ever add fresh water into the BioLink
14   tank that hadn't already been cycled?
15       A.   No, because we were on water restrictions.
16       Q.   Okay.  Do you know whether Dari-Tech had
17   recommended to the operators that you add water
18   periodically into the cycle to preserve sort of the
19   quality of the water going through?
20       A.   I had many talks with Dave and what Dave
21   said -- and I can't remember the numbers right off the
22   top of my head, but we had the number of cows we were
23   milking and we had a PLC or, like, a computer screen for
24   the BioLink and I ran that to the number that he said to
25   run it at to make sure we had enough water going into
```

1    the tank.

2        Q.   Well, part of the issue is how much water, but

3    there is also the issue of adding fresh water and it

4    doesn't sound like you did that.

5        A.   Well, you're not supposed to add fresh water

6    because it's supposed to be a contained loop.  Ask them

7    on their sales pitch on that.

8        Q.   Mr. DeWaard, before he died, was able to submit

9    a declaration which is part of the record here.  He says

10   that part of the -- part of the approved practice is

11   that you have to maintain a consistency of water and

12   there are times when you have to add fresh water to the

13   system.  Do you recall him talking about that at all

14   when he was talking about the BioLink system?

15       A.   Yes, and if he is talking freshwater, like,

16   right out of the river, he never said that.  He knew I

17   was putting in lagoon water, which is fairly clean

18   water, by the way.  It's not full of sand by that point,

19   and we suck it off the surface of the lagoon, not out of

20   the bottom.

21       Q.   When you were talking earlier, you were asked

22   whether with proper financing the dairy could have been

23   a success and you said, "Well, yes.  We removed the

24   BioLink or we fixed the BioLink tank."  And I want to

25   ask you, as you sit here today, what kind of fix of the

1  BioLink tank would you have contemplated?

2       A.    What I would have done with the BioLink tank is

3  somehow changed the bottom-removal to actually remove

4  the solids out of the tank.

5       Q.    Are you saying there is no mechanism for

6  removing the solids out of the bottom of the tank?

7       A.    No, I'm not saying that.   I'm saying the

8  mechanism they installed didn't work.   Not for sand.

9  But -- if we're talking about this, everybody knew we

10  were putting sand in our freestalls.   That was not

11  post-BioLink.

12       Q.    Now, we were talking about the cycle and what

13  we just touched on relates to that description.   Do you

14  understand that -- is it your understanding that with

15  the BioLink tank you take water off the top to

16  circulate, but you also have the ability to remove the

17  settleable solids from the bottom and to go to the

18  lagoon?

19       A.    Yes.

20       Q.    Is that your understanding?

21       A.    Yes.

22       Q.    Okay.   And are you saying that that mechanism

23  wouldn't remove sand from the tank?

24       A.    Yes.

25       Q.    Okay.   Now, we earlier talked about a device

1    called a sand separator.  Do you understand that the
2    BioLink tank is not a sand separator?
3        A.    Yes.  I also understood that they knew we were
4    using sand.  So if they wanted a sand separator, they
5    should have probably advised that in the construction of
6    the place.
7        Q.    Well, earlier we talked about the sand lanes.
8    And so my question is:  Had the sand lanes and the catch
9    basins operated properly and removed the sand or most of
10   the sand, that would have fixed the problem with the
11   BioLink tank, wouldn't it?
12       A.    Potentially, yeah.  I will never know because
13   the sand lanes weren't designed properly and the BioLink
14   never worked properly.
15       Q.    Well, it never worked properly in your view
16   because it -- the sand wasn't retained and taken out of
17   the system where it was supposed to taken out, right?
18       A.    True.
19       Q.    Okay.  I think that is all of the questions I
20   have.
21       A.    Okay.
22             MR. PATRICK:  I am going to go next if that
23   works for everybody.
24                 EXAMINATION BY MR. PATRICK:
25       Q.    Mr. Love, I represent an outfit called

# EXHIBIT J

```
 1            UNITED STATES BANKRUPTCY COURT

 2      EASTERN DISTRICT OF CALIFORNIA - FRESNO DIVISION

 3

 4   In re                          ) BANKRUPTCY
                                    ) CASE NO.
 5   GREGORY JOHN TE VELDE,         ) 18-11651-A-11
                                    )
 6   Debtor.                        )
     _____)
 7                                  )
     RANDY SUGARMAN, CHAPTER 11     )
 8   TRUSTEE,                       )
                                    )
 9            Plaintiff,            )
     vs.                            )
10                                  )
     IRZ CONSULTING, LLC, and LINDSAY )
11   CORPORATION, doing business under )
     the fictitious name of IRZ     )
12   CONSTRUCTION DIVISION, LLC,    )
                                    )
13            Defendants.           )
     _____)
14   AND RELATED THIRD-PARTY COMPLAINT )
     AND CONSOLIDATED ACTIONS.      )
15   _____)

16

17            THE VIDEOCONFERENCE DEPOSITION OF

18   THIRD-PARTY DEFENDANT DARITECH, INC. (Steven Peerce and

19   Joshua McCort), was taken pursuant to Notice of Taking

20   Deposition on Tuesday, June 4, 2024, commencing at

21   10:03 a.m. PDT, reported by Deborah M. DeSilva, CRR,

22   CSR No. 7307, Certified Shorthand Reporter in and for

23   the State of California.

24

25
```

1  speaking, we've gone over the plans and the proposal.

2        What work did Daritech actually perform on the

3  dairy?

4      A.  Daritech installed all of its equipment.

5  Everything that's listed in the quote that Daritech was

6  going to do, Daritech did.  Everything that Daritech

7  listed as exclusions, Daritech did not do.

8      Q.  Okay.  So it drew up the plans for certain

9  portions of the Biolynk system and then installed

10  whatever it designed?

11     A.  Correct.

12     Q.  All right.  Was there any point where Daritech

13  refused to work on the project?

14     A.  After we hadn't been paid for six months or so.

15     Q.  Okay.  Did that ultimately get cured?

16     A.  Ultimately, the trustee wound up --

17        MR. TURNER:  I'm sorry, I object to the form of

18  the question about what being "cured" meant.

19        MR. TARCZY:  I can rephrase the question.  It's

20  not a problem.

21  BY MR. TARCZY:

22     Q.  Did Daritech ultimately get paid for the

23  project?

24     A.  No.

25     Q.  Okay.  So what work did Daritech refuse to

1    perform as a result of nonpayment?

2        A.   There came a point -- and I couldn't tell you

3    when it started -- but there came a point when they

4    needed parts.

5        Q.   Okay.  And as a result of not being paid,

6    Daritech didn't install those parts?

7        A.   As I understand it, yes.  I was not involved in

8    that part of it, and I haven't really had any

9    conversations with anybody to brief myself on that part

10   of it before today.  But I know at some point, when you

11   don't get paid, you stop supporting work.

12       Q.   Is that generally your understanding of how the

13   dairy business works:  If a contractor is not being

14   paid, they have no obligation to complete their work?

15          MR. VOTE:  Incomplete hypothetical.  Calls for

16   a legal conclusion.

17          You can answer.

18          THE WITNESS:  We completed the work.  When they

19   wore something out and they needed a part, they didn't

20   get it till we got paid.

21   BY MR. TARCZY:

22       Q.   Okay.  Did Daritech subcontract any of the work

23   it performed out?

24       A.   Not to my knowledge.

25       Q.   Okay.  You mentioned you weren't involved with

Steven Peerce & Joshua McCort

1   be too small?

2      A.   No.

3      Q.   Did you have any interaction with Travis Love

4   on the site?

5      A.   Only, like, in December after the facility was

6   operating and they needed some parts but they weren't

7   paying their bills, and so I delivered some -- went to

8   deliver some parts, and he was extremely frustrated and

9   yelled at me.   And I was there to help them, but they

10   had already shot theirself in the foot and bypassed all

11   the separators and plugged up the Biolynk system.

12      Q.   Okay.   What do you mean by they bypassed the

13   separators and plugged up the Biolynk system?

14      A.   Well, the Biolynk system requires the solids,

15   the coarse solids, to be separated from the manure, and

16   they bypassed the slope screens and just pumped it

17   straight into the pit, and it pumped it directly to the

18   Biolynk system, which the coarse fiber plugged up the

19   bottom removal portion of the process and plugged the

20   tank up, completely filled the tank with manure solids

21   and sand.

22      Q.   Okay.   And bypassing the slope screens, was

23   that outside of how you would recommend use of the

24   Biolynk system?

25      A.   Yeah, you can't do that.   That's a -- that is

```
 1              (Recess, 12:13 p.m. to 12:15 p.m.)
 2    BY MR. TARCZY:
 3         Q.   And so, Mr. McCort, my last question that,
 4    unfortunately, I -- we got chopped versions of a few of
 5    your answers on it, so I will ask it one more time.
 6              Do you have any understanding as to why
 7    Mr. Love was yelling at you?
 8         A.   I would say because he was upset, because he
 9    had plugged up his Biolynk system by bypassing his
10    separators and he had a lot of manure from all the cows
11    and he had no way to deal with it, and they were trying
12    to vacuum lanes and move cows and do all kinds of stuff.
13         Q.   Okay.  Did you have any other interactions with
14    Mr. Love besides this one incident?
15         A.   That's my one incident.
16         Q.   Okay.  As you were working on the project, did
17    you have any understanding as to who designed the dairy?
18         A.   My -- all I have is assumptions.
19         Q.   Okay.  And as we talked about at the very
20    beginning, I don't want any guesses or speculation, but
21    I am entitled to your best testimony.
22              So is it your best testimony that you do not
23    have an understanding as to who designed the dairy?
24         A.   Not specifically.
25         Q.   Okay.  Did you come to an understanding at some
```