1
2
3
4
5
6
7
8
9
10
11
12

**55**

**WANGER JONES HELSLEY PC**
Riley C. Walter  #91839
Kurt F. Vote  #160496
265 E. River Park Circle, Suite 310
Fresno, CA  93720
Telephone:  (559) 233-4800
Facsimile:  (559) 233-9330
Email:        rwalter@wjhattorneys.com
                 kvote@wjhattorneys.com

**ZUCKERMAN SPAEDER LLP**
Carl S. Kravitz, *pro hac vice*
R. Miles Clark, *pro hac vice*
1800 M Street, NW, Suite 1000
Washington, DC 20036
Telephone:  (202) 778-1800
Facsimile:  (202) 822-8106
Email:        ckravitz@zuckerman.com
                 mclark@zuckerman.com

13   Attorneys for: Plaintiff RANDY SUGARMAN, Liquidating Trustee

14              **UNITED STATES BANKRUPTCY COURT**

15               **EASTERN DIVISION OF CALIFORNIA**

16                      **FRESNO DIVISION**

| | |
|---|---|
| In re | Bankruptcy Case No. 18-11651-A-11 |
| GREGORY JOHN TE VELDE, | Chapter 11 |
| Debtor, | Adv. Pro. No. 19-01033-B |
| RANDY SUGARMAN, Chapter 11 Trustee, | DCN: MNG-5 |
| Plaintiff, | **PLAINTIFF'S RESPONSE TO DEFENDANTS'STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| IRZ CONSULTING, LLC aka IRC CONSTRUCTION DIVISION, LLC, | |
| Defendants. | Date:   July 16, 2025 |
| AND RELATED THIRD PARTY COMPLAINT AND CONSOLIDATED ACTIONS. | Time:   11:00 a.m. |
| | Place:  2800 Tulare Street |
| | Fresno, CA 93721 |
| | 5th Floor, Courtroom 13 |
| | Judge: Honorable Rene Lastreto II |

27
28

1

Pursuant to Local Rule 7056-1(b), Plaintiff Randy Sugarman, Liquidating Trustee of the Estate of Gregory J. te Velde, respectfully submits the following Response to Defendants' Statement of Undisputed Facts in Support of Motion for Summary Judgment.

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
| --- | --- |
| 1.     In 2015, Gregory John te Velde ("Debtor") was the owner of two large dairy farms in Tulare County. In 2015, Debtor started negotiations into acquiring "Lost Valley Farm," a 7,288 acre parcel near Boardman, Oregon. Debtor's interest was to purchase and develop Lost Valley Farm into a dairy farm with approximately $30,000 dairy cows.<br><br>Evidence:<br><br>Disclosure Statement For Chapter 11 Trustee's Plan Of Reorganization at p.3, Bky Dkt. # 2009 [Ex. E]; First Amended Complaint at ¶ 10 [Ex. O]. | 1. **Undisputed**, other than the typographical error in the last sentence (which reads "$30,000" instead of "30,000"). |

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 2.  For many years, Debtor also ran a dairy farm on leased land at Three Mile Canyon not far from where he would eventually find land to move his dairy operation. Debtor intended to build the same dairy design at the Boardman property as he operated at his previous Three Mile Canyon property. <br><br> <u>Evidence</u>: <br> Decl. of Wayne Downey at ¶ 3 | 2. **Undisputed.** |
| 3.  In September of 2015, as part of Debtor's leadup to the purchase of Lost Valley Farm, IRZ and Debtor entered into negotiations to retain IRZ to assist in development of Lost Valley Farm. <br> <u>Evidence</u>: <br><br> Decl. of Wayne Downey at ¶ 2 | 3. **Undisputed.** |

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 4.      As part of these negotiations, the parties discussed IRZ acting as general contractor on the project, but the proposal was rejected by Debtor as result of the cost to retain IRZ as general contractor.<br><br>Evidence:<br><br>Decl. of Wayne Downey at ¶ 4; November 17, 2015, Services Agreement [Ex. B]. | 4. **Undisputed** that IRZ proposed that IRZ would serve as the general contractor for the project, that Mr. te Velde rejected the proposal, and that one of his reasons for doing so was the cost of retaining IRZ to serve as general contractor.<br><br>**Disputed** that cost was the only factor in Mr. te Velde's decision-making process. The declarant Defendants cite is not competent to testify about Mr. te Velde's state of mind and thought processes.<br><br>Evidence: Plaintiff's Evidentiary Objections. |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 5.      IRZ and Debtor entered into a more limited Work Order dated September 30, 2015. The Work Order mistakenly names "IRZ Construction Division," as opposed to the correctly named "IRZ Construction Division (ICD) (a division of IRZ Consulting LLC)" named in the Contract, as party to the Work Order. At all times, the parties understood the Work Order and Contract to be between IRZ and Debtor. <br> Evidence <br> Decl. of Wayne Downey at ¶¶ 5, 7; Decl. of Fred Ziari at ¶ 12; September 30, 2015, Work Order [Ex. A]. | 5. **Undisputed** that IRZ and Mr. te Velde entered into an agreement titled "Work Order" on September 30, 2015, and that the Work Order incorrectly identifies "IRZ Construction Division" as a party to the agreement. <br><br> **Disputed** that "IRZ Construction Division (ICD) (a division of IRZ Consulting LLC)" is a party to the Work Order. IRZ Construction Division (ICD) is not, and never has been, a separate legal entity. <br><br> Evidence: Decl. of Wayne Downey in Supp. of Def. IRZ Consulting's Opp'n to Pl.'s Mot. for Partial SJ, ¶ 6 (Dkt. No. 462). <br><br> **Disputed** that "[a]t all times, the parties understood the Work Order and Contract to be between IRZ and Debtor." Indeed, as Defendants are well aware, Plaintiff has disputed this assertion in multiple prior submissions. <br><br> Evidence: *E.g.*, Pl.'s Resp. to Def.'s Statement of Undisputed Facts in Opp'n to Pl.'s Mot. for Partial SJ, at 2, ¶ 1 (Dkt. No. 474); Plaintiff's Evidentiary Objections. |

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 6.     Under the Work Order, IRZ agreed to provide certain preliminary drawings and estimates for the proposed Lost Valley Farm project and serve in the limited capacity as Project Manager. <u>Evidence</u>: Decl. of Wayne Downey at ¶ 5; September 30, 2015, Work Order at p. 1 [Ex. A]. | 6. **Undisputed** that, under the Work Order, IRZ agreed to provide, among other things, "certain preliminary drawings and estimates for the proposed Lost Valley Farm project." <br><br> **Disputed** that the Work Order provides that IRZ would "serve in the limited capacity as Project Manager." The Work Order does not address that topic. <br><br> <u>Evidence</u>: Work Order [Defendants' Ex. A (Bates #s 004-007)]; Plaintiff's Evidentiary Objections. |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
| --- | --- |
| 7.    The 9/30/15 "Work Order" included the following provision: "Liabilities. The client agrees to limit ICD's liability to the client and to all construction contractors and subcontractors on the project, due to ICD's or any employee of ICD's negligent acts, errors, or omissions, such that the total aggregate limit of ICD to all those names shall not exceed $50,000, or the amount of ICD's fees, whichever is less." <br><br> Evidence: <br><br> Decl. of Wayne Downey at ¶ 5; September 30, 2015, Work Order at p. 2 [Ex. A]. | 7. **Undisputed.** |

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 8.     On November 12, 2015, Debtor purchased Lost Valley Farm for $65 million, payable by $10 million down and a purchase money note and deed of trust for the remainder. The Debtor was, at least for a time, successfully funding the Lost Valley Farm project, and paying his other obligations, using the funds generated by his other dairies.<br><br>Evidence:<br><br>FAC ¶ 22 [Ex. O]; Disclosure Statement For Chapter 11 Trustee's Plan Of Reorganization at p.4-5 [Ex. E]. | 8. **Undisputed.** |

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 9.      On November 17, 2015, Debtor and IRZ entered into the Agreement Between Debtor and IRZ for Services. The Services Agreement squarely states "[t]his is an Agreement effective as of date of signing by OWNER ("Effective Date") between Greg Tevelde ("OWNER") and IRZ Consulting, LLC (d/b/a IRZ Construction Division)." IRZ is the signatory on the Services Agreement.<br><br>Evidence:<br><br>Decl. of Wayne Downey at ¶ 6; November 17, 2015, Services Agreement at pp. 1, 10, 15 [Ex. B]. | 9. **Undisputed.**[1] |

---

[1] The full name of the document that Defendants refer to as the "Services Agreement" is "Design, Engineer, and Project Management Services for Greg Tevelde Willow Creek Dairy Construction Project November 2015." *See* Defendants' Ex. B at 1 (Bates #009).  Plaintiff refers to this document herein as the "Design, Engineer, and Project Management Services Agreement" or simply the "Agreement."

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 10.    Under the Services Agreement, IRZ offered to act as "Project Manager" to perform review, oversight, design, and engineering tasks as requested, with Debtor to act as General Contractor for the project.<br><br>Evidence:<br>Decl. of Wayne Downey at ¶ 6; November 17, 2015, Services Agreement at p. 1-10 [Ex. B]. | 10. **Undisputed** that the Design, Engineer, and Project Management Services Agreement provides that IRZ will act as Project Manager, and Mr. te Velde will act as General Contractor.<br><br>**Disputed** that the Agreement provides that IRZ only will "perform review, oversight, design, and engineering tasks *as requested*" (emphasis added). The Agreement contains no such qualification. Instead, the Agreement expressly provides that Mr. te Velde "retains ICD to perform design, engineering, and project management services" and that ICD[2] will be "completing a series of design and engineering tasks, as well as assisting OWNER in overseeing construction tasks." The Agreement's Scope of Work, in turn, identifies the many review, oversight, design, and engineering tasks IRZ agreed to perform under the Agreement that IRZ itself drafted.<br><br>Evidence: Design, Engineer, and Project Management Services Agreement at 1-8, 10 [Defendants' Ex. B (Bates #s 009-016, 018)]; Plaintiff's Evidentiary Objections. |

---

[2] The Agreement provides that IRZ Consulting, LLC and its "d/b/a IRZ Construction Division" are collectively referred to therein as "ICD." *See* Design, Engineer, and Project Management Services Agreement at 10 [Defendants' Ex. B (Bates # 018)].

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 11. The understanding of Debtor and IRZ was that IRZ would perform the work under the November 17, 2015, Services Agreement.<br><br>Evidence:<br>Decl. of Wayne Downey at ¶¶ 6-7; November 17, 2015, Services Agreement [Ex. B]. | 11. **Undisputed** that Mr. te Velde understood that IRZ would perform the work it agreed to perform under the Design, Engineer, and Project Management Services Agreement.<br><br>**Disputed** that IRZ shared in that understanding. IRZ, in fact, never intended to perform the design and engineering tasks it agreed to perform under the Agreement. For instance, although IRZ had engineers on staff when IRZ executed the Agreement, none of IRZ's engineers worked in IRZ's Construction Division (ICD), and no engineers from IRZ were assigned to the team that worked on the project. Indeed, the management of Lindsay and IRZ had decided to keep ICD separated from IRZ's engineering business. Moreover, IRZ did not hire any engineers or subject matter experts to assist ICD in the performance of IRZ's duties under the contract, and, prior to entering into the Work Order and Agreement, no one at IRZ had any experience designing large commercial dairies or designing the waste management systems of large commercial dairies.<br><br>Evidence: Transcript of the Deposition of Lindsay Corporation and IRZ Consulting, |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| | LLC, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, via the designated corporate representative Wayne Downey, May 30, 2024 (hereafter "Downey Rule 30(b)(6) Dep.") at 28:6-29:7, 35:19-36:3, 80:3-81:14, 126:1-7, 132:24-133:3, 134:24-135:5; Plaintiff's Evidentiary Objections. |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 12. The Services Agreement provides that Debtor will act as general contractor and that IRZ is not responsible for the quality of work performed by sub-contractors.<br><br>Evidence:<br><br>Decl. of Wayne Downey at ¶ 6; November 17, 2015, Services Agreement §§ 2.01(A), 3.01 [Ex. B]. | 12. **Undisputed** that the Design, Engineer, and Project Management Services Agreement provides that Mr. te Velde will act as General Contractor.<br><br>**Disputed** that the Agreement provides that "IRZ is not responsible for the quality of work performed by sub-contractors." Nowhere does the Agreement say that. To the contrary, the Agreement provides that ICD will "oversee all tasks associated with the project"; "[a]ssist Owner in hiring and overseeing all Sub Contractors"; and "[i]nsure [sic] that the project is constructed to the quality and standards set forth by the industry … by completing a series of design and engineering tasks, as well as assisting the OWNER in overseeing construction tasks."<br><br>Evidence: Design, Engineer, and Project Management Services Agreement at 1 [Defendants' Ex. B (Bates # 009)]; *see also id.* at 2-8 (Scope of Work), 10 (Preamble and Article 1), 11-12 (Article 3) (Bates #s 010-016, 018); Plaintiff's Evidentiary Objections. |

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 13. The Services Agreement contains an integration clause, stating that "This writing is the full and complete agreement between the parties concerning ICD's services to OWNER for the above services and work. This agreement may not be modified except by an agreement signed by ICD and OWNER."<br><br>Evidence:<br><br>Decl. of Wayne Downey at ¶ 6; November 17, 2015, Services Agreement at § 13 [Ex. B]. | 13. **Undisputed.** |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 14.   The Services Agreement includes the following provision: "**ICD Liability**. It is agreed by OWNER that ICD may be liable for damages directly caused by negligent acts, errors, or omissions made by ICD. Under no circumstances shall that amount exceed $500,000 or the amount of ICD's fees whichever is lower. Under no circumstances shall ICD be liable for negligent acts, errors, and omissions of OWNER or SUBCONTRACTORS." <br> Evidence: <br> Decl. of Wayne Downey at ¶ 6; November 17, 2015, Services Agreement § 6.01 [Ex. B]. | 14. **Undisputed.** |

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 15.　The ICD liability provision was a necessary and material portion of IRZ's consideration, as IRZ needed to limit is liability to a reasonable amount given the scope of its work versus the size of the project.<br><br>Evidence:<br><br>Decl. of Wayne Downey at ¶ 6; November 17, 2015, Services Agreement § 6.01 [Ex. B]. | 15. **Disputed.**  For the reasons set forth in Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Second Motion for Partial Summary Judgment, *see* Dkt. No. 445 at 5-7, 11-15, and in Plaintiff's Reply Memorandum, *see* Dkt. No. 482 at 3-4, the provision is unenforceable under Oregon law.  Further, the declarant Defendants cite is not competent to testify about the subject.<br><br>Evidence: Downey Rule 30(b)(6) Dep. at 63:16-64:4.; Plaintiff's Evidentiary Objections. |
| 16.　The signatory to the Work Order was Fred Ziari, CEO of IRZ.<br><br>Evidence:<br><br>Decl. of Fred Ziari at ¶ 13; November 17, 2015, Services Agreement at p. 3 [Ex. B]. | 16. **Undisputed.** |
| 17.　Mr. Ziari did not have authority to sign on behalf of IRZ's publicly traded then-ultimate parent company, Defendant Lindsay.<br><br>Evidence:<br><br>Decl. of Fred Ziari at ¶ 14. | 17. **Undisputed.** |

18. Over the course of the project, Debtor acted as general contractor, designing the dairy, retaining the services of several subcontractors for work to be performed, and overseeing and approving the construction of the dairy.

Evidence:

Decl. of Wayne Downey at ¶ 9; November 17, 2015, Services Agreement § 1 [Ex. B]; Deposition of Josh Obendorf at 9:17-21 [Ex. J]; Deposition of Travis Love at 22:7-18 and 23:24-24:2 [Ex. L].

18. **Undisputed** that the Design, Engineer, and Project Management Services Agreement provides that Mr. te Velde will act as General Contractor.

**Disputed** that Mr. te Velde, who is not an engineer, "design[ed] the dairy." To the contrary, as expressly provided in the Agreement, Mr. te Velde "retain[ed] ICD to perform design, engineering, and project management services, in connection with the design, engineering, and construction of the Willow Creek Dairy Construction Project." The Agreement further provides that ICD will be "completing a series of design and engineering tasks." The Agreement's Scope of Work, in turn, identifies the many design and engineering tasks IRZ agreed to perform under the Agreement that IRZ itself drafted.

Evidence: Design, Engineer, and Project Management Services Agreement at 1-8, 10 [Defendants' Ex. B (Bates #s 009-016, 018)].

**Disputed** that IRZ played no role "retaining the services of several subcontractors for work to be performed, and overseeing and approving the construction of the dairy." To the contrary, the Agreement provides that ICD will

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
|  | "oversee all tasks associated with the project"; "[a]ssist Owner in hiring and overseeing all Sub Contractors"; and "[i]nsure [sic] that the project is constructed to the quality and standards set forth by the industry … by completing a series of design and engineering tasks, as well as assisting the OWNER in overseeing construction tasks." <br><br> Evidence: Design, Engineer, and Project Management Services Agreement at 1 [Defendants' Ex. B (Bates # 009)]; *see also id.* at 2-8 (Scope of Work), 10 (Preamble and Article 1), 11-12 (Article 3) (Bates #s 010-016, 018). |
| 19.      IRZ did not contract with any subcontractors on the project. <br><br> Evidence: <br><br> Decl. of Wayne Downey at ¶ 10. | 19. **Undisputed.** |

| | |
|---|---|
| 20. IRZ played no role in selecting subcontractors, inspecting their work or independently providing any design information.<br><br>Evidence:<br><br>Decl. of Wayne Downey at ¶ 10. | 20. **Undisputed** that IRZ failed to perform this work**.**<br><br>**Disputed** that IRZ did not, in fact, agree, under the Design, Engineer, and Project Management Services Agreement, to provide services regarding "selecting subcontractors, inspecting their work, and independently providing design information."  Indeed, as expressly provided in the Agreement, Mr. te Velde "retain[ed] ICD to perform design, engineering, and project management services, in connection with the design, engineering, and construction of the Willow Creek Dairy Construction Project."  The Agreement further provides that ICD will "oversee all tasks associated with the project"; "[a]ssist Owner in hiring and overseeing all Sub Contractors"; and "[i]nsure [sic] that the project is constructed to the quality and standards set forth by the industry … by completing a series of design and engineering tasks, as well as assisting the OWNER in overseeing construction tasks."  The Agreement's Scope of Work, in turn, identifies the many review, oversight, design, and engineering tasks IRZ agreed to perform under the Agreement that IRZ itself drafted.<br><br>Evidence: Design, Engineer, and Project |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| | Management Services Agreement at 1-8, 10 [Defendants' Ex. B (Bates #s 009-016, 018)]; *see also id.* at 11-12 (Article 3) (Bates #s 019-020). |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

21.  During construction, Debtor never requested IRZ to provide engineering work or design services on the dairy nor did IRZ engage in such work. IRZ's sole duty in this regard was to act as project manager and to "oversee the design and engineering of the project to ensure that all objectives of the project are met in the final and complete design." IRZ is charged with assisting Debtor with the scheduling, hiring and other administrative aspects of the project. IRZ "shall not be liable for the negligence, errors and omissions of SUBCONTRACTORS." (Services Agreement, p.11). Thus the Services Agreement expressly provides that Owner will be consulted on all aspects of the contract, and that IRZ's role will be to assist owner in the scheduling and management of the Lost Valley Farm project.

Evidence:

Decl. of Wayne Downey at ¶ 10; Deposition of Wayne Downey, Vol III, at 34:11-13, 34:23-25, 35:4-6, 90:15-91:20, 94:6-15, 107:15-21, and 110:22-25 [Ex. M]; November 17, 2015, Services Agreement Scope of

21. **Undisputed** that IRZ failed "to provide any engineering work or design services on the dairy."

**Disputed** that Mr. te Velde "never requested IRZ to provide engineering work or design services on the dairy." In the aptly named Design, Engineer, and Project Management Services Agreement, Mr. te Velde expressly "retain[ed] ICD to perform design, engineering, and project management services, in connection with the design, engineering, and construction of The Willow Creek Dairy Construction Project."

Evidence: Design, Engineer, and Project Management Services Agreement at 10 [Defendants' Ex. B (Bates # 018)].

**Disputed** that "IRZ's *sole duty* in this regard was to act as project manager and to 'oversee the design and engineering of the project to ensure that all objectives of the project are met in the final and complete design' " (emphasis added). In particular, IRZ also agreed to "[i]nsure [sic] that the project is constructed to the quality and standards set forth by the industry … by completing a series of design and engineering tasks, as well as assisting the OWNER in overseeing construction tasks."

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| Work § 1, p.10 [Ex. B]. | The Agreement's Scope of Work, in turn, identifies the many review, oversight, design, and engineering tasks IRZ agreed to perform under the Agreement that IRZ itself drafted.<br><br>Evidence: Design, Engineer, and Project Management Services Agreement at 1-8, 10 [Defendants' Ex. B (Bates #s 009-016, 018)]. |
| 22.  IRZ's licensed engineers never engaged to perform any work on the project.<br>Evidence:<br>Decl. of Wayne Downey at ¶ 10;<br>Deposition of Wayne Downey, Vol III, at 34:11-13, 34:23-25, 35:4-6, 90:15-91:20, 94:6-15, 107:15-21, and 110:22-25 [Ex. M]. | 22.  **Undisputed.** |

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 23.    The work performed under the Work Order and Services Agreement was performed by Josh Rowell, Gibb Evans, Wayne Downey, Josh Obendorf, Robert McMillan, and Ian Brown. Each one of these individuals was solely an employee of IRZ during the relevant time period<br><br>Evidence:<br><br>Decl. of Wayne Downey at ¶ 10. | 23. **Undisputed.** |

| | |
|---|---|
| 24. Debtor was the ultimate decision maker as to the construction, design and placement of the dairy and IRZ had no say in how it was constructed.<br><br>Evidence:<br><br>Decl. of Wayne Downey at ¶ 11. | 24. **Disputed.** As expressly provided in the Agreement, Mr. te Velde "retain[ed] ICD to perform design, engineering, and project management services, in connection with the design, engineering, and construction of the Willow Creek Dairy Construction Project." The Agreement further provides that "ICD will act on behalf of the Owner and will oversee all tasks associated with the project." The Agreement further provides that ICD will be "completing a series of design and engineering tasks, as well as assisting OWNER in overseeing construction tasks." The Agreement's Scope of Work, in turn, provides that "it is understood by the OWNER and ICD" that "[t]his project will be undertaken under the supervision and control of ICD and **Project Manager**," and that "[i]t is also understood that ICD will be acting on behalf of the OWNER as **Agent for the OWNER**." The Scope of Work also identifies the many review, oversight, design, and engineering tasks IRZ agreed to perform under the Agreement that IRZ itself drafted.<br><br>Evidence: Design, Engineer, and Project Management Services Agreement at 1-8, 10 [Defendants' Ex. B (Bates #s 009-016, 018)]; Plaintiff's Evidentiary Objections. |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 25. At the time IRZ entered into the Work Order and Services Agreement, September through November of 2015, IRZ had no basis to believe that Debtor had any financial difficulties. Debtor's California and Oregon operations were successful and apparently profitable. There were no known unpaid creditors or other issues.<br><br>Evidence:<br><br>Decl. of Wayne Downey at ¶ 12. | 25. **Undisputed.** |

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 26.    Lost Valley Farm ran into logistical and financial difficulties arising out of legal disputes between Debtor and the Oregon Department of Agriculture.<br><br>Evidence:<br>Disclosure Statement For Chapter 11 Trustee's Plan Of Reorganization at p.4 [Ex. E]. | 26. **Disputed.**  Plaintiff disputes the characterization of "legal and financial difficulties arising out of legal disputes between Debtor and the Oregon Department of Agriculture." As explained in the Disclosure Statement Defendants cite, Lost Valley Farm's waste management system "was poorly designed and constructed when Debtor commenced operations."  Among other problems, "the effluent did not properly drain from the dairy stalls" and "effluent leaked from various parts of the waste management system," which "resulted in very aggressive litigation and administrative enforcement actions against the Lost Valley Farm by the ODA and the Oregon Attorney General's office resulting in civil contempt proceedings, fines and a revocation of the CAFO"—*i.e.*, the Confined Animal Feeding Operation permit required to operate the dairy.<br><br>Evidence: Disclosure Statement For Chapter 11 Trustee's Plan Of Reorganization at 4-5 [Defendants' Ex. E (Bates #s 064-065)]. |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 27.  Debtor was funding the construction of the Lost Valley Farm from the revenue of his California dairy operations. However, the price of milk was historically low and he lacked sufficient profits to maintain the construction.  <u>Evidence</u>: Declaration of Kristin A. McAbee, Bky Dkt. # 526 ¶ 11 [Ex. F] | 27. **Undisputed.** |

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 28.   Debtor was addicted to methamphetamines and was frequently high when he was operating his businesses. Debtor admitted that his drug addition to methamphetamines began when he was in college and continued for many years through in-treatment programs in 2004, 2015 and 2018.<br><br>Evidence:<br><br>Declaration of Kristin A. McAbee ¶ 13 [Ex. F] | 28. **Undisputed** that Mr. te Velde admitted in May 2018 that he had a drug addiction to methamphetamine, which began when he was in college, and that he had been in treatment programs three times, in 2004, 2015 and 2018.<br><br>**Disputed** that Mr. te Velde was frequently high when he was operating his businesses. The evidence Defendants cite does not support that assertion.<br><br>Evidence: Declaration of Kristin A. McAbee ¶ 13 [Defendants' Ex. F (Bates # 094)].<br><br>**Further disputed** that any purported fact stated in this paragraph is relevant or material to any issue on which Defendants have moved for summary judgment. *See* Fed. R. Evid. 401, 402.  And even if any such fact were material, the probative value of the evidence cited by Defendants would be substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury.  *See* Fed. R. Evid. 403.<br><br>Evidence: Plaintiff's Evidentiary Objections. |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 29. Debtor continued his methamphetamine use after filing for bankruptcy and used methamphetamine weekly.<br><br>Evidence:<br>Declaration of Kristin A. McAbee ¶ 14 [Ex. F] | 29. **Undisputed** that Mr. te Velde admitted in May 2018 that he used methamphetamine weekly and had used methamphetamine after filing for bankruptcy**.**<br><br>**Disputed** that any purported fact stated in this paragraph is relevant or material to any issue on which Defendants have moved for summary judgment. *See* Fed. R. Evid. 401, 402.  And even if any such fact were material, the probative value of the evidence cited by Defendants would be substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury.  *See* Fed. R. Evid. 403.<br><br>Evidence: Plaintiff's Evidentiary Objections. |
| 30. Debtor did not segregate his business and personal books, and all personal expenses were paid directly out of the dairy checking accounts.<br><br>Evidence:<br>Declaration of Kristin A. McAbee ¶ 10 [Ex. F]. | 30. **Disputed.**  The evidence Defendants cite does not support the assertions in this paragraph.<br><br>Evidence: Declaration of Kristin A. McAbee ¶ 10 [Defendants' Ex. F (Bates # 093)]. |

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 31.    Debtor admitted that his drug use "has negatively impaired [his] health, family and business." <br><br> Evidence: <br><br> Memorandum Opinion [Ex. G]. | 31. **Undisputed** that Mr. te Velde made this statement. <br><br> **Disputed** that the statement is relevant or material to any issue on which Defendants have moved for summary judgment. *See* Fed. R. Evid. 401, 402. And even if it were material, the probative value of the evidence would be substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury. *See* Fed. R. Evid. 403. <br><br> Evidence: Plaintiff's Evidentiary Objections. |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 32.  Debtor frequently withdrew cash directly from the dairy checking accounts for the sole purpose of gambling, generally at the Tachi Palace Hotel and Casino. <u>Evidence</u>: Declaration of Kristin A. McAbee ¶ 18 [Ex. F]. | 32. **Disputed.**  The evidence Defendants cite does not support the assertions in this paragraph.<br><br> <u>Evidence</u>: Declaration of Kristin A. McAbee ¶ 18 [Defendants' Ex. F (Bates # 095)].<br><br>**Further disputed** that any purported fact stated in this paragraph is relevant or material to any issue on which Defendants have moved for summary judgment. *See* Fed. R. Evid. 401, 402.  And even if any such fact were material, the probative value of the evidence cited by Defendants would be substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury.  *See* Fed. R. Evid. 403.<br><u>Evidence</u>: Plaintiff's Evidentiary Objections. |

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 33.     Debtor's gambling continued after he filed for Chapter 11 bankruptcy, where he would lose $2,000 to $7,000 a month.<br><br>Evidence:<br><br>Declaration of Kristin A. McAbee ¶ 19 [Ex. F]. | 33. **Disputed.** The evidence Defendants cite does not support the assertions in this paragraph.<br><br>Evidence: Declaration of Kristin A. McAbee ¶ 19 [Defendants' Ex. F (Bates # 095)].<br><br>**Further disputed** that any purported fact stated in this paragraph is relevant or material to any issue on which Defendants have moved for summary judgment. *See* Fed. R. Evid. 401, 402. And even if any such fact were material, the probative value of the evidence cited by Defendants would be substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury. *See* Fed. R. Evid. 403.<br><br>Evidence: Plaintiff's Evidentiary Objections. |
| 34.     Debtor neglected his duties as general contractor, resulting in delays to the project.<br><br>Evidence:<br><br>Decl. of Wayne Downey at ¶ 13; Deposition of Wayne Downey, Vol III, at 124:2-14 [Ex. M]; Deposition of Dari-Tech at 53:14-24 [Ex. N]. | 34. **Disputed.** Plaintiff objects to the characterization that Mr. te Velde "neglected his duties as general contractor," to the extent it may incorrectly suggest that Mr. te Velde breached any term of the Agreement absent a legally recognized excuse. |

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 35.　Debtor failed to pay IRZ for its services, along with failing to pay many subcontractors for their work.<br><br>Evidence:<br>Decl. of Wayne Downey at ¶ 14;<br>Deposition of Wayne Downey, Vol I, at 78:15-19, 151:25-152:3, and 187:8-11 [Ex. H];<br>Deposition of Wayne Downey, Vol II, at 351:11-15 [Ex. I];<br>Deposition of Wayne Downey, Vol III, at 101:2-19, and 124:2-14 [Ex. M]; Deposition of Dari-Tech at 54:12-55:11 [Ex. N];<br>Deposition of Randy Sugarman at 188:12-22 [Ex. K]. | 35. **Disputed.** Defendants have admitted that Mr. te Velde paid IRZ over $1 million dollars for its services.<br><br>Evidence: Transcript of the videotaped deposition of Lindsay Corporation and IRZ Consulting, LLC, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, on May 30, 2024, via the designated corporate representative Farahmand "Fred" Ziari (hereafter "Ziari Rule 30(b)(6) Dep.") at 10:23-13:2.<br><br>Plaintiff acknowledges that Mr. te Velde ultimately could no longer pay IRZ for its services, and that Plaintiff has previously represented that Mr. te Velde had defaulted on his contractual obligation to timely pay for IRZ's services.  As affirmatively alleged in the First Amended Complaint, however, any default by Mr. te Velde was excused by Defendants' prior material breaches.  *See* FAC ¶ 48. |

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 36.   Debtor defaulted on his contractual obligation to timely pay for IRZ's services.<br><br>Evidence:<br>Plaintiff's SUF ISO Motion for Partial Summary Judgment, No. 7 [Ex. P]. | 36. **Disputed**. Defendants have admitted that Mr. te Velde paid IRZ over $1 million dollars for its services.<br><br>Evidence: Ziari Rule 30(b)(6) Dep. at 10:23-13:2.<br><br>Plaintiff acknowledges that Mr. te Velde ultimately could no longer pay IRZ for its services, and that Plaintiff has previously represented that Mr. te Velde had defaulted on his contractual obligation to timely pay for IRZ's services.  As affirmatively alleged in the First Amended Complaint, however, any default by Mr. te Velde was excused by Defendants' prior material breaches.  *See* FAC ¶ 48. |
| 37.   IRZ was not able to perform its duties to sequence the work of subcontractors when the subcontractors increasingly refused to show up to work after not being paid by Debtor.<br>Evidence:<br>Decl. of Wayne Downey at ¶ 15;<br>Deposition of Wayne Downey, Vol III, at 124:2-14 [Ex. M]. | 37. **Undisputed**. |

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 38. As a result of Debtor's actions, IRZ notified Debtor of his failure to comply with the terms of the parties' agreement.<br><br>Evidence:<br><br>Decl. of Wayne Downey at ¶ 16. | 38. **Undisputed.** |
| 39. On or about August 3, 2017, Debtor terminated IRZ's work on the project due to lack of funding and instructed IRZ to cease work so as to avoid incurring further fees.<br><br>Evidence:<br>Decl. of Wayne Downey at ¶ 17; Deposition of Wayne Downey, Vol III, at 101:2-19 [Ex. M]. | 39. **Undisputed.** |
| 40. IRZ remained on the project to wind down its services for roughly two weeks after the contract was terminated and provided no further services to Debtor.<br><br>Evidence:<br>Decl. of Wayne Downey at ¶ 17. | 40. **Undisputed.** |

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 41.  Debtor continued to design, build and operate the dairy without IRZ's involvement up until Debtor filed for bankruptcy. In doing so, Debtor made significant and material changes from the draftsman drawings that had been drafted by IRZ under Debtor's direction. IRZ's representatives, after Debtor filed bankruptcy, in fact toured the property and discovered these changes, which they were previously unaware of. These changes were actually implemented in the construction that was completed. IRZ had no part in these changes and revisions and was unaware that they were made after IRZ was terminated from the project.<br><u>Evidence</u>:<br>Decl. of Wayne Downey at ¶¶ 18-19, 21. | 41. **Disputed** that Mr. te Velde "continued to design" and "build" the dairy without IRZ's involvement, and that he "made significant and material changes from the draftsman drawings that had been drafted by IRZ." The declarant Defendants cite lacks personal knowledge of Mr. te Velde's actions after IRZ stopped working on the project.<br><br>**Further disputed** that Mr. te Velde made significant and material changes from the draftsman drawing that had been drafted by IRZ on the ground that the evidence Defendants cite does not support the statement. The declarant nowhere states that ***Mr. te Velde*** made significant and material changes, he simply states that "significant and material changes had been made."<br><br>**Further disputed** as vague and ambiguous in that that statements do not identify in any meaningful way what the purported changes are.<br><br><u>Evidence</u>: Decl. of Wayne Downey, ¶ 19; Plaintiff's Evidentiary Objections. |

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 42.    Soon after Debtor began operations, he repeatedly violated the terms and conditions of the Confined Animal Feeding Operation and was shut down by the State of Oregon.<br><br>Evidence:<br><br>Decl. of Wayne Downey at ¶ 20; Disclosure Statement For Chapter 11 Trustee's Plan Of Reorganization at 4:14-5:6 [Ex. E]. | 42. **Disputed.**  Plaintiff disputes the characterization of Mr. te Velde having "repeatedly violated the terms and conditions of the Confined Animal Feeding Operation" (CAFO) permit. As explained in the Disclosure Statement Defendants cite, Lost Valley Farm's waste management system "was poorly designed and constructed when Debtor commenced operations."  Among other problems, "the effluent did not properly drain from the dairy stalls" and "effluent leaked from various parts of the waste management system," which "resulted in very aggressive litigation and administrative enforcement actions against the Lost Valley Farm by the ODA and the Oregon Attorney General's office resulting in civil contempt proceedings, fines and a revocation of the CAFO."<br><br>Evidence: Disclosure Statement For Chapter 11 Trustee's Plan Of Reorganization at 4-5 [Defendants' Ex. E (Bates #s 064-065)]; Plaintiff's Evidentiary Objections. |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 43.　On September 25, 2017, IRZ recorded a construction lien against Lost Valley Farm for the principal sum of $393,476.81.<br>Evidence:<br>IRZ Proof of Claim, Attachment B, 817 [Ex. D]. | 43. **Undisputed.** |
| 44.　On November 2, 2017, IRZ filed a complaint in Oregon Circuit Court for foreclosure on the construction lien.<br>Evidence:<br>IRZ Proof of Claim, Attachment B, p. 1-7 [Ex. D]. | 44. **Undisputed.** |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 45. At no point during the construction, or after Debtor completed building the dairy without IRZ's assistance as project manager, did Debtor ever complain about the quality of IRZ's work or allege any defects associated with the construction or operation of the dairy, nor did Debtor provide any opportunity to remediate any alleged defect.<br><br>Evidence:<br>Decl. of Wayne Downey at ¶ 21. | 45. **Undisputed** that Mr. te Velde was unaware of the full extent of Defendants' breaches of contract and negligence before he filed for bankruptcy.<br><br>**Disputed** that Mr. te Velde did not "provide any opportunity to remediate any alleged defect." By the time Mr. te Velde could no longer pay for IRZ's services, IRZ already had been working on the project for over a year and already had received more than $1 million from Mr. te Velde. IRZ had more than ample opportunity to remedy its failure to provide Mr. te Velde with the parties' agreed upon design and engineering services. IRZ simply chose not to do that work.<br><br>Evidence: Design, Engineer, and Project Management Services Agreement [Defendants' Ex. B (Bates #s 009-023)]; Ziari Rule 30(b)(6) Dep. at 10:23-13:2. |

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 46. On June 4, 2018, IRZ filed Proof of Claim 19-1 (the "IRZ Claim"). The IRZ Claim seeks payment of $347,057.56, which is the actual amount owed as of April 26, 2018. The IRZ Proof of Claim was prepared using Official Form 410, was signed under penalty of perjury by IRZ, and attaches the relevant lawsuit and contracts.<br>Evidence:<br>Decl. of Fred Ziari at ¶ 16;<br>IRZ Proof of Claim [Ex. D] | 46. **Undisputed** that IRZ filed the IRZ Claim on June 4, 2018; and that the IRZ Claim seeks payment of $357,057.56, was prepared on Form 410, and was signed under penalty of perjury.<br><br>**Disputed** that the IRZ Claim "attaches the relevant … contracts." The IRZ Claim does not attach a complete copy of the Design, Engineer, and Project Management Services Agreement.<br><br>Evidence: IRZ Proof of Claim [Defendants' Ex. D] |
| 47. The Oregon Construction Contractors Board issued IRZ a contractor's license on November 21, 2011 and IRZ has maintained that license to this date.<br>Evidence:<br>Decl. of Wayne Downey at ¶ 8; Record of Oregon Construction Contractor's Board [Ex. C]. | 47. **Undisputed.** |
| 48. IRZ Construction Division is a registered assumed business name of IRZ.<br>Evidence:<br>Decl. of Wayne Downey at ¶ 8 | 48. **Undisputed.** |

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 49. The unpaid invoices out of which this $347,057.56 arises were incurred after November 17, 2015, and represent only work performed within the scope of the Services Agreement, not the September 30, 2015, Work Order.<br><br>Evidence:<br>Decl. of Wayne Downey at ¶ 22; Decl. of Fred Ziari at ¶ 18. | 49. **Undisputed.** |
| 50. Defendant Lindsay Corporation was the ultimate owner of IRZ during the period of the Lost Valley Farm project. Through a subsidiary, Lindsay Corporation purchased the IRZ business from entities controlled by Farahmand "Fred" Ziari on or about August 26, 2011. A decade later, in August 2021, Lindsay Corporation, through a subsidiary, sold IRZ Consulting, LLC, to IRZ Holding Company LLC, a company managed by Fred Ziari. Accordingly, Lindsay Corp. was the owner of IRZ during the operative time period.<br><br>Evidence:<br>Decl. of Fred Ziari at ¶¶ 6-10. | 50. **Undisputed.** |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 51.    IRZ is and was a limited liability company.<br>Evidence:<br>Decl. of Fred Ziari at ¶ 4. | 51. **Undisputed.** |
| 52.    The invoices for the project were sent from IRZ to Debtor.<br>Evidence:<br>Decl. of Fred Ziari at ¶ 18 | 52. **Undisputed.** |
| 53.    IRZ's principal place of business is located in Hermiston, Oregon.<br>Evidence:<br>Decl. of Fred Ziari at ¶ 5. | 53. **Undisputed.** |
| 54.    Prior the events of the bankruptcy, Debtor spent roughly half of his time living in Oregon.<br>Evidence:<br>Declaration of Kristin A. McAbee, Bky Dkt. # 526 ¶ 8 [Ex. F]. | 54. **Undisputed.** |

| DEFENDANTS' STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 55. "IRZ Construction Division by Lindsay" was a marketing name developed to capitalize on IRZ's connection with Lindsay Corp., a publicly traded company in the irrigation space. However, IRZ Construction Division was always an assumed name of IRZ. Neither Lindsay Corp. nor the Lindsay Holdco ever did work under the IRZ name.<br><br>Evidence:<br>Decl. of Fred Ziari at ¶ 19-20. | 55. **Undisputed.** |

## PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS

1. The Design, Engineer, and Project Management Services Agreement was drafted by IRZ. *See* Defs' Ex. B (Agreement on IRZ form); Pl.'s Ex. 1 (Downey Rule 30(b)(6) Dep.) at 37:4-8, 38:1-8, 43:6-14, 45:20-25.

2. Consistent with its title, the Agreement clearly provides that the Debtor retained IRZ to perform design and engineering services. *See generally* Defs' Ex. B (Agreement); *see also* Def. IRZ Consulting's Mem. of Points and Authorities in Opp'n to Pl.'s Mot. for Partial SJ, at 6 (Dkt. No. 461) (acknowledging that the Agreement obligated IRZ "to perform review, oversight, design, and engineering tasks"); Decl. of Wayne Downey in Supp. of Def. IRZ Consulting's Opp'n to Pl.'s Mot. for Partial SJ, ¶ 3 (Dkt. No. 462) (stating that the Agreement obligated IRZ "to perform review, oversight, design, and engineering tasks").

3. For example, the opening paragraph of the Agreement provides the following:

> Greg Tevelde (OWNER) intends to design[,] engineer[,] and construct a dairy facility "the Willow Creek Dairy-WCD" near Boardman Oregon beginning in November 2015. IRZ Construction Division (ICD) (a division of IRZ Consulting

LLC) is pleased to offer our professional design, engineering, and project management services to assist OWNER in accomplishing this goal.

Defs' Ex. B (Agreement) at 1.

4.    The first page of the Agreement has a section titled "Project Objective," which includes the following:

> ICD will assist the OWNER to make sure that the project is designed and constructed to operate at maximum efficiencies while using quality materials and qualified personnel to minimize costs and achieve a long lasting and sustainable project.

> ICD will act on behalf of the OWNER and will oversee all tasks associated with the Project.  These tasks may include but are not limited to … Insure [sic] that the project is constructed to the quality and standards set forth by the industry.  ICD will assist the OWNER in achieving this goal by completing a series of design and engineering tasks, as well as assisting OWNER in overseeing construction tasks, in phases.

Defs' Ex. B (Agreement) at 1.

5.    Elsewhere, the Agreement expressly provides that "OWNER retains ICD to perform design, engineering, and project management services, in connection with the design, engineering, and construction of The Willow Creek Dairy Construction Project as described in the enclosed Scope of Work ('Assignment')."  Defs' Ex. B (Agreement).

6.    The Agreement further states that "ICD shall provide the services set forth in SCOPE OF WORK."  Defs' Ex. B (Agreement) at 10, § 1.01(A).

7.    The Agreement contains a section titled "SCOPE OF WORK," which is divided into three subsections.  Defs' Ex. B (Agreement) at 2-9.

8.    The first subsection of the Agreement's Scope of Work (titled "1 – Project Management Services") provides the following: "Prior to the acceptance of this contract, it is understood by the OWNER and ICD" that "[t]he project will be undertaken under the supervision and control of ICD as **Project Manager**," and "[i]t is also understood that ICD will be acting on behalf of the OWNER as **Agent for the Owner**."  Defs' Ex. B (Agreement) at 2.

9.    Among other things, the first subsection of the Agreement's Scope of Work sets forth the general duties of ICD as Project Manager.  These include the following: "1. ICD will oversee the design and engineering of this project. … ICD will oversee the design and engineering of the project to

1　insure [sic] that all objectives of the project are met in the final and complete design." Defs' Ex. B

2　(Agreement) at 2.

3　　　　10.　　The second subsection of the Agreement's Scope of Work (titled "2 – Work Phases to

4　Be Performed During Project") lists twenty-one (21) phases of work to be performed by ICD "for the

5　successful completion of the project." Each work phase contains multiple specific tasks to be performed

6　by ICD. Many of the work phases and tasks include ICD's performance of specified design and

7　engineering services. Defs' Ex. B (Agreement) at 3-8.

8　　　　11.　　For example, the Agreement's Scope of Work includes the following work phase and

9　tasks to be performed by ICD:

10　　　　　　**4.　　Engineered structure designs ready for construction**
11　　　　　　- Meet with OWNER to finalize structure layout and details sufficient enough
　　　　　　　to ***design and engineer drawings*** for building permits and review and
12　　　　　　　approval of OWNER.
13　　　　　　- After review and approval of drawings by the OWNER and the building
　　　　　　　authority make any necessary modifications and ***make drawings ready for
14　　　　　　　construction***.

15　Defs' Ex. B (Agreement) at 4 (emphasis added).

16　　　　12.　　The Agreement's Scope of Work includes the following work phase and tasks to be

17　performed by ICD:

18　　　　　　**5.　　Engineered site design ready for construction**
19　　　　　　- Meet with OWNER to ***finalize the site design***, and layout of all structures,
　　　　　　　facilities, and infrastructure to be placed on the site so that final grading can
20　　　　　　　be designed for the site.
　　　　　　- After site is designed meet with OWNER and ODA [Oregon Department of
21　　　　　　　Agriculture] to get approval of the final design.
22　　　　　　- ***Make drawings ready for construction***.

23　Defs' Ex. B (Agreement) at 4 (emphasis added).

24　　　　13.　　The Agreement's Scope of Work includes the following work phase and tasks to be

25　performed by ICD:

26　　　　　　**7.　　Design and engineer underground infrastructure**
27　　　　　　- Meet with OWNER and service providers to determine appropriate routes
　　　　　　　for all underground infrastructure. Underground infrastructure to include

28

but are not limited to electrical, water, communication, drain, effluent and sanitary sewer lines.

- After determining routes to be taken ICD will ***oversee the design & engineering of all conduit cable and pipe*** to insure [sic] that they will appropriately handle the demand and loads required.

　　　　　*　　　*　　　*

- After review and approval of drawings by the service providers, OWNER and permitting agencies, make any necessary modifications and ***make drawings ready for construction***.

Defs' Ex. B (Agreement) at 5 (emphasis added).

14. The Agreement's Scope of Work includes the following work phase and tasks to be performed by ICD:

**9.     Engineered lagoon design ready for construction**

- Meet with OWNER, to determine final design of lagoon system.
- ***Oversee lagoon design and engineering*** to insure [sic] proper design.

　　　　　*　　　*　　　*

- After review and approval of drawings by the OWNER and permitting agencies, make any necessary modifications and ***make drawings ready for construction***.

Defs' Ex. B (Agreement) at 5 (emphasis added).

15. The Agreement's Scope of Work includes the following work phase and tasks to be performed by ICD:

**11.     Engineered open lot replacement facility design ready for construction**

- Meet with OWNER to finalize facility layout and details sufficient enough to ***design and engineer drawings*** for review and approval by OWNER and ODA [Oregon Department of Agriculture].
- After review and approval of drawings by the OWNER and ODA make any necessary modifications and ***make drawings ready for construction***.

Defs' Ex. B (Agreement) at 6 (emphasis added).

16. The Agreement's Scope of Work includes the following work phase and tasks to be performed by ICD:

**17.     Engineered milking facility design ready for construction**

- Meet with OWNER and permitting authorities to finalize milking facility layout and details, sufficient enough to ***design and engineer drawings*** for review and approval by OWNER and permitting authorities.

- After review and approval of drawing by OWNER and permitting authorities make any final necessary modifications and ***make drawings ready for construction***.

Def's Ex. B (Agreement) at 7 (emphasis added).

17.    The Agreement's Scope of Work includes the following work phase and tasks to be performed by ICD:

**19.    Engineered freestall cow housing facilities design ready for construction**

- Meet with OWNER and permitting authorities to finalize freestall cow housing facilities layout and details, sufficient enough to ***design and engineer drawings*** for review and approval by OWNER and permitting authorities.
- After review and approval of drawings by the OWNER and permitting authorities make any necessary modifications and ***make drawings ready for construction***.

Defs' Ex. B (Agreement) at 8 (emphasis added).

18.    The Agreement's Scope of Work includes the following work phase and tasks to be performed by ICD:

**21.    Design and engineer concrete construction**

- ***Design and engineer all types of concrete construction for the project***. This is to include all slab on grade, poured in place walls, footings, and any other type of concrete construction to be used on the project.
- After review and approval of drawings by the OWNER and permitting authorities make and necessary modifications and ***make drawings ready for construction***.

Defs' Ex. B (Agreement) at 8 (emphasis added).

19.    The Agreement's Scope of Work contains additional work phases and tasks to be performed by ICD that obligated ICD to perform specified design and engineering services. *See*, *e.g.*, Defs' Ex. B (Agreement) at 6, ¶ 13 ("**Engineered calf facility design ready for construction**"); *id.* at 7, ¶ 15 ("**Engineered commodity storage and processing facility design ready for construction**").

20.    As to its timing and duration, the Agreement provides that "[t]he design, engineering and project management services work will begin immediately upon approval of this Agreement," and that "[t]he schedule for the Scope of Work is understood to begin immediately upon approval, and to be in

47

effect through the completion of the design, engineering, construction, commissioning and into actual facilities operation, as needed." Defs' Ex. B (Agreement) at 9.

21. Regarding payment, the Agreement provides the following: "**DESIGN, ENGINEERING AND PROJECT MANAGEMENT SERVICES**: For the service provided by ICD under the Scope of Work, OWNER shall compensate ICD in accordance with ICD's standard hourly rate schedule attached herein, plus expenses." Defs' Ex. B (Agreement) at 12, § 5.01(A); *see also id.* at 2 ("It is … understood by the OWNER and ICD that all services provided by ICD for this project will be on a Time and Materials basis, based on the fee schedule plus expenses attached herein.").

22. Immediately before the signature page, the Agreement has a section titled "Service Fee Schedule 2015 Design, Engineer and Project Management Services." Defs' Ex. B (Agreement) at 14.

23. The Service Fee Schedule includes the per hour rates for the following IRZ personnel: "Senior Engineer (PE)," "Senior Hydrologist," and "Project Engineer." Defs' Ex. B (Agreement) at 14.

24. As noted above, the Design, Engineer, and Project Management Services Agreement identifies ICD as the "**Project Manager**." *See* Defs' Ex. B (Agreement) at 2 ("This project will be undertaken under the supervision and control of ICD as **Project Manager**.").

25. Earlier drafts of the Agreement proposed that ICD would serve as the "General Contractor" for the project. *See* Pl.'s Ex. 2 at 1; Pl.'s Ex. 3 at 1; *see also* Pl.'s Ex. 1 (Downey Rule 30(b)(6) Dep.) at 36:11-38:15; 47:5-49:10.

26. These drafts provided that the Debtor was retaining ICD "to perform design, engineer, project management, and general contracting services, in connection with the design, engineering, and construction of the Willow Creek Dairy Construction Project as described in the enclosed Scope of Work ('Assignment')." Pl.'s Ex. 2 at 9; Pl.'s Ex. 3 at 9.

27. All drafts of the Design, Engineer, and Project Management Services Agreement, including those proposing that ICD would serve as the "General Contractor," provided that IRZ (through ICD) would provide "design," "engineer," and "project management" services "in connection with the design, engineering, and construction of The Willow Creek Dairy Construction Project as described in

1   the enclosed Scope of Work ('Assignment')." Pl.'s Ex. 2 at 9; Pl.'s Ex. 3 at 9; Pl.'s Ex. 4 at 9; Pl.'s Ex.

2   5 at 10.

3       28.    All drafts of the Design, Engineer, and Project Management Services Agreement,

4   including those providing that ICD would serve as the "General Contractor," included a Scope of Work

5   providing that ICD would "oversee the design and engineering" of the project, including "to insure [sic]

6   that all objectives of the project are met in the final and complete design." Pl.'s Ex. 2 at 2; Pl.'s Ex. 3

7   at 2; Pl.'s Ex. 4 at 2; Pl.'s Ex. 5 at 2; *see also* Pl.'s Ex. 1 (Downey Rule 30(b)(6) Dep.) at 39:1-19, 48:14-

8   49:10, 58:22-60:5, 61:25-63:6, 64:18-66:10.

9       29.    All drafts of the Design, Engineer, and Project Management Services Agreement,

10   including those providing that ICD would serve as the "General Contractor," included a Scope of Work

11   listing twenty-one (21) phases of work to be performed by ICD, and identifying, for each, multiple

12   specific tasks to be performed by ICD. In each draft of the Agreement, the twenty-one (21) work phases

13   and associated tasks were virtually identical to the work phases and tasks included in the final, executed

14   Agreement. *See* Pl.'s Ex. 2 at 2-7; Pl.'s Ex. 3 at 2-7; Pl.'s Ex. 4 at 2-7; Pl.'s Ex. 5 at 2-8; *see also* Pl.'s

15   Ex. 1 (Downey Rule 30(b)(6) Dep.) at 41:9-42:2, 50:23-51:9, 60:6-11, 63:7-15, 64:18-65:5, 66:11-67:1.

16       30.    All drafts of the Design, Engineer, and Project Management Services Agreement were

17   drafted by IRZ. *See* Pl.'s Ex. 1 (Downey Rule 30(b)(6) Dep.) at 37:4-8, 38:1-8, 43:6-14, 45:20-25.

18       31.    In the "Project Objective" section of the last draft of the Agreement that identified IRZ

19   as "General Contractor," the document provides the following:

20       [IRZ] will act … on behalf of the OWNER and will oversee all tasks associated with the
       project. These tasks may include but are not limited to … [i]nsure [sic] that the project is
21       constructed to the quality and standards set forth by the industry. [IRZ] will assist the
       OWNER in achieving this goal ***by completing a series of design and construction tasks***
22       ***in phases.***

23   Pl.'s Ex. 3 at 1 (emphasis added).

24       32.    In each subsequent draft in the record, including the final, executed Agreement (which

25   all identify ICD as "Project Manager"), the last sentence in the portion quoted was amended to read:

26   "[IRZ] will assist the OWNER in achieving this goal by completing a series of design ***and engineering***

27

28

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

*tasks*, as well as assisting OWNER in overseeing construction tasks, in phases." Defs' Ex. B at 1 (emphasis added); Pl.'s Ex. 4 at 1; Pl.'s Ex. 5 at 1.

33. The final, executed Agreement assigns no design or engineering tasks to the General Contractor. *See* Defs' Ex. B (Agreement) at 10-11, Article 2 (Owner's Responsibilities).

34. IRZ did not design or engineer any aspect of the project's massive concrete construction, which included, among other things, the floors of the "freestall" barns and milking facilities, the catch basins (or troughs) at the ends of each barn, and the dairy's multiple sand lanes. *See* Pl.'s Ex. 1 at 92:20-96:2; 107:15-23; 119:9-121:8.

35. IRZ did not design or engineer any drawings ready for construction with respect to ***any*** of the work phases identified in the Agreement's Statement of Work. *See*, *e.g.*, Pl.'s Ex. 1 at 78:22-79:22, 81:15-25, 91:24-92:10, 95:13-96:2, 115:2-7, 118:4-12, 119:9-120:9.

36. The poorly designed barn floors, the poorly designed catch basins (or troughs), and the poorly designed sand lanes caused daily permit violations at the dairy and substantially contributed to the ultimate failure of the dairy's waste management system. *See* Pl.'s Ex. 6 (Excerpts of transcript of the Deposition of Joel Edmonds, May 31, 2024) at 22:4-13; 22:21-23:20; 40:1-4; 46:11-23; 47:9-50:13; 51:17-52:9; 61:9-10; 61:18-24; 74:5-20; 75:1-76:16; 77:7-9; 77:17-78:13.

37. IRZ did not review any engineering work that Fazio Engineering may have performed regarding the dairy's lagoon system. Pl.'s Ex. 1 at 114:19-20.

38. Although IRZ did have engineers on staff at the time that IRZ executed the Contract, none of IRZ's engineers worked in IRZ's Construction Division (ICD), and no engineers from IRZ were assigned to the team that worked on the project. Pl.'s Ex. 1 (Downey Rule 30(b)(6) Dep.) at 35:19-36:3, 80:3-81:14.

39. The management of Lindsay and IRZ had decided to keep IRZ's Construction Division (ICD) separated from IRZ's engineering business. Pl.'s Ex. 1. (Downey Rule 30(b)(6) Dep.) at 28:6-29:7.

40.     IRZ did not hire any engineers to assist IRZ's Construction Division (ICD) in the performance of IRZ's duties under the Contract.  Pl.'s Ex. 1 (Downey Rule 30(b)(6) Dep.) at 132:24-133:3, 134:24-135:2.

41.     IRZ did not hire any subject matter experts to assist IRZ's Construction Division (ICD) in the performance of IRZ's duties under the Contract.  Pl.'s Ex. 1 (Downey Rule 30(b)(6) Dep.) at 135:3-5.

42.     Prior to IRZ's entering into the Agreement, no one at IRZ had any experience designing a large commercial dairy.  Pl.'s Ex. 1 (Downey Rule 30(b)(6) Dep.) at 126:1-4.

43.     Prior to IRZ's entering into the Agreement, no one at IRZ had any experience designing waste management systems for large commercial dairies.  Pl.'s Ex. 1 (Downey Rule 30(b)(6) Dep.) at 126:5-7.

44.     Mr. te Velde paid IRZ over $1 million dollars for its services.  *See* Pl.'s Ex. 7 (Ziari Rule 30(b)(6) Dep.) at 10:23-13:2.

45.     IRZ is a "design engineering company."  Pl.'s Ex. 8 (Excerpts of transcript of the deposition of Fred Ziari, Apr. 26, 2023) (hereinafter "Ziari Dep.") at 46:13-14.

46.     Under each work phase in the Agreement's Scope of Work that included design and engineering tasks, IRZ also agreed to "[p]repare bid package and review with OWNER," "[s]ubmit bid package to contractors for bid," and "[m]eet with OWNER to review bids and select contractor" for the particular construction and/or installation projects associated with the work phase.  Defs' Ex. B (Agreement) at 4-8, ¶¶ 4, 5, 7, 9, 11, 13, 15, 17, 19, 21.

47.     There is no evidence, however, that IRZ ever prepared a single bid package for a single subcontractor, that IRZ ever received any bids submitted by potential subcontractors, or that IRZ ever met with Mr. te Velde to review bids and to help select subcontractors for the project.  *See* Pl.'s Ex. 1 (Downey Rule 30(b)(6) Dep.) at 78:4-21.

48.     IRZ also agreed to oversee the subcontractors, provide control, and provide QA/QC during construction and/or installation.  *See* Defs' Ex. B (Agreement) at 4-8, ¶¶ 6, 8, 10, 12, 14, 16, 18, 20.

49.     IRZ's work on the project "fell below acceptable standards."  Pl.'s Ex. 9 (Expert Report of Jesse D. Frederick, July 2024) at 4.

50.     Fred Ziari, IRZ's founder and CEO who signed the Work Order and the Design, Engineer, and Project Management Services Agreement, did not have any discussions with the Debtor about any of the terms of either contract before the Debtor executed them.  Pl.'s Ex. 8 (Ziari Dep.) at 45:7-13; 60:4-11.

51.     Wayne Downey, the IRZ employee who was the principal drafter of both contracts, never discussed the limitation of liability provision in the Design, Engineer, and Project Management Services Agreement with the Debtor before the Debtor signed the Agreement, and could not recall if he ever discussed the limitation of liability provision in the Work Order with the Debtor before the Debtor executed the Work Order.  Pl.'s Ex. 10 (Excerpts of transcript of the deposition of Wayne Downey, Apr. 18, 2023) (hereinafter "Downey Dep. Vol. I") at 59:13-60:18; 75:19-76:22.

52.     Mr. te Velde did not receive any form of discounts from IRZ for agreeing that IRZ's liability would be limited under the Work Order and the Agreement.  Pl.'s Ex. 10 (Downey Dep. Vol. I) at 59:13-60:18; 75:19-76:22.

53.     IRZ has produced in discovery 19 months of invoices addressed to Mr. te Velde's Willow Creek Dairy, totaling more than $990,000, on forms that have a graphically designed and trademarked logo identifying the issuer as "ICD IRZ Construction Division By Lindsay."  Pl.'s Ex. 11 (invoices).

54.     IRZ has produced in discovery e-mails sent by IRZ employees, including to Mr. te Velde, that bear the same branding.  Pl.'s Ex. 12 (sample e-mail).

55.     IRZ has produced in discovery drawings of Mr. te Velde's dairy site and of structures being constructed or installed there (none of which are engineered drawings ready for construction), that bear the same branding.  Pl.'s Ex. 13 (sample of CAD drawings).

56.     IRZ has produced in discovery correspondence from Wayne Downey at IRZ to Mr. te Velde bearing the same branding, including a letter advising Mr. te Velde that Mr. Downey had discussed Mr. te Velde's outstanding invoices with Lindsay's counsel.  Pl.'s Ex. 14 (sample of correspondence).

57.     Lindsay legal counsel reviewed the Design, Engineer, and Project Management Services Agreement before Mr. Ziari executed the Agreement for IRZ.  Pl.'s Ex. 8 (Ziari Dep.) at 60:17-61:15; Pl.'s Ex. 10 (Downey Dep. Vol. I) at 73:7-74:4.

58.     On August 27, 2021, Lindsay Sales Holding Co., LLC and IRZ Holding Company LLC entered into a Membership Interest Purchase Agreement, pursuant to which Lindsay Sales and Holding Co., LLC (identified in the Agreement as the "Seller") sold all of its ownership interests in IRZ Consulting, LLC (identified in the Agreement as the "Company") to IRZ Holding Company LLC (identified in the Agreement as the "Purchaser").  Pl.'s Ex. 15 (MIP Agreement).

59.     Mr. Ziari, as the corporate representative for both Lindsay and IRZ, testified that the Membership Interest Purchase Agreement is the agreement by which Mr. Ziari repurchased IRZ from Lindsay.  Pl.'s Ex. 7 (Ziari Rule 30(b)(6) Dep.") at 13:15-20, 15:2-9, 16:21-17:1

60.     In paragraph 4.3(h) ("<u>Willow Creek Litigation; Nasho Project Claim</u>"), the Membership Interest Purchase Agreement provides the following:

> Purchaser and Company acknowledge and agree that Seller shall have the right to manage, control, defend, litigate and settle both the Willow Creek Litigation and the Nasho Project Claim in its sole discretion, and Purchaser shall cooperate and cause Company and its employees and representatives to cooperate with respect to the Willow Creek Litigation and the Nasho Project Claim (at Seller's expense), and otherwise provide Seller with all reasonable access to the Company's books, records and personnel, as reasonably requested in connection with the Willow Creek Litigation and the Nasho Project Claim, and any related matters.  Notwithstanding any of the following, however, or any other part of this Agreement, Seller may not settle, compromise or discharge (including the consent to entry of any judgment) any claims related to the Willow Creek Litigation or the Nasho Project Claim without the Company's consent, unless the claimants against the Company agreed to release and discharge the Company and Purchaser of all liability as part of the settlement, compromise or judgment, and the Company and Purchaser owe no obligations and incur no losses or liabilities in connection with the settlement, compromise or judgment.

Pl.'s Ex. 15 (MIP Agreement) at 8, ¶ 4.3(h).

61.     The Membership Interest Purchase Agreement defines the term "Willow Creek Litigation" to mean "that certain case captioned *In re Gregory John te Velde (Randy Sugarman, Chapter 11 Trustee) v. IRZ Consulting, LLC* filed in the Eastern District of California, Fresno Division."  Pl.'s Ex. 15 (MIP Agreement) at 13, ¶ 7.1(m); *see* Pl.'s Ex. 7 (Ziari Rule 30(b)(6) Dep.) at 18:4-17.

62.    Mr. Ziari, as the corporate representative for both Lindsay and IRZ, testified that paragraph 4.3(h) of the Membership Interest Purchase Agreement gives Lindsay the right to manage and control the defense of this case on behalf of both Lindsay and IRZ.  Pl.'s Ex. 7 (Ziari Rule 30(b)(6) Dep.) at 20:4-25.

63.    Mr. Ziari, as the corporate representative for both Lindsay and IRZ, testified that Lindsay is, in fact, managing and controlling the defense of this case on behalf of both Lindsay and IRZ.  Pl.'s Ex. 7 (Ziari Rule 30(b)(6) Dep.) at 21:1-2.

64.    In paragraph 5.1(c) ("**Indemnification by Seller**"), the Membership Interest Purchase Agreement provides the following:

> Seller shall indemnify, defend and hold harmless the Purchaser, and, if applicable, the Purchaser's, owners, affiliates (including the Company after the Closing), lenders, attorneys, accountants, agents and employees and their heirs, successors and assigns (collectively, the 'Purchaser Indemnified Parties' …) from, against and in respect and to the extent of any Losses imposed on, sustained, incurred or suffered by any of the Purchaser Indemnified Parties, relating to or arising out of … (iii) the Willow Creek Litigation.

Pl.'s Ex. 15 (MIP Agreement) at 9, ¶ 5.1(c).

65.    Mr. Ziari, as the corporate representative for both Lindsay and IRZ, testified that paragraph 5.1(c) of the Membership Interest Purchase Agreement obligates Lindsay to indemnify IRZ for any losses arising out of this litigation.  Pl.'s Ex. 7 (Ziari Rule 30(b)(6) Dep.) at 20:4-22:2.

66.    Mr. Ziari, as he corporate representative for both Lindsay and IRZ, testified that neither party has breached the Membership Interest Purchase Agreement, that Lindsay's indemnification obligations under paragraph 5.1(c) remain in full force and effect, and that there is no reason why Lindsay would not fulfill its indemnification obligations under paragraph 5.1(c).  Pl.'s Ex. 7 (Ziari Rule 30(b)(6) Dep.) at 22:3-24.

Dated: October 22, 2025

Respectfully submitted,

WANGER JONES HELSLEY PC

and

ZUCKERMAN SPAEDER LLP

/s/ Kurt F. Vote

By: _____
    Kurt F. Vote
    Attorneys for Plaintiff
    Randy Sugarman, Liquidating Trustee

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT